# 21-02901cv

To Be Argued By:
Torrey Terrial Townsend

# United States Court of Appeals

## for the

## Second Circuit

---

### TORREY TERRIAL TOWNSEND
Plaintiffs-Appellants

V.

### FIRST STUDENT
Defendant-Appellee
### CSEA SEIU Local 2001
Defendant-Appellee

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE**

**DISTRICT OF CONNECTICUT**
**3:18-cv-01684**

===========================================================

**BRIEF FOR THE APPELLANT TORREY TERRIAL TOWNSEND**

===========================================================

Torrey Terrial Townsend ( Pro-Se )
39 Orchard Place NewHaven, Connecticut
Email: Torrey.Townsend@yahoo.com
Telephone Number: 860-835-3710

1

## TABLE OF CONTENTS

Table of Contents……………………………………………………... Pg. 2-3

Table of Authorities…………………………………………………Pg. 4.

Statutes & Rules…………………………………………………….Pg. 5

Statement of Jurisdiction and Appellate Jurisdiction.....................................Pg. 6

I.    Statement of the Issues Presented for Review . ..................................Pg. 7

II.   Statement of the Case ........................................................................Pg. 7-9

III.  Statement of Facts............................................................................Pg. 9-11

IV.   Summary of the Argument……………………………………… Pg. 12-13

V.    Argument……………………………………………………………Pg.14

   A.  THE DISTRICT COURT ERR WHEN NOT CONSIDERING THE DVIR
       SHEET IS A STATUTORY REGULATION REQUIREMENT; V ZONAR
       IS NOT WITHIN COMPLIANCE WITH FEDERAL OR STATE LAW

       1.  Zonar v. Daily Vehicle inspection sheet ( DVIR)....................Pg.14-16

   B.  THE DISTRICT COURT ERR WHEN NOT FINDING FED.RULE
       56c(1)(A)(B), THAT THE DEFENDANT DID NOT MEET THE
       STANDARDS OF 56e(2), DVIR SHEET IS REQUIRED BY LAW AND
       THE TERMINATION IS BASED UPON NOT DOING DAILY
       INSPECTION.

       2.  Termination………………………………………………..Pg.16-33

2

C. THE DISTRICT COURT ERR WHEN NOT FINDING THE PLAINTIFF
DEPOSITION TESTIMONY "He targeted me, and I think he targeted me
based on my race and based on retaliation of the police report."

3. Title VII and ;Retaliation.........................................Pg.33-44

D. THE DISTRICT COURT ERR WHEN NOT FINDING THE UNION
CONTRACT AND THE NATIONAL EMPLOYEE HANDBOOK IS A
LEGAL AGREEMENT THAT IS ENFORCEABLE.

4. Title VII 1981 Claims...................................................Pg.44-49

Conclusion...........................................................................Pg.49

Certification of Compliance...................................................Pg.50

Antivirus Certification form..................................................Pg.51

Certification of Service.........................................................Pg.52

Addendum...........................................................................Pg.53

Table of Contents...........................................................Add.Pg.54

Anderson v. Liberty Lobby, Inc..........................................Add.Pg.55-71

Barrentine v. Arkansas-Best Freight System, Inc.........................Add.Pg.72-75

Liles v. Rock Farms of Ark.,LLC.........................................Add.Pg. 76-77

Charlton. v. Republic Services of Florida, Limited Partnership et a,.lAdd..Pg.78-85

Doolv.LibertyMut. Ins. Co.....................................Add.Pg-86-101

Moren v. Progress Energy, Inc.,................................................Add.Pg. 102-109

## TABLE OF AUTHORITIES

Anderson v. Liberty Lobby, Inc. - 477 U.S. 242, 106 S. Ct. 2505
(1986)......................................................................................**Cited.Pg 24**

Barrentine v. Arkansas-Best Freight System, Inc., 750 F.2d 47, 50 (8th Cir.
1984)..................................................................................... **Cited.Pg 17**

Liles v. Rock Farms of Ark., LLC, No. 4:15-cv-469-DPM (E.D. Ark. Feb. 24,
2017).....................................................................................**CitedPg 15,16,17,20**

Charlton v. Republic Services of Florida, Limited Partnership et al, No.

1:2009cv22506 - Document 28 (S.D. Fla. 2010)....................**Cited.Pg 35**

Moren v. Progress Energy, Inc., Case No.: 8:07-cv-1676-T-17 (M.D. Fla. Aug. 7,

2008)........................................................................................**Cited.Pg. 34,40**

Dooley v.LibertyMut. Ins. Co., 307 F. Supp. 2d 234 (D. Mass. 2004)...**Cited.Pg 17.**

## STATUTES

28 U.S.C. § 1367 ..................................................................................Pg.6

28 U.S.C. §1341..................................................................................Pg.6

28 U.S.C. § 1331 and 1343(a)(4)..........................................................Pg.6

TitleVII 1981 Claims……………………………………………Pg.44-49

Administrative Procedure Act (APA), Pub.L. 79–404………….Pg.23-24

Notice of Proposed Rulemaking (NPRM)....................................Pg..23-24

Motor Carrier Safety Improvement Act of 1999………………..Pg.23-24

## RULES

Fed. R. App. P. 4..........................................................Pg.6 Appendix Pg 4

Fed.Rules Civ.Proc. Rule 56a(c). 28 U.S.C.A………………….Pg.16-32
Fed.Rules Civ.Proc. Rule 50(e)2. 28 U.S.C……………………..Pg.16-32

5

## STATEMENT OF JURISDICTION

This is an appeal from an October 14, 2021 summary judgment case in the District of Connecticut (Judge Vanessa L. Bryant). Judgement entered on October 14, 2021 district court had 3 subject matter jurisdiction over this federal civil case, the court has original Jurisdiction of Plaintiff 42 U.S.C.§ 1981claim pursuant to 28 U.S.C. § 3231 and 1343 (a)(4). The Court has original jurisdiction of Plaintiffs Title VII claims pursuant to the aforesaid provisions, as well as through 42 U.S.C. § 2000e, et, seq. This Court has supplemental jurisdiction of the Plaintiffs Connecticut Constitutional claims and her CLRA claim pursuant to 28 U.S.C. § 1367, as amended The Plaintiff filed a timely notice of appeal under Fed. R. App. P. 4(b) on November 22, 2021.104.; Subsequently opening the Second Circuit App. case on November 23, 2021 This Court has jurisdiction over the defendant's appeal of pursuant to summary Judgment in accordance to Fed. Rule Civ.Price. Rule 56

6

## I. STATEMENT OF THE ISSUES

Whether the District Court Properly Granted Defendant-Appellant, First Student

Motion For Summary Judgment?

## II. STATEMENT OF THE CASE

This court should reverse the judgment and remand back to District Court. This

case is an employment case that Involves First Student and CSEA SEIU Local

2001 union contract, State and Federal Laws, the Plaintiff was terminated from her

employment within her community base on a Alleged complaint By the City of

New Haven Board Of Education official of a horn honking, and Making a police

report, The defendants First Student's Senior Location Manager claim he received

a call for a public Official for the City of New Haven Board of Education, The

Plaintiff was also accused of not doing pre trip, coming to the school late, On

October 25, 2017, which on that morning the plaintiff reported her seat was wet

and asked for permission to go home to change her pants. I still worked in

unwavering conditions by using a blanket for my house to sit on and completed my

job. Plaintiff filed the present lawsuit against Defendant First Student on October

Case 3:18-cv-01684-VLB Document 87 Filed 03/08/21 Page 7 of 31 8 10, 2018

and alleged two causes of action in violation of Title VII. (Document 1) Subsequently, Plaintiff filed an Amended Complaint on November 8, 2018 against First Student and Defendant CSEA SEIU Local 2001, alleging violations of Title VII, 42 U.S.C. § 1983, 42 U.S.C. § 1981, 42 U.S.C. § 1985, the Fourteenth Amendment to the United StatesConstitution, the Fifth Amendment to the United States Constitution, an ordinance of the City of New Haven and Connecticut General Statutes Chapter 561. When plaintiff filed her complaint on October 10, 2018, she simultaneously filed a request to proceed in forma pauperis. (Document 1) Her request was referred to Magistrate Judge Richardson, who recommended dismissal of all claims alleged under 42 U.S.C. §1983, 42 U.S.C. §1985(3) and 42 U.S.C. §1981. Although Plaintiff's Motion to Proceed in forma pauperis was granted on April 11, 2019 (Document 15), she did not serve the complaint on the Defendants until July 19, 2019. (Documents 22 and 23).During a December 18, 2019 discovery status conference with the Court, Bryant, J., it became clear—based on the Court's questions—that Plaintiff lacked knowledge regarding the substance of her claims. Thus, the Courtadministratively dismissed the case and issued the following order:by 4/16/2020, the Court will entertain a motion to dismiss for failure to proceed. Document 40. On March 18, 2020, Attorney Charles Eggert filed an appearance for Plaintiff and then filed an Amended Complaint alleging the following causes of action against First Student: (1) Discrimination in

8

violation of 1981; (2) Violation of Title VII; (3) Violation of Conn. Gen. Stat. § 31-51m; (4) Violation of Fifth Amendment right to due process; (5) Violation of the Equal Protection Clause of the Fourteenth Amendment; and (6) Violation of Conn. Gen. Stat. § 31-51q. (Document 41) Plaintiff also alleged several causes of action against the Union of which she was a member, CSEA SEIU Local 2001 ("the Union"). Subsequently, on April 3, 2020, Plaintiff filed a Motion to Open Administrative Dismissal (Document 44) The Court granted her Motion to Open over Defendants' objections. On June 8, 2020, Plaintiff filed a Revised Complaint (Document 40), which is virtually identical to the Amended Complaint filed on March 23, 2020. On July 22, 2020, the Union filed a Motion to Dismiss the entire complaint, and on July 23, 2020, First Student filed a Motion to Dismiss Counts Four, Five and Six of the Revised Complaint, both of which were granted on November 17, 2020. (Document Number 76, )The matter before the court is the Motion for summary Judgment, which was granted and decided on October 14, 2021

## III.   STATEMENT OF THE FACTS

"The use of ZONAR by First Student is in direct contravention of the DVIR requirement under C.G.S. § 14-275c-41 and 49 CFR 396.11 ("49 CFR"),

Deposition of Paul Demaio can be found **Document 88 Filed Page 45 of 120** "On October 25, 2017, the Transportation Director for the City of New Haven, Teddy

9

Barros, called First Student to relay a complaint that had come in from Sheridan School in New Haven. DeMaio Tr., p. 63. The school had complained about a driver who was late to arrive at the school, was aggressively honking the horn outside of the school and was very rude to one of the school's security guards. Id. p. 58; See also Exhibit A. Based on the bus number that the school disclosed, as well as the timing of the driver's arrival, First Student concluded the bus was driven by Plaintiff and pulled the videotape from the bus driven by Plaintiff from that day in order to investigate the complaint. DeMaio Tr., p. 58.`"Code of Federal Regulations, 49 CFR 396.11 ("49 CFR") likewise requires the DVIR, signed by the driver, from the previous day's operation to be carried on each bus which the driver must sign each day."**Document 42  Page 7 of 31** Deposition of Paul Demaio can be found **Document 88  Filed  Page 45 of 120,**"First Student deleted reports made by Plaintiff through ZONAR for requested repairs for Plaintiffs bus, as well as the reported repairs made thereto." **Document 42 Filed Page 8 of 31,**"Plaintiff completed her pre-trip inspection, using a DVIR Inspection sheet, as required by C.G.S. §§ 14-275c-41 and 276a-4 "Deposition of Paul Demaio" can be found Case **Document 88 Filed 03/08/21 Page 45 of 120** and see Plaintiff's **competed DVIR for 10/25/2017 Case 3:18-cv-01684-VLB Document 1-1 Filed 10/10/18 Page 9 of 42** "The Plaintiff is required to keep the Driver's Vehicle Inspection Report ("DVIR") on her bus at all times pursuant to C.G.S. § 14-275c-41 in order to allow

a Department of Transportation inspector ( or other designated official) to review said DVIR records. The statute provides in pertinent part: "All ... (DVIRs) shall remain and be kept on file by the carrier for six ( 6) months. They shall be made available for inspection at any time by any driver of the carrier. A copy of the DVIR from the previous day's operation for each vehicle shall be carried in such vehicle," and signed by the driver and mechanic". **Document** 42 **Filed Page 7 of 31"When Plaintiff arrived home, she saw a police car in the substation parking lot behind her home. Plaintiff made a police report with Officer Dash concerning the wet seat claiming it was done to harass and intimidate her.**"According to the Defendants evidence in Dk(88 )on **Page 120 of 120** the defendants showed the Employee Handbook Acknowledgment Page of the employee's handbook, which was signed by the plaintiff, **If the terms and conditions of my employment are covered by a Collective Bargaíning Agreement any term or condition contained in the Collective Bargaining Agreement supersedes the terms and conditions contained in this Employee Handbook, ln the event that they conflict"** The Collective Bargaining Agreement between First Student and CSEA SEIU Local 2001 union contract Article 19 it states "The Company shall not initiate or instigate employee removal or customer complaints with the district" **Document** 95 **Filed Page 149 of177**

11

## IV.  SUMMARY OF THE ARGUMENT

The plaintiff argues there are many genuine material facts that was not considered within the Defendants Motion for summary Judgment, The plaintiff was not terminated by First Student because of airbrake training, morning only schedule request or me being racially attacked by a co-worker Theses issues were apart of many issues of unfair treatment and decision making made by management towards the Plaintiff, because of my skin color, my race, Making a police report the morning, and doing pre-trip according to law which is a statutorily protected activity right on October 25, 2017 and being a member of CSEA SEIU Local 2001 which the contract between first student and CSEA SEIU was broadly overlooked and disregarded according with Plaintiff's opposition to the defendant Motion for summary Judgment( Document 95 )pg 148, 149 of 177 . I was not able to enforce any of the union contracts I was a part of. The revised complaint( Document 50), Memorandum in Opposition re 86 MOTION for Summary Judgment (Document 94) and Statement of Facts in Opposition re 86 MOTION for Summary Judgment (Document 95 ) is voluminous; the pipeline of the Plaintiff argument is focused on the termination letter, email sent by First Student's Assistant Manager Vasil Chíacu

12

addressed to Andrew Joppa and ccPaul Demaio all three men were apart of my termination according with the defendant's evidences; within the termination letter and email there are genuine Facts that points to Sr. Location Manager Paul Demaio lying on the termination letter. The Plaintiff will also show how retaliation was the main factor in this termination, reasonably the Alleged complaint was stated to have been made by the Board of Education according to the email sent by Assistant Location Manager Vasil Chiacu, the information places the Plaintiff directly in Article 19 of the Union Contract it states "The Company shall not initiate or instigate employee removal or customer complaints with the district" and Employee Handbook Acknowledgment which was sign by me, Stating " If the terms and conditions of my employment are covered by a Collective Bargaíning Agreement any term or condition contained in the Collective Bargaining Agreement supersedes the terms and conditions contained in this Employee Handbook, ln the event that they conflict"

13

## V.  ARGUMENT

A. THE DISTRICT COURT ERR WHEN NOT CONSIDERING THE DVIR
SHEET IS A STATUTORY REGULATION REQUIREMENT; V ZONAR IS
NOT WITHIN COMPLIANCE WITH FEDERAL OR STATE LAWS

**1.**  ZONAR vs. DVIR (Daily Vehicle Inspection sheet)

**ZONAR** is an Electronic Verified Inspection Reporting (EVIR®) that is not
regulated or approved  by the Federal Motor Carriers Safety Administration
according to Federal Regulation 49 CFR 396.11 ("49 CFR"). The Zonar allows
First Student to have Electronic record keeping with options to
automatically delete dated records, these actions are without the driver or
mechanics signature, there is also no way for a driver to verify if another
driver did per-trip or post-trip the day before; First Student would be the
principal controller of all daily inspection taking the communication out of
the driver and mechanics control; the verification that the driver or
mechanic did the inspection is compromised because a signature is not
apart of Zonars's function and Zonar is not a written report. The State of
Connecticut Laws according to C.G.S. § 14-275c-41 requires a written report
and a driver's signature. Zonar has GPS Functions which is a requirement
by the City of New Haven Contract with First Student;  the daily inspection

14

is a requirement by Federal and State Law for a Commercial Driver to perform. The Daily inspection has to be verified by the driver and mechanic at the end of each day by law.

**2. DVIR( Daily Vehicle Inspection Sheet ) is a** Federal regulation requiring all paper Daily inspection reports to be signed by the driver of a Commercial Motor Vehicle, the inspection report is given to the heavy Diesel mechanic to complete any defects reported by the driver, day's-end inspection would allow for repairs, based on any reported problems, before the truck went back on the road. 49 C.F.R. § 396.11(a)(3). But if no problems were found, the driver could begin the next workday without another comprehensive inspection, as long as he was "satisfied that the motor vehicle [was] in safe operating condition." 49 C.F.R. § 396.13(a). Part of making this decision was reviewing the last inspection report. And if that report noted defects or deficiencies, then the driver had to sign it—to confirm review and that complete repairs had been done. 49 C.F.R. § 396.13(b) & (c). The regulations don't require two full-dress inspections. Compare the specifics mandated by § 396.11(a)(1) (inspect service brakes, parking brake', steering mechanism, lighting devices and reflectors, tires, horn, windshield wipers, rear vision mirrors, coupling devices, wheels and rims, and emergency equipment) with § 396.13(a)'s general mandate (driver must be satisfied that commercial vehicles is in safe operating condition).

15

If a thorough inspection had been done the night before, a quick confirming look in the morning would suffice. As the title of § 396.13—"Driver Inspection"— As applied to our facts, these regulations require one thorough daily inspection. They contemplate this event happening at the end of a day's work. 49 C.F.R. § 396.11(a)(1). They also contemplate a written report. See Liles v. Rock Farms of Ark., LLC, No. 4:15-cv-469-DPM (E.D. Ark. Feb. 24, 201..hbbh)

B. THE DISTRICT COURT ERR WHEN NOT FINDING FED.RULE 56c(1)(A)(B), THAT THE DEFENDANT DID NOT MEET THE STANDARDS OF 56e(2), DVIR SHEET IS REQUIRED BY LAW AND THE TERMINATION IS BASED UPON NOT DOING DAILY INSPECTION.

## 2. Termination

The Defendant/Appellant First Student's Assistant manager Vasil Chicau provided an email addressed to Andrew Joppa and cc Paul Demaio stating " yesterday the "board of Ed" asked us to review a video." Based on the Video he was able to provide some of the dialogue when drafting the email, between me and dispatch (flex) and the New Haven Police Officer Dash.

The Plaintiff argues the early morning of October 25, 2017 she started performing per-trip, when she sat in the seat the chair was soaking wet, according to The Memorandum of Decision Document 98 Filed 10/14/21 (Page 10 of 25) gives a very small Highlights of Sec. 14-275c-41 in the footnotes. The State of

16

Connecticut regulations Sec. 14-275c-41(c). Driver's vehicle inspection report (DVIR It state's

**( c) "The DVIR shall also require the driver to list and identify problems with respect to other components, systems, or aspects of vehicle on-road performance that in the judgment of the driver comprise a defect or deficiency of the type referred to in subsection (a) of this section."** Document 95 Filed Page 144 of 177.**see App. Pg 83**)**,** see, Liles v. Rock Farms of Ark., LLC. "One thorough daily inspection was required by law, so it was a principal activity 49 C.F.R§ 396.11 & § 396.13; Barentine v Arkansas- Best Freight System.Inc, 750 F.2d 47, 50 (8th Cir. 1894).And, in this case , the morning inspection started the drivers' continuous workday. IBP, Inc. v alvarez, 546 U.S. 21,28-30 (2005); Dooley v Liberty Mutual Insurance Co., 307 F. Supp. 2d 234, 242-49 (D.Mass.2004)." The Plaintiff reported the wet seat, which is a component of the school bus, to dispatch, according to the email sent by First Student's Assistant Manager Vasil Chíacu addressed to Andrew Joppa and cc Paul Demaio. at "6:57 driver call base and says someone intentionally poured water on the driver's seat and in other parts of the bus." According to the defendant's First Student Local Rule 56(a)(1) Statement; evidence The National Employee's Handbook which was signed by the Plaintiff on page 120 of 120 in Dk(88 ),on pg. 74 of 120 Number 12( **see App. Ex Pg.96** )of Dk(88 it States, "**It is**

17

**important that drivers also look for objects inside or that may have been placed there by unknown persons with the intent to create harm and damage.**" The National Empoyee's Handbook and State of Connecticut regulations Sec. 14-275c-41(c). Driver's vehicle inspection reports (DVIR) are requiring the Drivers to check or stay vigilant for any other hazards and problems with the bus, State of Connecticut regulations Sec. 14-275c-41(d). States, **(d) Whenever a DVIR submitted to the carrier indicates a defect or deficiency, the carrier shall immediately inspect or cause to be inspected the relevant component or system of the vehicle, prior to any further highway operation. If the carrier determines the DVIR to be accurate it shall proceed immediately to make the necessary repairs, adjustments or replacements. If, after inspection, the carrier is unable to confirm the existence of the defect or deficiency, it shall inform the driver. In either case the carrier shall make note of its inspection, findings and repairs, if any, on the DVIR.** The plaintiff did report the defect, by dispatching base for immediate assistants with the defect, nothing was done, a mechanic was not called to the bus nor was I switched out of the bus to a different bus, that was the only defect I found on bus 979 which was reported to the dispatch via the radio, and a DVIR report was done. **(see App. ExPg 73.)** The email further indicates at 6:45 am that a pre-trip was not completed **"per zonar"** this statement does not say I did not complete or conduct my daily per-trip, it just

18

states" was not completed "per Zonar." According to the Judge Bryant's Memorandum of Decision Document 98 Filed 10/14/21 Page 12 of 25, States', Chicau indicates in the email that the video reveals that the driver failed to complete a pre-trip inspection of the bus before departing.7 [Def.'s Ex. F]. The Defendants Exhibit is an email that actually state's at 6:45 am that a pre-trip was not completed **"per zonar"** 6 Plaintiff objects to the admission of this fact and additional facts relating to the videotape evidence arguing that such statements are inadmissible because the tape was not produced in discovery. The Defendant's Exhibit F, is an email from Chicau to Andrew Joppa and cc Paul Demaio. The plaintiff objection to the Videotape, is proper, based on the fact it was not produced into evidence, the email was produced which is a secondary form of verification of record according to the video, the defendant First Student's Assistant Manager Vasil Chiacu was asked to review the video by Board of Education, he gives a timeline of events that accrued the Morning of October 26, 2017, which the termination was based off this email that video was review by Assistant Manager Vasil Chicau and Paul Demaio, according to the defendant's Document 88 Filed Page 49 of 120, Paul Demaio's Deposition States On page 56 and plaintiff entered page-57 on Page 49 of( Dk 88)

19

**By Mr. EGGERT**

**Q. Now, is it true that the plaintiff completed her per-trip that morning?**

**MS. MASTRONEY: Objection to the form.**

**THE WITNESS: I don't believe she did.**

**Q  You saying she did not?**

**A. My Understanding is that she didn't. I believe that the video that we looked at also confirmed it, But I didn't, I didn't review the video. I had my team review it, and it was also sent on to human resources**

**Q.  Are you saying you had no knowledge of viewing the video personally?**

**A.  I saw bits and pieces of it, and I was informed, and I also spoke to Torrey that next day and she admitted  that she didn't do a pre-trip.** See. Liles v. Rock Farms of Ark., LLC, " Liles. Casey, and Halley drove dump trucks for Rock Farms in Arkansas Limited Liability Company. They Hauled mostly sand gravel from the quarries to Rocks Farm's Customers; In this case all of the drivers wanted to be compensated for the per-trip and post-trip inspections done during the day, the court concluded ;As the courts said from the bench, the drivers' two inspections were really part of one whole, which might be more or less thorough in the morning or in the evening, depending on circumstances", Liles v. Rock Farms of Ark.. LLC. "In this case all of the drivers wanted to be compensated for the

20

per-trip and post-trip inspections done during the day, The Court concludes, though, that the whistle blew when each driver delivered his last load, not when he got home, (or to Wal-Mart in Halley's situation).The Plaintiff would like to note that her route did not start when she went home to change her pants, the court further explains; "Remember: The agreement to keep the trucks at the drivers' houses was for the drivers' convenience, too. When Rock Farms and Harrell suggested changing the drill to start and finish at the shop, Liles objected strongly, and the employers backed off. If that change had been made, the Portal-to-Portal Act's exclusion would cover all time traveling to and from the shop. Fairness to both sides therefore requires particular attention to the applicable federal regulations and what actually happened here." The plaintiff would like to bring rise to the Memorandum of Decision,Case 3:18-cv-01684-VLB Document 98 Filed 10/14/21 Page 10 of 25 the regulations were not consider in full just recited, without any regard to the facts of the email and compared with regulation, alongside the National Employee Handbook ,which was legally signed by me (**see App. Ex Pg.96**) which was apart of the defendants First Students, Case Document 88 Filed Page 64 of 120, the ending page was 85. The Memorandum of decision states starting on page 10, C. DVIR and ZONAR The third complaint Plaintiff made throughout her work experience with Defendant related to her objections with Defendant's use of a digital record keeping program called ZONAR. Plaintiff

21

alleged in her complaint that she made several complaints to Mr. DeMaio that Defendant was not complying with Federal and Connecticut law when it came to maintaining DVIRs.4 [Id. at ¶ 10]. Defendant uses Connecticut State Agencies section 14-275c-41 provides for the regulations of DVIRS and states in part: (a) Every carrier shall require its driver or each of its drivers, whichever is applicable, to prepare and submit to the carrier a written report, on a daily basis, with respect to each school bus or STV operated by said driver or drivers. The report shall identify the vehicle through a program called ZONAR, which is an electronic system through which vehicle inspections are conducted by Defendant's drivers. [Id. at ¶ 12]. Plaintiff believed— and shared this belief with Mr. DeMaio—that using ZONAR instead of a written DVIR violated the law. [Id. at ¶ 11]. Mr. DeMaio did not agree with Plaintiff's assessment and insisted that ZONAR was proper and in compliance with the legal and regulatory schemes. [Id.]. According to Defendant's Case Document 88 Filed Page 45 of 120 Paul Demaio Deposition, He was asked,

**Q. Now, this DVIR inspection report requirement is part of that state regulation and agency, correct?**

**A. Yup, yes.**

**Q. And yet you did not use the DVIR?**

**A. No, paper versions have been being phased out 8 for years.**

22

**Q The statute still requires that, it has not been changed, correct?**

**A I don't know about the statute. What I can tell you is that not only First Student runs 50,000 buses throughout the United States --**

**A New Haven or otherwise, vehicle inspection reports are going to automated systems. I can't speak to all the, you know,**

The plaintiff has always maintained that the state and Federal laws require a written report with the drive signature and the mechanic signature if any defects are found, the defendants have never provided any evidence that zonar is an approved device that follows state and federal laws. Demaio gave an answer in his Deposition Plaintiffs' Document 95 Filed Page 76 of 177, he said, "**New Haven or otherwise, vehicle inspection reports are going to automated systems. I can't speak to all the, you know,**" In order to change a federal regulation, A notice of proposed rulemaking (NPRM) is a public notice that is issued by law when an independent agency of the US government wishes to add, remove, or change a rule or regulation as part of the rulemaking process. The notice is an important part of US administrative law, which facilitates government by typically creating a process of taking of public comment. The term is also used at the state level in the United States, Although it is not required by the US Constitution, NPRM is required and defined by the Administrative Procedure Act, section 553, The NPRM is published in the Federal Register and typically gives 60 days for public

23

comment from any interested party and an additional 30 days for reply comments. The Federal Register Act was approved on July 26, 1935, and the first issue of the Federal Register was published on March 16, 1936. The DEPARTMENT OF TRANSPORT are required to follow the NPRM, the last change to 49 CFR Part 396 [Docket No. FMCSA–2019–0075] RIN 2126–AC29 Federal Register / Vol. 84, No. 218 / Tuesday, November 12, 2019 / Proposed Rules; AGENCY: Federal Motor Carrier Safety Administration (FMCSA), DOT. SUMMARY: FMCSA proposes to rescind the requirement that drivers of passenger-carrying commercial motor vehicles (CMVs) operating in interstate commerce, submit, and motor carriers retain, driver-vehicle inspection reports (DVIRs) when the driver has neither found nor been made aware of any vehicle defects or deficiencies (no defect DVIRs). This proposed rule would remove an information collection burden without adversely impacting safety. "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

According to the termination Letter presented by the defendants Document 88 Filed Page 16 of 120, the letter provides reasons for termination.

- Intentionally failing to perform a pre-trip inspection.
- Leaving a vehicle unattended with key in ignition or running.

24

- Not performing child check
- Unsafe backing and operation of the bus
- Unauthorized stop

The Plaintiff is asking the court to compare the Email provided by First Student Assistant Manager Vail Chiacu and The termination Letter signed and provided by Senior Location Manager Paul Demaio it is reasonably concluded the termination Letter is based off the email provided by Assistant Manager Vail Chiacu, which was based off the Board of Education asking First Student to view a video, The Assistant Manager documented his findings in an email addressed to Andrew Joppa, and Cc Paul Demaio. The Termination Letter Starts:

**Intentionally failing to perform a pre-trip inspection.**

The Plaintiff argues, per-trip is a continuous activity until the end of a working day, The email clearly only has provided the timeline of starting my per-trip, the information from the email never said, I didn't do my pre-trip inspection, it state's " was not completed( per-zonar). I have provide my Paper per-trip inspection in this Case 3:18-cv-01684-VLB Document 14-4 Filed Page 9 of 55 See (App.Pg 73 ) At the bottom of the paper per-trip it requires a signature form the Mechanic and a signature saying that the driver reviewed repairs, alongside dates are required, I could not sign off on the pre-trip inspection repairs because on October 26, 2017, I was placed on Paid Administrative Leave, by Mr. Paul A.Demaio, Jr.

25

**Leaving a vehicle unattended with key in ignition or running**.

According to the email provided by First Student Assistant Manager Vasil Chiau to

Paul A. Demaio, Jr. at " 7:11.53 exit bus at police station leave key in ignition".

According to the defendants Document 88 Filed Page 65 of 120, provides National

Employee Handbook section 6, Company Rules and Personal Conduct. It states;

#2. **"Leaving the bus unattended or unsecured with children or any passenger

on board."** The plaintiff argues that the key is alway in the ignition while

performing pre-trip inspection, when the key is in the ignition, it allows, 1.)

Cameras to operate 2.) Stop sign arm to operate, 3.) emergency Amber Lights to

function, 4.) Extension arm to operate, 5.) The radio to communicate with the

driver Leaving the key in the ignition is not against company policy or state law

it's apart of the pre-trip inspection to check all of your lights, ambers, sos, haszors,

stop sign arm, extension arm, high beams, low beams and Reverse back light,

brake lights, and clip light( small light on side of bus) which at all time relevant

was operating properly. The key being in the ignition turned to the right operates

the battery. If I would have turned the key right before turning it completely on,

and the driver's dash did not light up, the battery would have been dead, which is a

part of pre-trip inspection. There were no passengers on board. He further stated

that **"Child check not performed."**

26

According to the Defendants Document 88 Filed Page 75 of 120 National Employees handbook Section 7 Rules and regulations for Operating a school bus.

**3.** Sleeping Child/ Passenger Protection Procedures.

It is the responsibility of each driver and attendant to follow without exception, the company requirements for performing the sleeping child/passenger protection procedures. The Child Check-Mate Safety System is an electronic child reminder which was developed as a driver's aid to increase child safety and job security. **The Child Check-Mate system is activated when the brake pedal is applied, when you engage your B-way flashers by opening the loading door, or some systems are activated by engaging the marker/headlights. The system cannot be deactivated until the driver walks to the rear of the bus and depresses the "Stop and Check" reset button upon completion of each route.** The Child Check-Mate system does not remove the responsibility of the driver to search his/her vehicle every time the bus becomes empty after completing a tier and before going on to the next schoolitier. If the bus is equipped with Zonar, the wand must be used on the child search sensor to log the search in between route tiers and any time the driver exits the vehicle after the search is completed. **All First Student employees who transport passengers or move our vehicles including, but not limited to, drivers, monitors and technicians are accountable for performing this critical safety inspection. Any employee operating a First**

27

**Student vehicle is required to conduct a thorough search of the vehicle prior to exciting**

The Plaintiff did in fact do child check, according with the email provided by First Student Assistant Manager Vasil Chiau to Paul A. Demaio, Jr., it states at "7:16 child check alarm goes off again the driver finally does proper child check and shuts off bus" the plaintiff argues to activate child check mate, 1.) Start the bus, 2.) flick the master switch button on 3.) Child Check Mate only Activate when engaging your flasher (yellow sos light ) by opening the door with your master switch on. The defendant First Student Senior Location Manager has stated in his termination letter "Intentionally failing to perform a pre-trip inspection." According to the email at "7:14.03 child check Alarm sounds Driver comes on bus "**resets the key in the ignition"** does not do child check and get back off the bus." The Plaintiff argues that the alarm that was sounding the horn verification check, when the key is taking out of the ignition before doing child check your are activating the horn verification check, when resetting the key in the ignition you turn the horn's alarm off, then child check mate reativates, because the system resets it. According to Defendant's Document 88 Filed Page 77 of 120...- According to the Defendants Document 88 Filed Page 75 of 120 National Employees handbook Section 7 Rules and regulations for Operating a school bus.Sleeping Child/ Passenger Protection Procedures.

28

Weekly Horn Verification

- The driver must also perform a weekly verification allowing the horn to
  activate.

- This may be checked after boarding the bus by waiting for the horn to sound
  before turning the key to ON or ACCESSORY.

- Drivers must follow specific location procedures for performing the weekly
  horn verifications.

- Drivers shall indicate "HORN VЁRIFICATION PЁRFORMЁD" on
  DVIR/Log Book or follow specific location procedures for documenting.

The Plaintiff did all pre-trip procedure according to First Student National

Employee's Handbook, State of Connecticut laws and Federal law there is no set

way to perform a per-trip, all must action of pre trip can be done while driving the

vehicle on the road, pre-trip inspection completed at the end of a work day see…

Liles v. Rock Farms of Ark., LLC. The Court's tentative conclusion is confirmed

by 49 C.F.R. § 396.11 & § 396.13, which together help achieve an important safety

goal: systematic inspection, repair, and maintenance of commercial vehicles. 49

C.F.R. § 396.3(a). As applied to our facts, these regulations require one thorough

daily inspection. They contemplate this event happening at the end of a day's work.

49 C.F.R. § 396.11(a)(1).

29

**Unsafe backing and operation of the bus** this information is in

Accordance to the termination Letter signed and provided by Senior Location Manager Paul A. Demaio, Jr.; The email provided by Vasil Chiacu states at **"6:46 Driver put the bus in reverse and back the bus without beeping the horn first"** according to the Defendant's evidence The National Employee's Handbook which was signed by the Plaintiff on page 120 of 120 in Dk(88),on pg. 74 of 120 Number 18, of Dk(88) it state's,

"Drivers shall ask for backing assistance when it is necessary to back a First Student vehicle on Company property. lt shall be the driver's sole responsibility to secure the bus and be certain that the way is clear before moving the vehicle backwards. When on trips drivers should be careful to not drive the vehicle into a situation that requires backing to get out. In those rare situations where backing is the only choice or becomes necessary, the driver enlist help from one of the adults on the vehicle to provide backing assistance. Drivers are not to ask a student to help with backing, no matter what age the student may be. If away from the yard on a trip and no assistance is available, and the bus does not have passengers on board, the driver is to secure the vehicle, get out, and look before performing the backing." See App. Pg79 #18

The Plaintiff argues that nothing in this statement contained in First Student The National Employee's Handbook States or requires me to beep

30

the horn. I did put the bus in reverse to check the reverse back lights and buzzer, which is a part of per-trip, there is no way I would have backed the bus out of the parking space, because all school buses back into a park, so the next morning we can pull out facing forward.

**Unauthorized stop** was the last and final reason for termination according to the termination Letter signed and provided by Senior Location Manager Paul A. Demaio, Jr.; the email provided by First Student Assistant Manager Vasil Chiacu, "**Never**" Stated, I had no permission to go home or never gave dispatch responds to me asking to go home. According to to the Plaintiff's Document 95 Filed Page 86 of 177 is Paul A Demaio Jr Deposition stating:

MR. EGGERT

**Q. Are you aware of the fact that Miss Townsend had a puddle of water in her seat that morning and had requested permission to go home to change her clothes because she was wet?**

**A. Not first hand. I had heard that there was some concern about a wet seat or -- yeah, I don't know the specifics, but I do know that she had a concern about it or voiced a concern about it.**

**Q. And are you aware that she had called dispatch and had spoken to the supervisor Felix who gave her permission to go back home and change her clothes?**

31

A. I'm aware that she made a radio call to dispatch and she spoke to Felix.

Q And she then drove her bus back to her house behind her house, and went to change her clothes, is that your understanding of the sequence of events?

A I don't know. That's one of the stories that I heard.

Q. One of the stories you heard. Okay. And that didn't play into your decision to terminate her?

A. No.

Q. No.

A. No.

Q. Were you aware that she also made a police report concerning the wet seat to Officer Dash that morning?

A. I'm aware that she went off route and went and met a police officer at a substation.

Q. The substation. Okay Which happened to be ! behind her house where she parks her truck -- her bus every night?

A. I don't know the location.

Q You are aware that she made a report to Officer Dash or a police report?

32

**A I'm aware that she spoke to a police officer,' that was something else that became problematic with the whole course of events that were investigated, but, yes, I'm aware.**

C. THE DISTRICT COURT ERR WHEN NOT FINDING THE PLAINTIFF DEPOSITION TESTIMONY "He targeted me, and I think he targeted me based on my race and based on retaliation of the police report."

### 4. Title VII and ;Retaliation

The United States District Hon. Vanessa L. Bryant stated within her Summary Judgment Decision Document 98 { Page 15 of 25}in relevant part, "During Plaintiff's deposition, Defendant's counsel inquired as to why she believed her race played a role in her termination. Plaintiff suggested that the horn beeping allegations were "conjured up with the Hispanics" by Mr. DeMaio, who was angered by Plaintiff for calling the police. [Pl.'s Ex. 1 at PDF p. 44]. When asked to elaborate further, she explains "That means that at the board of education, there is nothing but Hispanic women that work in the board of education transportation . . . ." [Pl.'s Ex. 1 at PDF p.45]. Plaintiff was asked why she believed her termination was based on race, she said:

**The reason why I think that the termination was based on my race is because of the way First Student is – well, when I was there, I can only speak from when I was there, the way they hired, the board of education transportation department was predominantly Hispanic, actually it was all Hispanic that worked in that particular office. . . . Now, the problem**

33

**that I'm having where I'm feeling discriminated at all is because it was a fair investigation . . . He targeted me, and I think he targeted me based on my race and based on retaliation from the police report. [Pl.'s Ex. 1 at PDF p. 52–54].**

See Moren v. Progress Energy, Inc., Case No.: 8:07-cv-1676-T-17 (M.D. Fla. Aug. 7, 2008) establishing a prima facie case of retaliation under Title VII the Plaintiff must prove that: 1.) She participated in a protective activity that Title VII protects. 2.)Suffered an adverse employment action. 3.) There is a causal connection between the participation in the protected activity and the adverse employment decision. See Hurbert v. St Mary's Health care sys, Inc, 439, F.3d 1297 (11t Cir.2006). If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate reason for the adverse employment action. *Id.* "If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." *Id.*

**1.) She participated in a protective activity**: 1.) "To recover for retaliation, the plaintiff `need not prove the underlying claim of discrimination which led to her protest,' so long as she had a reasonable good faith belief that the discrimination existed."). Moren engaged in statutorily-protected activity by filing a formal complaint with the Corporate Security Department at Progress, which, in turn, resulted in the termination of Grosseibl. Thus, Moren can meet the first element of his *prima facie* case for retaliation under Title VII. The plaintiff engaged with the City

34

of New Haven Police Department by making a police report on the manager at First student. The plaintiff further engaged in statutorily protected expression pursuant to 49U.S.C § 31105 Employee protections when completing the pre-trip according to 49 CFR 396.11 ("49 CFR"). The plaintiff argues she was exercising her privilege of employment, See **Charlton v. Republic Services of Florida, Limited Partnership et al, No. 1:2009cv22506 - Document 28 (S.D. Fla. 2010)**

In deciding whether an employee has engaged in statutorily protected expression, "the plain language of the statute, as well as legal precedent, demonstrate that the activity protected by the [FWA] must be an actual violation of the law, rule or regulation; a suspected violation, even a good faith belief that there is a violation, is not sufficient to trigger the Act's protection." Odin v. Gov't Em~loyees Ins. Co., No. 8:08-cv-1282-T-24-EAJ, 2009 WL 2134918, at *3 (M.D. Fla. July 13,2009) (citing White v. Purdue Pharma. Inc., 369 F. Supp. 2d 1335, 1337-39 (M.D. Fla. 2005)) (emphasis in original); see Moren v. Progress Energy. Inc., No. 8:07-cv-1676- T-17,2008 WL 3243860, at *9 (M.D. Fla. Aug. 7,2008) (stating that "unlike Title VII's unlawful retaliation provisions, the FWA requires the plaintiff to actually prove a violation of the law, rule, or regulation in order to succeed");

35

Branche v. Airtran Airways. Inc., No. 8:O 1 CV 1 747- T-30MSS, 2005 WL 1051097, at *2 (M.D. Fla. May 2,2005) (same, declining to apply Title

2.).plaintiff was also in civil litigation with 22 defendent all City of New Haven Officals, Townsend v. Harp et al 3:17-cv-00483-SRU file date 3/24/2017. **William Celentano**(*City of New Haven, Fire Commission Board Members; Former City of New Haven, Civil)*, **John Cirello**(City of New Haven, Civil Service Board Members), **Pedro Delgado**(*City of New Haven, Civil Service Board Members)*, **Daniel Delprete**(*Former City of New Haven, Civil Service Board Members)*, **John Destefano, Jr**(*Former Mayor of the City of New Haven)*, **Maurice Douglas**(*City of New Haven, Fire Commission Board Members)*, **Toni Harp**(*Current Mayor, City of New Haven)*, **Garth Harris**(*Former Superintendent, City of New Haven, Board of Education)*, **Stephen J. Librand**i(*City of New Haven, Manager of Human Resources and Benefits)*, **George Longyear**(*Former City of New Haven, Fire Commission Board Members)*, **Noelia Marcano**(*City of New Haven Personnel Director)*, **Anne Massaro**(*City of New Haven, Civil Service Board Members)*, **Vencent E Mauro Jr,**(*City of New Haven, Fire Commission Board Members)*, **Reynold Mayo**(*Dr., Current Superintendent, City of New Haven, Board of Education)*, **Wendy Mongillo**(*Former City of New Haven, Fire Commission Board Members);*

*Currently City of New,Haven, Civil Service Board Members).* **Eldron Morrison***(City of New Haven, Fire Commission Board Members, Rev.).*, **Paul Nunez***(City of New Haven, Fire Commission Board Members).*, **Carman Rodriguez***(City of New Haven, Civil Service Board Members).*, **James L. Williams(***City of New Haven, Civil Service Board Members, Dr.).*, **Allyn Wright***(Former City of New Haven, Civil Service Board Members).*, **Denise Merrill(***Secretary of the State of Connecticut)*

The Plaintiff sent a notice to the Manager requesting a schedule change on August 4, 2017 in the request the plaintiff informed First Student she was in litigations with the City of New Haven, they were well aware of the court action that was taking place see Case 3:18-cv-01684-VLB Document 14-4 Filed 11/08/18 Page 3 of 55. An agency's report is also infected by suspect motivation when it was "'compiled in anticipation of litigation.'" Lewis v. Velez, 149 F.R.D. 474, 488 (S.D.N.Y. 1993) (citation omitted).

2.) **Suffered an adverse employment action.***The Supreme Court recently addressed the adverse employment action element of a Title VII retaliation claim in Burlington N. Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). In that case, the Court held that "the scope of [Title VII's] anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm," and, therefore, "is not limited to discriminatory actions that affect the terms and*

37

*conditions of employment." Id. at 63-65. Therefore, "an employee need not show an adverse employment action, but rather, must show that `a reasonable employee would have found the challenged action materially adverse.'" Crosby v. Mobile County Personnel Bd., 2007 WL 245126, at \*4 (11th Cir. January 30, 2007) (quoting Burlington, 548 U.S. at 68). In* other words, the plaintiff must show that he suffered a materially adverse action that would dissuade a reasonable employee in the same position from filing his complaint. The Plaintiff was accused in the termination letter not performing pre-trip inspection and was but on Paid Administrative Leave on October 26, 2017 and after there investigation terminated on November 17, 2017

- Intentionally failing to perform a pre trip inspection
- Leaving a vehicle unattended with key in ignition or running.
- Not performing child check
- Unsafe backing and operation of the bus
- Unauthorized stop

According to the email Provided by Vasil Chai, the "Original investigation was from the school for her actions with blowing the horn. The Plaintiff argues a reasonable employee would have found the challenged action ( blowing the horn ) materially adverse. First student was very aware of the school not coming to get the kids of the bus, First student was informed according to the email at 7:11 it states "

38

and she will be running late." the challenged action are materially adverse, the information collected by First Student Assistant Manager Vasil Chiacu would had dissuade a reasonable employee in the same position as Paul A Demaio, Jr.. based on the City of New haven transportation contact see Case 3:18-cv-01684-VLB Document 14-4 Filed 11/08/18 Page 15 of 55., states "the contractor shall notify the transportation Department of any delays of 10 minutes or more in a bus schedule, the contractor shall work with the transportation department, if necessary, of notifying the school of such delays." The plaintiff suffered a material adverse action because of all the information that is presented, a reasonable person would have not taken such actions to terminate or look for other reasons to cause harm. *"Courts analyzing the trustworthiness of public agency findings also consider "[t]the extent to which the agency findings are based upon or are the product of proceedings pervaded by receipts of substantial amounts of material which would not be admissible in evidence (e.g., hearsay, confidential communications, ex parte evidence), and the extent to which such material is supplied by persons with an interest in the outcome of the proceeding."* Coleman, 306 F.3d *at*," First Student was well informed of the City of New Haven and Torrey Terrial Townsend's litigations action, in federal court at all time relevant on August 4, 2017 a letter was given to management requesting a Air Braking testing and in the

39

body of the letter it stated the plaintiff and the city of New Haven were currently in litigation and action your company has displayed towards me is being flagged

{ App. p.23 }

3.) **There is a causal connection between the participation in the protected activity and the adverse employment decision.** See..*Moren v. Progress Energy, Inc.,* Case No.: 8:07-cv-1676-T-17 (M.D. Fla. Aug. 7, 2008)

*To establish a causal connection between Plaintiff's participation in a protected activity and Defendant's adverse employment action, Plaintiff must show that the "decision-maker[s] [were] aware of the protected conduct," and "that the protected activity and the adverse action were not wholly unrelated. Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999) (citations omitted). For the purposes of establishing a prima facie case, "close temporal proximity" may be sufficient to show that the protected activity and the adverse action were not "wholly unrelated." Id.*

The Email drafted by First Student assistant Manager Vasil Chiacu, stated that the Board of education asked them to view Video; He also Stated at the bottom of the email that the original investigation was from the school for her action with blowing the horn. First Student Managers Never gave the Union or Myself a written Complaint according to our union contract Article 19. See{ App. Pg 21}

40

*It is undisputed that Progress was aware he filed a complaint with Allen and with the Corporate Security Department. Moreover, Moren's complaint to the Corporate Security Department and the materially adverse actions that followed are temporally proximate and not wholly unrelated. Therefore, we find that Moren has established a prima facie retaliation claim under Title VII.* The Plaintiff's case is relatable, First Student's Senior Manage was very much aware of the plaintiff filing a police report with the City of New Haven's Police Department Officer Gregory Dash on 10/25/2017 Report time 7:18am wed. see {App. Pg 18 }police report]. Within Paul A. Demaio, Jr. Deposition Document 95 Filed Page 87 of 177, { See App. pg. 15 } Mr. Demaio was asked a question by Attorney Charles Eggert Jr.

**Q. Are you aware that she made a report to Officer Dash or a police report?**

**A. I'm aware that she spoke to a police officer,' that was something else that became problematic with the whole course of events that were investigated, but, yes, I'm aware.**

The defendant First Student Senior Location Manager Paul A. Demaio stated, making a police report problematic is really the reason behind his action to not allow the Administrative Complaint process to move forward with the City of New Haven Board of Education once they made a complaint. Mr. Demaio has full

41

knowledge of contract law and litigations between me and the City of New Haven, Instead he decided to never clear up the matter with the complaint mad by the City of Nw Haven Board of Education or the School about the horn, because if they Board of Education want to see the tape it would have show the Plaintiff making a police report stating discrimination. First Student Senior Manager Paul A. Demaio changed the course of the investigation to cover up for me making a police report and to dismiss my right to have an Administrative Process with the Board of Education, concerning their complaint and mine.

The termination letter is all violation of Daily Inspection except for the allegation of Unauthorized Stop which according to his deposition that was not the reason for termination see { App. Pg. 12. }

**A.  I'm aware that she made a radio call to dispatch and she spoke to Felix.**

**Q And she then drove her bus back to her house behind her house, and went to change her clothes, is that your understanding of the sequence of events?**

**A I don't know. That's one of the stories that I heard.**

**Q. One of the stories you heard. Okay. And that didn't play into your decision to terminate her?**

**A. No.**

**Q. No.**

**A. No.**

The Defendants First Student Assistant Manager Vasil Chiacu and First Student Paul A. Demaio who issued the termination letter have no Statutory authority to determine if the daily inspection for a commercial vehicle is done correctly. According with the the email drafted by Mr. Chiacu he never said I didn't do my inspection; he said "per zonar" According with State of connecticut

**Regulations of Connecticut State Agencies; TITLE 14. Motor VehiclesSec. 14-163c-9. Inspection authority**

(a) A person having inspection authority means any motor vehicle inspector appointed by the commissioner in accordance with section 14-8 of the Connecticut General Statutes, or any state or municipal police officer who has satisfactorily completed eighty (80) hours of on-the-job training and a course of instruction as prescribed by the United States Department of Transportation, Federal Motor Carrier Safety Administration, in federal motor carrier safety regulations, North American safety inspection procedures and the Commercial Vehicle Safety Alliance's "North American Standard Out-of-Service Criteria." As used in sections 14-163c-1 through 14-163c-12 of the Regulations of Connecticut State Agencies, **inspection authority means authorization to enter upon and perform inspections of motor carriers' vehicles in operation, to record the results of such inspections, to issue infractions for those parts specified in section**

43

**14-163c-1 of the Regulations of Connecticut State Agencies, and to declare a motor vehicle or its operator "Out of Service".**

Motor Carrier Safety Regulations Sec. 14-163c-1. Adoption of regulations (a) The following parts of Title 49 of the Code of Federal Regulations are incorporated by reference herein as regulations of the Department of Motor Vehicles: **(14) Part 396, "Inspection, Repair and Maintenance," as amended from time to time;**

The plaintiff further engaged in statutorily protected expression pursuant to 49U.S.C § 31105 Employee protections when completing the pre-trip according to 49 CFR 396.11 ("49 CFR").

D. THE DISTRICT COURT ERR WHEN NOT FINDING THE UNION CONTRACT AND THE NATIONAL EMPLOYEE HANDBOOK IS A LEGAL AGREEMENT THAT IS ENFORCEABLE.

### 4. Title VII 1981 Claims

The United States District Hon. Vanessa L. Bryant stated furthering her findings within her Summary Judgment Decision Document 98 { Page 16 of 25}in relevant part, "No other evidence relating to racial motivation was provided aside from Plaintiff's conclusory beliefs that she expressed during her depositions. Specifically, no comparator evidence was presented, no racial comment was cited, nor was there any evidence that a non-African American filled her position after her termination." During Deposition First Student was asked to provide

Affirmative action information concerning hiring and firing of all employees we didn't receive this information during discovery.

The United States District Hon. Vanessa L. Bryant state furthering her findings within her Summary Judgement Decision Document 98 { Page 22 of 25}in relevant part, "Plaintiff also alleges an inference of discrimination can be found based on an incident with a fellow employee back in January 2017, approximately ten months prior to her termination. By way of background, on January 31, 2017, Plaintiff filed an incident report relating to a confrontation in the driver's room with a fellow employee. [Pl.s' 56(a)2 at ¶ 6; Def.'s Response at ¶ 6]. Another employee began yelling at Plaintiff saying "My nigga10 you going to bump me."

The plaintiff file a Police report in this incident, and accoridng to First Student Paul A. Demaio, Jr filing police reports are problematic, Sara Evans is a hispanic women with green eye, She referenaced the Plaintiff as My Nigga, providing ownership to her statement, Sara was not written up for the racal slur, there was nothing done, according with a report drafted on 02/07/2017 by Safety Manger Denise kiley it states I requested both videos and this is what I saw. Torrey's bus had no sound, but l see her passing by Sara's bus. In Sara's video, as Torrey was passing by her bus, she states, out loud, with students on her bus," that's the chick I

had the problem with, she called the cops on me, I don't like that girl. I'm going to beat her up at my job. Sara then calls into base to ask Felix if he is going to be there .upon her return. She says that she had an incident with another driver at the school. No one from Management informed me of sara comments this report came out during discovery, My right to place a union grievance on Mrs. Sara Evans was hindered because, First Student Manager kept this information in a file. July 25, 2017 I was working the summary school program for First student, there was an incident of Sara Evan son hit Honesty in the head with a gate, First Student managers refused to call the emergency services and I transported my daughter to the hospital on there bus, she had a hole in her head, you could stick your tip of your finger in, she received stitches. When I got back to base Sara Evans and the managers were standing around, there was a note on the Managers door that said First Student is not responsible for children being hurt on school property or school buses.

The plaintiff argues that this is a causal connection between the incident with Sara Evan and The Incident with Sara Evans son Hitting My daughter Honesty in the head with the gate, First Student Senior Manager thinks calling the police is problematic, I call the cops during the incident with sara, and reported the incident to management, Nothing was done, but when there is a report of me blowing my horn a full investigation is done with violation, The court should recognize that

46

patten of negligence with insuring all employee's are safe, First student does the bare minimum is anything to make sure all incident with children and staff are fully document according with there on process, which is established within Human Resources Policy Manual, see

**Civil Rights Act of 1964, 42 U.S.C. § § 2000**

The United States District Hon. Vanessa L. Bryant states furthering her findings within her Summary Judgment Decision Document 98 { Page 6 of 25}in relevant part, **A. Airbrake Training**

According to the Connecticut Department of Motor Vehicle website, a holder of a Commercial Drivers License ("CDL") can request to have additional endorsement added to their license if they pass a test. Available at:

The Plaintiff argues that according to Connecticut By law, each applicant for an "S" endorsement, or for the renewal of an "S" endorsement, must submit a certificate, signed by an approved instructor, indicating that the applicant has completed the applicable pre-service training or in-service training (Conn. Agencies Regs. § 14-276a-2). Carriers must include training records in the driver qualification files the law requires them to maintain for each driver they employ (Conn Agencies Regs. § 14-276a-7) When having an S endorsement you already have you Commercial Drivers License, The air

47

brake test need  a certified instructor to sign off on the driver receiving training with the S endorsement while operating a school bus, First Student has to submit the hours of training to an Motor Vehicle Inspector, signing off that I met all requirements to be tested by the DMV inspector,  The Plaintiff maintains that there is a driver by the name of Paul Rivera (hispanic Male not a trainer) who was hire with his CDL with no restriction form operating a airbrake bus, when it's time for Paul's Proficiency he will have to use an air brake bus because his license has no airbrake restrictions, which means the trainer will have to train him on an airbrake bus to insure the correct procedure using the air brake system on a school bus. In the memorandum of decision Document 98 { Page 8 of 25}in relevant part  She then stated she knew only of one Hispanic driver who held the air brake endorsement, but the plaintiff could not recall his name. [Id.]. She indicated that this other driver was a Class A truck driver. [Def.'s Ex. C at PDF p. 32]. There was a lot of pressure on me that day of my deposition. I could not remember his name at that moment, but that does not mean it is not true. Paul Rivera came to First Student Fully License, he just missed the S endorsement, Mr. Rivera still works for First Student.

To establish a prima facie case of discrimination based on disparate treatment a plaintiff must show that he (1) is a member of a protected class, (2) suffered an adverse employment action, (3) met his employer's legitimate expectations at the time of the adverse employment action, and (4) was treated differently from similarly situated employees outside his protected class. The plaintiff was treat differently when ask to Air Brake Training, Paul Rivera is a CDL holder with Air brakes, He has to train for is profecay with an air brake bus, when the Plaintiff initially asked for the Training I was told no, then they put on my letter requesting air brakes I can train in March 22, 2019, which never happen because of the termination; which has a causal connection; with the protected activity of Daily Inspection, which I was ultimately terminated for allegedly not doing "per-zonar"

## CONCLUSION

The Plaintiff is requesting for the Second Circuit Court to reverse and remand the District Court Decision, there is a genuine dispute as to the material facts in this case.

**Respectfully Submitted**
Miss.Torrey Terrial Townsend

39 Orchard Place

New Haven, Ct 06511

Torrey.Townsend@yahoo.com

860-835-3710

49

**Federal Rules of Appellate Procedure Form 6. Certificate of Compliance With Rule 32(a)**

Certificate of Compliance With Type-Volume Limitation, Typeface   Requirements and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed.R. App.

P.32(a)(7)(B) because:

X this brief contains 8,374 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

x  this brief uses a monospaced typeface and contains 767 lines of text , excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)

and the type style requirements of Fed. R. App. P. 32(a)(6) because:

X    this brief has been prepared in a proportionally spaced typeface using [Microsoft Word 2013] in [14 point type Times New Roman Style]

Antivirus Certification form

**CASE NAME:** Townsend V. First Student

**DOCKET NUMBER:** 21-2901

I certify that the PDF version of the Defendant-Appellee' s Brief that was filed electronically in CM/ECF has been scanned for viruses and that no viruses were detected.

Please print the name and version of the anti-virus detector that you used: Symantec Endpoint Protection 12.1.5 Virus Definition Version Rev. 4. (January 22, 2022)

/s/TorreyTown
Torrey Terrial Townsend
June 23, 2021

Miss.Torrey Terrial Townsend

39 Orchard Place

New Haven, Ct 06511

Torrey.Townsend@yahoo.com

860-835-3710

51

## CERTIFICATION OF SERVICE

This is to certify that on June 23, 2022, the foregoing was filed electronically

with the U.S. Court of Appeals for the Second Circuit. Notice of this filing

will be sent by email to all parties by operation of the Court(s) electronic

filing system or by mail to anyone unable to accept electronic filing as

indicated on the Notice of Electronic Filing. Parties may access this filing

through the Court's CM/ECF system. Three of the Brief and appendix copies

were sent via U.S: on June 23, 2021 because of the holiday.

**U.S. Court of Appeals for the Second Circuit 40 Foley Square, Thurgood Marshall Courthouse New York, NY 10007**

And one copy was sent electronically and also via U.S. Mail:

**Maura A. Mastrony (ct27787)**
**Littler Mendelson,**
**P.C. One Century**
**Tower 265 Church Street-Suite 300**
**New Haven, CT 06510**
**Telephone: 203.974.8700**
**Facsimile: 203.974.8799**
**mmastrony@littler.com**

Miss.Torrey Terrial Townsend

39 Orchard Place
New Haven, Ct 06511
Torrey.Townsend@yahoo.com
860-835-3710

# 21-02901cv

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE SEACOND CIRCUIT

**TORREY TERRIAL TOWNSEND**

Plaintiffs-Appellants

V.

**FIRST STUDENT**

Defendant-Appellee

**CSEA SEIU Local 2001**

Defendant-Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

===============================

**ADDENDUM**

## TABLE OF AUTHORITIES

Anderson v. Liberty Lobby, Inc. - 477 U.S. 242, 106 S. Ct. 2505
(1986)......................................................................CITED..Pg 24…Add.PG.55-71

Barrentine v. Arkansas-Best Freight System, Inc., 750 F.2d 47, 50  (8th Cir.
1984)...............................................................CITED..Pg 17…Add.PG 72-75

Liles v. Rock Farms of Ark., LLC, No. 4:15-cv-469-DPM  (E.D. Ark. Feb. 24,
2017)................................................CITED..Pg ..15,16,17,20…Add. PG. 76-77

Charlton v. Republic Services of Florida, Limited Partnership et al, No.
1:2009cv22506 Document 28 (S.D. Fla. 2010)....CITED…Pg 35..Add PG 78-85

Dooley v. Liberty Mut. Ins. Co., 307 F. Supp. 2d 234 (D. Mass.
2004)..........CITED..Pg 17…..Add Pg-86-101

Moren v. Progress Energy, Inc., Case No.: 8:07-cv-1676-T-17 (M.D. Fla. Aug. 7,
2008)...........................................................CITEDPg 34,40…… Add.PG 102-109

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)

106 S.Ct. 2505, 91 L.Ed.2d 202, 54 USLW 4755, 4 Fed.R.Serv.3d 1041...

KeyCite Yellow Flag - Negative Treatment

Not Followed on State Law Grounds Huckabee v. Time Warner
Entertainment Co. L.P., Tex., May 4, 2000

106 S.Ct. 2505

Supreme Court of the United States

Jack **ANDERSON**, et al., Petitioners

v.

**LIBERTY LOBBY**, INC. and Willis A. Carto.

No. 84–1602.
|
Argued Dec. 3, 1985.
|
Decided June 25, 1986.

**Synopsis**

Libel action was brought against magazine, its publisher, and
its chief executive officer. The United States District Court for
the District of Columbia, 562 F.Supp. 201, granted summary
judgment in favor of defendants and plaintiffs appealed. The
Court of Appeals for the District of Columbia Circuit, 746
F.2d. 1563,affirmed in part and reversed in part. The Supreme
Court, Justice White, held that: (1) ruling on motion for
summary judgment or directed verdict necessarily implicates
that substantive evidentiary standard of proof that would
apply at a trial on the merits, and (2) when determining if
genuine factual issue as to actual malice exists in a libel suit
brought by a public figure, trial judge must bear in mind
the actual quantum and quality of proof necessary to support
liability under the *New York Times* doctrine.

Vacated and remanded.

Justice Brennan filed a dissenting opinion.

Justice Rehnquist filed a dissenting opinion in which Chief
Justice Burger joined.

West Headnotes (17)

[1]    **Federal Civil Procedure** ⬥ Absence of
genuine issue of fact in general

Mere existence of some alleged factual
dispute between the parties will not defeat

an otherwise properly supported motion for
summary judgment; there must be no genuine
issue of material fact. Fed.Rules Civ.Proc.Rule
56(c), 28 U.S.C.A.

58170 Cases that cite this headnote

[2]    **Federal Civil Procedure** ⬥ Materiality and
genuineness of fact issue

Substantive law will identify which facts are
material for purposes of summary judgment, as
only disputes over facts that might affect the
outcome of the suit under the governing law
will properly preclude the entry of summary
judgment; factual disputes that are irrelevant
or unnecessary will not be counted. Fed.Rules
Civ.Proc.Rule 56(c), 28 U.S.C.A.

62915 Cases that cite this headnote

[3]    **Federal Civil Procedure** ⬥ Materiality and
genuineness of fact issue

Materiality determination on motion for
summary judgment rests on the substantive law
and it is the substantive law's identification of
which facts are critical and which facts are
irrelevant that governs. Fed.Rules Civ.Proc.Rule
56(c), 28 U.S.C.A.

8136 Cases that cite this headnote

[4]    **Federal Civil Procedure** ⬥ Materiality and
genuineness of fact issue

Summary judgment will not lie if the dispute
about a fact is "genuine," i.e., if the evidence is
such that a reasonable jury could return a verdict
for the nonmoving party.

170462 Cases that cite this headnote

[5]    **Federal Civil Procedure** ⬥ Hearing and
Determination

At summary judgment stage, judge's function is
not himself to weigh the evidence and determine
the truth of the matter but to determine whether
there is a genuine issue for trial. Fed.Rules
Civ.Proc.Rule 56(c), 28 U.S.C.A.

Case 21-2901, Document 62, 06/24/2022, 3337761, Page56 of 109

**Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)**
106 S.Ct. 2505, 91 L.Ed.2d 202, 54 USLW 4755, 4 Fed.R.Serv.3d 1041...

20775 Cases that cite this headnote

[6] **Federal Civil Procedure** ⬤ Absence of genuine issue of fact in general

There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for jury to return a verdict for that party; if the evidence is merely colorable or is not significantly probative, summary judgment may be granted. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

157872 Cases that cite this headnote

[7] **Federal Civil Procedure** ⬤ Findings and conclusions

There is no requirement that trial judge make findings of fact when granting summary judgment but, in many cases, findings are extremely helpful to a reviewing court. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

147 Cases that cite this headnote

[8] **Federal Civil Procedure** ⬤ Right to judgment as matter of law

Standard for granting summary judgment mirrors the standard for a directed verdict which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. Fed.Rules Civ.Proc.Rules 50(a), 56(c), 28 U.S.C.A.

2441 Cases that cite this headnote

[9] **Federal Civil Procedure** ⬤ Burden of proof

Inquiry involved in a ruling on a motion for summary judgment or for directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. Fed.Rules Civ.Proc.Rules 50(a), 56(c), 28 U.S.C.A.

1678 Cases that cite this headnote

[10] **Federal Civil Procedure** ⬤ Absence of genuine issue of fact in general

If defendant in a run-of-the-mill civil case moves for summary judgment or for directed verdict based on the lack of proof of a material fact, the judge must ask himself, not whether he thinks the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Fed.Rules Civ.Proc.Rules 50(a), 56(c), 28 U.S.C.A.

22804 Cases that cite this headnote

[11] **Federal Civil Procedure** ⬤ Weight and sufficiency

When ruling on a defendant's motion for summary judgment or a directed verdict in favor of plaintiff, mere existence of a scintilla of evidence in support of the plaintiff's position will not be sufficient; there must be evidence on which the jury could reasonably find for the plaintiff. Fed.Rules Civ.Proc.Rules 50(a), 56(c), 28 U.S.C.A.

29817 Cases that cite this headnote

[12] **Federal Civil Procedure** ⬤ Tort cases in general

When determining if a genuine factual issue exists as to actual malice in a libel suit brought by public figure, trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under the *New York Times* doctrine. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

3685 Cases that cite this headnote

[13] **Federal Civil Procedure** ⬤ Tort cases in general

There is no genuine issue of material fact if the evidence presented in opposing affidavits in libel action involving a public figure is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)

106 S.Ct. 2505, 91 L.Ed.2d 202, 54 USLW 4755, 4 Fed.R.Serv.3d 1041...

convincing evidence. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

6535 Cases that cite this headnote

[14] **Federal Civil Procedure** Construction of evidence

**Federal Civil Procedure** Questions for Jury

**Federal Civil Procedure** Presumptions

**Federal Civil Procedure** Ascertaining existence of fact issue

Credibility determinations, weighing of evidence, and drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether his ruling is on motion for summary judgment or for directed verdict; evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. Fed.Rules Civ.Proc.Rules 50(a), 56(c), 28 U.S.C.A.

42917 Cases that cite this headnote

[15] **Federal Civil Procedure** Summary Judgment

Trial court should not act other than with caution in granting summary judgment and may deny summary judgment where there is reason to believe that the better course would be to proceed to a full trial. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

1245 Cases that cite this headnote

[16] **Federal Civil Procedure** Weight and Sufficiency of Evidence

**Federal Civil Procedure** Absence of genuine issue of fact in general

Determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case and that is true at both the directed verdict and summary judgment stages. Fed.Rules Civ.Proc.Rules 50(a), 56(c), 28 U.S.C.A.

2454 Cases that cite this headnote

[17] **Federal Civil Procedure** Burden of proof

Plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment, even where the evidence is likely to be within the possession of the defendant, as long as plaintiff has had a full opportunity to conduct discovery. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

10489 Cases that cite this headnote

**\*\*2506 \*242** *Syllabus*[*]

In *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, it was held that, in a libel suit brought by a public official (extended by later cases to public figures), the First Amendment requires **\*\*2507** the plaintiff to show that in publishing the alleged defamatory statement the defendant acted with actual malice. It was further held that such actual malice must be shown with "convincing clarity." Respondents, a nonprofit corporation described as a "citizens' lobby" and its founder, filed a libel action in Federal District Court against petitioners, alleging that certain statements in a magazine published by petitioners were false and derogatory. Following discovery, petitioners moved for summary judgment pursuant to Federal Rule of Civil Procedure 56, asserting that because respondents were public figures they were required to prove their case under the *New York Times* standards and that summary judgment was proper because actual malice was absent as a matter of law in view of an affidavit by the author of the articles in question that they had been thoroughly researched and that the facts were obtained from numerous sources. Opposing the motion, respondents claimed that an issue of actual malice was presented because the author had relied on patently unreliable sources in preparing the articles. After holding that *New York Times* applied because respondents were limited-purpose public figures, the District Court entered summary judgment for petitioners on the ground that the author's investigation and research and his reliance on numerous sources precluded a finding of actual malice. Reversing as to certain of the allegedly defamatory statements, the Court of Appeals held that the requirement that actual malice be proved by clear and convincing evidence need not be considered at the summary judgment stage, and that with respect to those statements summary judgment had been improperly granted because a

Case 21-2901, Document 62, 06/24/2022, 3337761, Page58 of 109

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)

106 S.Ct. 2505, 91 L.Ed.2d 202, 54 USLW 4755, 4 Fed.R.Serv.3d 1041...

jury could reasonably have concluded that the allegations were defamatory, false, and made with actual malice.

*Held:* The Court of Appeals did not apply the correct standard in reviewing the District Court's grant of summary judgment. Pp. 2509–2515.

(a) Summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. At the summary judgment stage, the trial judge's function is not himself to weigh the evidence and **\*243** determine the truth of the matter but to determine whether there is a genuine issue for trial. There is no such issue unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. In essence, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Pp. 2509–2512.

(b) A trial court ruling on a motion for summary judgment in a case such as this must be guided by the *New York Times* "clear and convincing" evidentiary standard in determining whether a genuine issue of actual malice exists, that is, whether the evidence is such that a reasonable jury might find that actual malice had been shown with convincing clarity. Pp. 2512–2514.

(c) A plaintiff may not defeat a defendant's properly supported motion for summary judgment in a libel case such as this one without offering any concrete evidence from which a reasonable jury could return a verdict in his favor and by merely asserting that the jury might disbelieve the defendant's denial of actual malice. The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict. Pp. 2514–2515.

241 U.S.App.D.C. 246, 746 F.2d 1563, vacated and remanded.

WHITE, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, POWELL, STEVENS, and O'CONNOR, JJ., joined. BRENNAN, J., filed a dissenting opinion, *post,* p. ——. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C.J., joined, *post,* p. ——.

**Attorneys and Law Firms**

*David J. Branson* argued the cause for petitioners. With him on the briefs was *David O. Bickart.*

*Mark Lane* argued the cause for respondents. With him on the brief were *Linda Huber* and *Fleming Lee.\**

\* Briefs of *amici curiae* urging reversal were filed for the American Newspaper Publishers Association et al. by *Robert D. Sack, Robert S. Warren, W. Terry Maguire, Richard M. Schmidt, Jr., R. Bruce Rich, Lawrence Gunnels, Harvey L. Lipton, Peter C. Gould,* and *Jane E. Kirtley;* for the Reader's Digest Association, Inc., by *Walter R. Allan* and *Karen J. Wagner.*

Briefs of *amici curiae* urging affirmance were filed for the American Legal Foundation by *Daniel J. Popeo;* and for the Synanon Church et al. by *Jonathan W. Lubell, Philip C. Bourdette, David R. Benjamin,* and *Andrew J. Weill.*

**Opinion**

**\*244 \*\*2508** Justice WHITE delivered the opinion of the Court.

In *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–280, 84 S.Ct. 710, 725–726, 11 L.Ed.2d 686 (1964), we held that, in a libel suit brought by a public official, the First Amendment requires the plaintiff to show that in publishing the defamatory statement the defendant acted with actual malice—"with knowledge that it was false or with reckless disregard of whether it was false or not." We held further that such actual malice must be shown with "convincing clarity." *Id.,* at 285–286, 84 S.Ct., at 728–729. See also *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974). These *New York Times* requirements we have since extended to libel suits brought by public figures as well. See, *e.g., Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

This case presents the question whether the clear-and-convincing-evidence requirement must be considered by a court ruling on a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure in a case to which *New York Times* applies. The United States Court of Appeals for the District of Columbia Circuit held that that requirement need not be considered at the summary judgment stage. 241 U.S.App.D.C. 246, 746 F.2d 1563 (1984). We granted certiorari, 471 U.S. 1134, 105 S.Ct. 2672, 86 L.Ed.2d 691

(1985), because that holding was in conflict with decisions of several other Courts of Appeals, which had held that the *New York Times* requirement of clear and convincing evidence must be considered on a motion for summary judgment.[1] We now reverse.

I

Respondent **Liberty Lobby**, Inc., is a not-for-profit corporation and self-described "citizens' lobby." Respondent Willis Carto is its founder and treasurer. In October 1981, **\*245** The Investigator magazine published two articles: "The Private World of Willis Carto" and "Yockey: Profile of an American Hitler." These articles were introduced by a third, shorter article entitled "America's Neo-Nazi Underground: Did *Mein Kampf* Spawn Yockey's *Imperium*, a Book Revived by Carto's **Liberty Lobby**?" These articles portrayed respondents as neo-Nazi, anti-Semitic, racist, and Fascist.

Respondents filed this diversity libel action in the United States District Court for the District of Columbia, alleging that some 28 statements and 2 illustrations in the 3 articles were false and derogatory. Named as defendants in the action were petitioner Jack **Anderson**, the publisher of The Investigator, petitioner Bill Adkins, president and chief executive officer of the Investigator Publishing Co., and petitioner Investigator Publishing Co. itself.

Following discovery, petitioners moved for summary judgment pursuant to Rule 56. In their motion, petitioners asserted that because respondents are public figures they were required to prove their case under the standards set forth in *New York Times*. Petitioners also asserted that summary judgment was proper because actual malice was absent as a matter of law. In support of this latter assertion, petitioners submitted the affidavit of Charles Bermant, an employee of petitioners and the author of the two longer articles.[2] In this affidavit, Bermant stated that he had spent a substantial amount of time researching **\*\*2509** and writing the articles and that his facts were obtained from a wide variety of sources. He also stated that he had at all times believed and still believed that the facts contained in the articles were truthful and accurate. Attached to this affidavit was an appendix in which Bermant detailed the sources for each of the statements alleged by respondents to be libelous.

**\*246** Respondents opposed the motion for summary judgment, asserting that there were numerous inaccuracies in the articles and claiming that an issue of actual malice was presented by virtue of the fact that in preparing the articles Bermant had relied on several sources that respondents asserted were patently unreliable. Generally, respondents charged that petitioners had failed adequately to verify their information before publishing. Respondents also presented evidence that William McGaw, an editor of The Investigator, had told petitioner Adkins before publication that the articles were "terrible" and "ridiculous."

In ruling on the motion for summary judgment, the District Court first held that respondents were limited-purpose public figures and that *New York Times* therefore applied.[3] The District Court then held that Bermant's thorough investigation and research and his reliance on numerous sources precluded a finding of actual malice. Thus, the District Court granted the motion and entered judgment in favor of petitioners.

On appeal, the Court of Appeals affirmed as to 21 and reversed as to 9 of the allegedly defamatory statements. Although it noted that respondents did not challenge the District Court's ruling that they were limited-purpose public **\*247** figures and that they were thus required to prove their case under *New York Times*, the Court of Appeals nevertheless held that for the purposes of summary judgment the requirement that actual malice be proved by clear and convincing evidence, rather than by a preponderance of the evidence, was irrelevant: To defeat summary judgment respondents did not have to show that a jury could find actual malice with "convincing clarity." The court based this conclusion on a perception that to impose the greater evidentiary burden at summary judgment "would change the threshold summary judgment inquiry from a search for a minimum of facts supporting the plaintiff's case to an evaluation of the weight of those facts and (it would seem) of the weight of at least the defendant's uncontroverted facts as well." 241 U.S.App.D.C., at 253, 746 F.2d, at 1570. The court then held, with respect to nine of the statements, that summary judgment had been improperly granted because "a jury could reasonably conclude that the ... allegations were defamatory, false, and made with actual malice." *Id.*, at 260, 746 F.2d at 1577.

II

Case 21-2901, Document 62, 06/24/2022, 3337761, Page60 of 109

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)

106 S.Ct. 2505, 91 L.Ed.2d 202, 54 USLW 4755, 4 Fed.R.Serv.3d 1041...

A

[1] Our inquiry is whether the Court of Appeals erred in holding that the heightened evidentiary requirements that apply to proof of actual malice in this *New York Times* case need not be considered for the purposes of a motion for summary judgment. Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if **\*\*2510** the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported **\*248** motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

[2] [3] As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93–95 (1983). This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

[4] More important for present purposes, summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. In *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), we affirmed a grant of summary judgment for an antitrust defendant where the issue was whether there was a genuine factual dispute as to the existence of a conspiracy. We noted Rule 56(c)'s provision that a party opposing a properly supported motion for summary judgment " 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.' " We observed further that

"[i]t is true that the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to **\*249** trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." 391 U.S., at 288–289, 88 S.Ct., at 1592.

We went on to hold that, in the face of the defendant's properly supported motion for summary judgment, the plaintiff could not rest on his allegations of a conspiracy to get to a jury without "any significant probative evidence tending to support the complaint." *Id.*, at 290, 88 S.Ct., at 1593.

Again, in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), the Court emphasized that the availability of summary judgment turned on whether a proper jury question was presented. There, one of the issues was whether there was a conspiracy between private persons and law enforcement officers. The District Court granted summary judgment for the defendants, stating that there was no evidence from which reasonably minded jurors might draw an inference of conspiracy. We reversed, pointing out that the moving parties' submissions had not foreclosed the possibility of the existence of certain facts from which "it would be open to a jury ... to infer from the circumstances" that there had been a meeting of the minds. *Id.*, at 158–159, 90 S.Ct., at 1608, 1609.

[5] [6] Our prior decisions may not have uniformly recited the same language in describing genuine factual issues under **\*\*2511** Rule 56, but it is clear enough from our recent cases that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. As *Adickes, supra,* and *Cities Service, supra,* indicate, there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Cities Service, supra,* 391 U.S., at 288–289, 88 S.Ct., at 1592. If the evidence is merely colorable, *Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (*per curiam* ), or is not significantly probative, **\*250** *Cities Service, supra,* at 290, 88 S.Ct., at 1592, summary judgment may be granted.

Case 21-2901, Document 62, 06/24/2022, 3337761, Page61 of 109

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)
106 S.Ct. 2505, 91 L.Ed.2d 202, 54 USLW 4755, 4 Fed.R.Serv.3d 1041...

**[7]** That this is the proper focus of the inquiry is strongly suggested by the Rule itself. Rule 56(e) provides that, when a properly supported motion for summary judgment is made,[4] the adverse party "must set forth specific facts showing that there is a genuine issue for trial."[5] And, as we noted above, Rule 56(c) provides that the trial judge shall then grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. There is no requirement that the trial judge make findings of fact.[6] The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

**[8]** Petitioners suggest, and we agree, that this standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Brady v. Southern R. Co.,* 320 U.S. 476, 479–480, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943). If reasonable minds could differ as to the import of the evidence, however, **\*251** a verdict should not be directed. *Wilkerson v. McCarthy,* 336 U.S. 53, 62, 69 S.Ct. 413, 417, 93 L.Ed. 497 (1949). As the Court long ago said in *Improvement Co. v. Munson,* 14 Wall. 442, 448, 20 L.Ed. 867 (1872), and has several times repeated:

"Nor are judges any longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a *scintilla* of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." (Footnotes omitted.)

See also *Pleasants v. Fant,* 22 Wall. 116, 120–121, 22 L.Ed. 780 (1875); *Coughran v. Bigelow,* 164 U.S. 301, 307, 17 S.Ct. 117, 119, 41 L.Ed. 442 (1896); *Pennsylvania R. Co. v. Chamberlain,* 288 U.S. 333, 343, 53 S.Ct. 391, 394, 77 L.Ed. 819 (1933).

**\*\*2512** The Court has said that summary judgment should be granted where the evidence is such that it "would require a directed verdict for the moving party." *Sartor v. Arkansas Gas Corp.,* 321 U.S. 620, 624, 64 S.Ct. 724, 727, 88 L.Ed. 967 (1944). And we have noted that the "genuine issue" summary judgment standard is "very close" to the "reasonable jury" directed verdict standard: "The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted." *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745, n. 11, 103 S.Ct. 2161, 2171, n. 11, 76 L.Ed.2d 277 (1983). In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission **\*252** to a jury or whether it is so one-sided that one party must prevail as a matter of law.

**B**

**[9]** **[10]** **[11]** Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—"whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Munson, supra,* 14 Wall., at 448.

In terms of the nature of the inquiry, this is no different from the consideration of a motion for acquittal in a criminal case, where the beyond-a-reasonable-doubt standard applies and where the trial judge asks whether a reasonable jury could find guilt beyond a reasonable doubt. See *Jackson v. Virginia,* 443 U.S. 307, 318–319, 99 S.Ct. 2781, 2788–2789, 61 L.Ed.2d 560 (1979). Similarly, where the First

Case 21-2901, Document 62, 06/24/2022, 3337761, Page62 of 109

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)
106 S.Ct. 2505, 91 L.Ed.2d 202, 54 USLW 4755, 4 Fed.R.Serv.3d 1041...

Amendment mandates a "clear and convincing" standard, the trial judge in disposing of a directed verdict motion should consider whether a reasonable factfinder could conclude, for example, that the plaintiff had shown actual malice with convincing clarity.

**\*253** The case for the proposition that a higher burden of proof should have a corresponding effect on the judge when deciding whether to send the case to the jury was well made by the Court of Appeals for the Second Circuit in *United States v. Taylor,* 464 F.2d 240 (2d Cir.1972), which overruled *United States v. Feinberg,* 140 F.2d 592 (2d Cir.1944), a case holding that the standard of evidence necessary for a judge to send a case to the jury is the same in both civil and criminal cases even though the standard that the jury must apply in a criminal case is more demanding than in civil proceedings. Speaking through Judge Friendly, the Second Circuit said: "It would seem at first blush—and we think also at second—that more 'facts in evidence' are needed for the judge to allow [reasonable jurors to pass on a claim] when the proponent is required to establish [the claim] not merely by a preponderance of the evidence but ... beyond a reasonable doubt." 464 F.2d, at 242. The court could not find a "satisfying explanation in the *Feinberg* opinion why the judge should not place this higher burden on the prosecution in criminal proceedings before sending the case to the jury." *Ibid.* The *Taylor* court **\*\*2513** also pointed out that almost all the Circuits had adopted something like Judge Prettyman's formulation in *Curley v. United States,* 160 F.2d 229, 232–233 (D.C.Cir.1947):

"The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt, the motion must be granted. If he concludes that either of the **\*254** two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter."

This view is equally applicable to a civil case to which the "clear and convincing" standard applies. Indeed, the *Taylor* court thought that it was implicit in this Court's adoption of the clear-and-convincing-evidence standard for certain kinds of cases that there was a "concomitant duty on the judge to consider the applicable burden when deciding whether to send a case to the jury." 464 F.2d, at 243. Although the court thought that this higher standard would not produce different results in many cases, it could not say that it would never do so.

**[12]** **[13]** Just as the "convincing clarity" requirement is relevant in ruling on a motion for directed verdict, it is relevant in ruling on a motion for summary judgment. When determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times.* For example, there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.

Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden. This conclusion is mandated by the nature of this determination. The question here is whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not. Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It makes no sense to say that a jury could reasonably find for either party without some **\*255** benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards.

**[14]** **[15]** Our holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury. It by no means authorizes trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Adickes,* 398 U.S., at 158–159, 90 S.Ct., at 1608–1609. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary

Case 21-2901, Document 62, 06/24/2022, 3337761, Page63 of 109

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)

106 S.Ct. 2505, 91 L.Ed.2d 202, 54 USLW 4755, 4 Fed.R.Serv.3d 1041...

judgment in a case where there is reason to believe that the better course would be to proceed to a full trial. \*\*2514 *Kennedy v. Silas Mason Co.,* 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948).

[16] In sum, we conclude that the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case. This is true at both the directed verdict and summary judgment stages. Consequently, where the *New York Times* "clear and convincing" evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant. Thus, where the factual dispute concerns actual malice, clearly a material issue in a *New York Times* case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding \*256 either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.[7]

## III

[17] Respondents argue, however, that whatever may be true of the applicability of the "clear and convincing" standard at the summary judgment or directed verdict stage, the defendant should seldom if ever be granted summary judgment where his state of mind is at issue and the jury might disbelieve him or his witnesses as to this issue. They rely on *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), for this proposition. We do not understand *Poller,* however, to hold that a plaintiff may defeat a defendant's properly supported motion for summary judgment in a conspiracy or libel case, for example, without offering any concrete evidence from which a reasonable juror could return a verdict in his favor and by merely asserting that the jury might, and legally could, disbelieve the defendant's denial of a conspiracy or of legal malice. The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict. Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial. Based on that Rule, *Cities Service,* 391 U.S., at 290, 88 S.Ct., at 1593, held that the plaintiff could

not defeat the properly supported summary judgment motion of a defendant charged with a conspiracy without offering "any significant probative evidence tending to support the complaint." As we have recently said, "discredited testimony \*257 is not [normally] considered a sufficient basis for drawing a contrary conclusion." *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984). Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery. We repeat, however, that the plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial.

## IV

In sum, a court ruling on a motion for summary judgment must be guided by the *New York Times* "clear and convincing" \*\*2515 evidentiary standard in determining whether a genuine issue of actual malice exists—that is, whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity. Because the Court of Appeals did not apply the correct standard in reviewing the District Court's grant of summary judgment, we vacate its decision and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Justice BRENNAN, dissenting.

The Court today holds that "whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case," *ante,* at 2513.[1] In my view, the Court's analysis is deeply flawed, \*258 and rests on a shaky foundation of unconnected and unsupported observations, assertions, and conclusions. Moreover, I am unable to divine from the Court's opinion *how* these evidentiary standards are to be considered, or what a trial judge is actually supposed to do in ruling on a motion for summary judgment. Accordingly, I respectfully dissent.

To support its holding that in ruling on a motion for summary judgment a trial court must consider substantive evidentiary

Case 21-2901, Document 62, 06/24/2022, 3337761, Page64 of 109

**Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)**

106 S.Ct. 2505, 91 L.Ed.2d 202, 54 USLW 4755, 4 Fed.R.Serv.3d 1041...

burdens, the Court appropriately begins with the language of Rule 56(c), which states that summary judgment shall be granted if it appears that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court then purports to restate this Rule, and asserts that "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ante,* at 2510. No direct authority is cited for the proposition that in order to determine whether a dispute is "genuine" for Rule 56 purposes a judge must ask if a "reasonable" jury could find for the non-moving party. Instead, the Court quotes from **\*259** *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288–289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968), to the effect that a summary judgment motion will be defeated if "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial," *ante,* at 2510, and that a plaintiff may not, in defending against a motion for summary judgment, rest on mere allegations or denials of his pleadings. After citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), for the unstartling proposition that "the availability of summary judgment turn[s] on whether a proper jury question [is] presented," *ante,* at ——, the Court then reasserts, again with no direct authority, that in determining whether **\*\*2516** a jury question is presented, the inquiry is whether there are factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Ante,* at 2511. The Court maintains that this summary judgment inquiry "mirrors" that which applies in the context of a motion for directed verdict under Federal Rule of Civil Procedure 50(a): "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Ante,* at 2511.

Having thus decided that a "genuine" dispute is one which is not "one-sided," and one which could "reasonably" be resolved by a "fair-minded" jury in favor of either party, *ibid.,* the Court then concludes:

"Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall,

and these standards and boundaries are in fact provided by the applicable evidentiary standards." *Ante,* at 2513.

**\*260** As far as I can discern, this conclusion, which is at the heart of the case, has been reached without the benefit of any support in the case law. Although, as noted above, the Court cites *Adickes* and *Cities Service,* those cases simply do not stand for the proposition that in ruling on a summary judgment motion, the trial court is to inquire into the "one-sidedness" of the evidence presented by the parties. *Cities Service* involved the propriety of a grant of summary judgment in favor of a defendant alleged to have conspired to violate the antitrust laws. The issue in the case was whether, on the basis of the facts in the record, a jury could *infer* that the defendant had entered into a conspiracy to boycott. No direct evidence of the conspiracy was produced. In agreeing with the lower courts that the *circumstantial* evidence presented by the plaintiff was insufficient to take the case to the jury, we observed that there was "one fact" that petitioner had produced to support the existence of the illegal agreement, and that that single fact could not support petitioner's *theory* of liability. Critically, we observed that "[t]he case at hand presents peculiar difficulties because the issue of fact crucial to petitioner's case is also an issue of law, namely the existence of a conspiracy." 391 U.S., at 289, 88 S.Ct., at 1592. In other words, *Cities Service* is at heart about whether certain facts can support inferences that are, as a matter of antitrust law, sufficient to support a particular theory of liability under the Sherman Act. Just this Term, in discussing summary judgment in the context of suits brought under the antitrust laws, we characterized both *Cities Service* and *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), as cases in which "*antitrust law* limit[ed] the range of permissible inferences from ambiguous evidence...." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (emphasis added). *Cities Service* thus provides no authority for the conclusion that Rule 56 requires a trial court to consider whether direct evidence produced by the parties is "one-sided." To the contrary, in *Matsushita,* the most recent **\*261** case to cite and discuss *Cities Service,* we stated that the requirement that a dispute be "genuine" means simply that there must be more than "some metaphysical doubt as to the material facts." 475 U.S., at 586, 106 S.Ct., at 1356.[2]

**\*\*2517** Nor does *Adickes,* also relied on by the Court, suggest in any way that the appropriate summary judgment inquiry is whether the evidence overwhelmingly supports one

Case 21-2901, Document 62, 06/24/2022, 3337761, Page65 of 109

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)

106 S.Ct. 2505, 91 L.Ed.2d 202, 54 USLW 4755, 4 Fed.R.Serv.3d 1041...

party. *Adickes*, like *Cities Service*, presented the question of whether a grant of summary judgment in favor of a defendant on a conspiracy count was appropriate. The plaintiff, a **\*262** white schoolteacher, maintained that employees of defendant Kress conspired with the police to deny her rights protected by the Fourteenth Amendment by refusing to serve her in one of its lunchrooms simply because she was white and accompanied by a number of black schoolchildren. She maintained, among other things, that Kress arranged with the police to have her arrested for vagrancy when she left the defendant's premises. In support of its motion for summary judgment, Kress submitted statements from a deposition of one of its employees asserting that he had not communicated or agreed with the police to deny plaintiff service or to have her arrested, and explaining that the store had taken the challenged action not because of the race of the plaintiff, but because it was fearful of the reaction of some of its customers if it served a racially mixed group. Kress also submitted affidavits from the Chief of Police and the arresting officers denying that the store manager had requested that petitioner be arrested, and noted that in the plaintiff's own deposition, she conceded that she had no knowledge of any communication between the police and any Kress employee and was relying on circumstantial evidence to support her allegations. In opposing defendant's motion for summary judgment, plaintiff stated that defendant in its moving papers failed to dispute an allegation in the complaint, a statement at her deposition, and an unsworn statement by a Kress employee all to the effect that there was a policeman in the store at the time of the refusal to serve, and that it was this policeman who subsequently made the arrest. Plaintiff argued that this sequence of events "created a substantial enough possibility of a conspiracy to allow her to proceed to trial...." 398 U.S., at 157, 90 S.Ct., at 1608.

We agreed, and therefore reversed the lower courts, reasoning that Kress "did not carry its burden because of its failure to foreclose the possibility that there was a policeman in the Kress store while petitioner was awaiting service, and that this policeman reached an understanding with some **\*263** Kress employee that petitioner not be served." 398 U.S. at 157, 90 S.Ct., at 1608. Despite the fact that *none of the materials relied on by plaintiff* met the requirements of Rule 56(e), we stated nonetheless that Kress failed to meet its initial burden of showing that there was no genuine dispute of a material fact. Specifically, we held that because Kress failed to negate plaintiff's materials suggesting that a **\*\*2518** policeman was in fact in the store at the time of the refusal to serve, "it would be open to a jury ... to infer from the circumstances that the

policeman and a Kress employee had a 'meeting of the minds' and thus reached an understanding that petitioner should be refused service." *Ibid.*

In *Adickes* we held that a jury might permissibly infer a conspiracy from the mere presence of a policeman in a restaurant. We never reached and did not consider whether the evidence was "one-sided," and had we done so, we clearly would have had to affirm, rather than reverse, the lower courts, since in that case there was no admissible evidence submitted by petitioner, and a significant amount of evidence presented by the defendant tending to rebut the existence of a conspiracy. The question we did reach was simply whether, as a matter of conspiracy law, a jury would be entitled, again, as a matter of law, to infer from the presence of a policeman in a restaurant the making of an agreement between that policeman and an employee. Because we held that a jury was entitled so to infer, and because the defendant had not carried its initial burden of production of demonstrating that there was no evidence that there was not a policeman in the lunchroom, we concluded that summary judgment was inappropriate.

Accordingly, it is surprising to find the case cited by the majority for the proposition that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Ante,* at 2511. There was, of course, *no* admissible evidence in *Adickes* favoring the nonmoving plaintiff; there was only an **\*264** unrebutted assertion that a Kress employee and a policeman were in the same room at the time of the alleged constitutional violation. Like *Cities Service, Adickes* suggests that on a defendant's motion for summary judgment, a trial court must consider whether, as a matter of the substantive law of the plaintiff's cause of action, a jury will be permitted to draw inferences supporting the plaintiff's legal theory. In *Cities Service* we found, in effect, that the plaintiff had failed to make out a prima facie case; in *Adickes* we held that the moving defendant had failed to rebut the plaintiff's prima facie case. In neither case is there any intimation that a trial court should inquire whether plaintiff's evidence is "significantly probative," as opposed to "merely colorable," or, again, "one-sided." Nor is there in either case any suggestion that once a nonmoving plaintiff has made out a prima facie case based on evidence satisfying Rule 56(e) that there is any showing that a defendant can make to prevail on a motion for summary judgment. Yet this is what the Court appears to hold, relying, in part, on these two cases.[3]

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)

106 S.Ct. 2505, 91 L.Ed.2d 202, 54 USLW 4755, 4 Fed.R.Serv.3d 1041...

As explained above, and as explained also by Justice REHNQUIST in his dissent, see *post*, at 2522, I cannot agree that the authority cited by the Court supports its position. In my view, the Court's result is the product of an exercise **\*265** akin to the child's game of "telephone," in which a message is repeated from one person to another and then another; after some time, the message bears little resemblance to what was originally spoken. In the present case, the Court purports to restate the summary judgment test, but with each repetition, the original understanding is increasingly distorted.

**\*\*2519** But my concern is not only that the Court's decision is unsupported; after all, unsupported views may nonetheless be supportable. I am more troubled by the fact that the Court's opinion sends conflicting signals to trial courts and reviewing courts which must deal with summary judgment motions on a day-to-day basis. This case is about a trial court's responsibility when considering a motion for summary judgment, but in my view, the Court, while instructing the trial judge to "consider" heightened evidentiary standards, fails to explain what that means. In other words, how does a judge assess how one-sided evidence is, or what a "fair-minded" jury could "reasonably" decide? The Court provides conflicting clues to these mysteries, which I fear can lead only to increased confusion in the district and appellate courts.

The Court's opinion is replete with boilerplate language to the effect that trial courts are not to weigh evidence when deciding summary judgment motions:

"[I]t is clear enough from our recent cases that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter...." *Ante*, at 2511.

"Our holding ... does not denigrate the role of the jury.... Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Ante*, at 2513.

**\*266** But the Court's opinion is also full of language which could surely be understood as an invitation—if not an instruction—to trial courts to assess and weigh evidence much as a juror would:

"When determining if a genuine factual issue ... exists ..., a trial judge must *bear in mind the actual quantum and quantity* of proof necessary to support liability.... For example, *there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quality* to allow a rational finder of fact to find actual malice by clear and convincing evidence." *Ante*, at 2513 (emphasis added).

"[T]he inquiry ... [is] whether the evidence presents a *sufficient* disagreement to require submission to a jury or whether *it is so one-sided* that one party must prevail as a matter of law." *Ante*, at 2512 (emphasis added).

"[T]he judge must ask himself ... whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Ibid.*

I simply cannot square the direction that the judge "is not himself to weigh the evidence" with the direction that the judge also bear in mind the "quantum" of proof required and consider whether the evidence is of sufficient "caliber or quantity" to meet that "quantum." I would have thought that a determination of the "caliber and quantity," *i.e.*, the importance and value, of the evidence in light of the "quantum," *i.e.*, amount "required," could *only* be performed by weighing the evidence.

If in fact, this is what the Court would, under today's decision, require of district courts, then I am fearful that this new rule—for this surely would be a brand new procedure—will transform what is meant to provide an expedited "summary" **\*267** procedure into a full-blown paper trial on the merits. It is hard for me to imagine that a responsible counsel, aware that the judge will be assessing the "quantum" of the evidence he is presenting, will risk either moving for or responding to a summary judgment motion without coming forth with *all* of the evidence he can muster in support of his client's case. Moreover, if the judge on motion for summary judgment really is to weigh the evidence, then **\*\*2520** in my view grave concerns are raised concerning the constitutional right of civil litigants to a jury trial.

It may well be, as Justice REHNQUIST suggests, see *post*, at 2521, that the Court's decision today will be of little practical effect. I, for one, cannot imagine a case in which a

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)
106 S.Ct. 2505, 91 L.Ed.2d 202, 54 USLW 4755, 4 Fed.R.Serv.3d 1041...

judge might plausibly hold that the evidence on motion for summary judgment was sufficient to enable a plaintiff bearing a mere preponderance burden to get to the jury—*i.e.*, that a prima facie case had been made out—but insufficient for a plaintiff bearing a clear-and-convincing burden to withstand a defendant's summary judgment motion. Imagine a suit for breach of contract. If, for example, the defendant moves for summary judgment and produces one purported eyewitness who states that he was present at the time the parties discussed the possibility of an agreement, and unequivocally denies that the parties ever agreed to enter into a contract, while the plaintiff produces one purported eyewitness who asserts that the parties did in fact come to terms, presumably that case would go to the jury. But if the defendant produced not one, but 100 eyewitnesses, while the plaintiff stuck with his single witness, would that case, under the Court's holding, still go to the jury? After all, although the plaintiff's burden in this hypothetical contract action is to prove his case by a mere preponderance of the evidence, the judge, so the Court tells us, is to "ask himself ... whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Ante,* at 2512. Is there, in this hypothetical example, "a sufficient disagreement to require submission **\*268** to a jury," or is the evidence "so one-sided that one party must prevail as a matter of law"? *Ibid.* Would the result change if the plaintiff's one witness were now shown to be a convicted perjurer? Would the result change if, instead of a garden-variety contract claim, the plaintiff sued on a fraud theory, thus requiring him to prove his case by clear and convincing evidence?

It seems to me that the Court's decision today unpersuasively answers the question presented, and in doing so raises a host of difficult and troubling questions for which there may well be no adequate solutions. What is particularly unfair is that the mess we make is not, at least in the first instance, our own to deal with; it is the district courts and courts of appeals that must struggle to clean up after us.

In my view, if a plaintiff presents evidence which either directly or by permissible inference (and these inferences are a product of the substantive law of the underlying claim) supports all of the elements he needs to prove in order to prevail on his legal claim, the plaintiff has made out a prima facie case and a defendant's motion for summary judgment must fail regardless of the burden of proof that the plaintiff must meet. In other words, whether evidence is "clear and convincing," or proves a point by a mere preponderance, is for the factfinder to determine. As I read the case law, this is how it has been, and because of my concern that today's

decision may erode the constitutionally enshrined role of the jury, and also undermine the usefulness of summary judgment procedure, this is how I believe it should remain.

Justice REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

The Court, apparently moved by concerns for intellectual tidiness, mistakenly decides that the "clear and convincing evidence" standard governing finders of fact in libel cases must be applied by trial courts in deciding a motion for summary judgment in such a case. The Court refers to this as a "substantive standard," but I think it is actually a procedural **\*269** requirement engrafted onto Rule 56, contrary to our statement in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), that

"[w]e have already declined in other contexts to grant special procedural protections to defendants in libel and defamation actions in addition to the constitutional **\*\*2521** protections embodied in the substantive laws." *Id.,* at 790–791, 104 S.Ct., at 1487–1488.

The Court, I believe, makes an even greater mistake in failing to apply its newly announced rule to the facts of this case. Instead of thus illustrating how the rule works, it contents itself with abstractions and paraphrases of abstractions, so that its opinion sounds much like a treatise about cooking by someone who has never cooked before and has no intention of starting now.

There is a large class of cases in which the higher standard imposed by the Court today would seem to have no effect at all. Suppose, for example, on motion for summary judgment in a hypothetical libel case, the plaintiff concedes that his only proof of malice is the testimony of witness A. Witness A testifies at his deposition that the reporter who wrote the story in question told him that she, the reporter, had done absolutely no checking on the story and had real doubts about whether or not it was correct as to the plaintiff. The defendant's examination of witness A brings out that he has a prior conviction for perjury.

May the Court grant the defendant's motion for summary judgment on the ground that the plaintiff has failed to produce sufficient proof of malice? Surely not, if the Court means what it says, when it states: "Credibility determinations ... are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The

Case 21-2901, Document 62, 06/24/2022, 3337761, Page68 of 109

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)

106 S.Ct. 2505, 91 L.Ed.2d 202, 54 USLW 4755, 4 Fed.R.Serv.3d 1041...

evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Ante,* at 2513.

The case proceeds to trial, and at the close of the plaintiff's evidence the defendant moves for a directed verdict on the **\*270** ground that the plaintiff has failed to produce sufficient evidence of malice. The only evidence of malice produced by the plaintiff is the same testimony of witness A, who is duly impeached by the defendant for the prior perjury conviction. In addition, the trial judge has now had an opportunity to observe the demeanor of witness A, and has noticed that he fidgets when answering critical questions, his eyes shift from the floor to the ceiling, and he manifests all other indicia traditionally attributed to perjurers.

May the trial court at this stage grant a directed verdict? Again, surely not; we are still dealing with "credibility determinations."

The defendant now puts on its testimony, and produces three witnesses who were present at the time when witness A alleges that the reporter said she had not checked the story and had grave doubts about its accuracy as to plaintiff. Witness A concedes that these three people were present at the meeting, and that the statement of the reporter took place in the presence of all these witnesses. Each witness categorically denies that the reporter made the claimed statement to witness A.

May the trial court now grant a directed verdict at the close of all the evidence? Certainly the plaintiff's case is appreciably weakened by the testimony of three disinterested witnesses, and one would hope that a properly charged jury would quickly return a verdict for the defendant. But as long as credibility is exclusively for the jury, it seems the Court's analysis would still require this case to be decided by that body.

Thus, in the case that I have posed, it would seem to make no difference whether the standard of proof which the plaintiff had to meet in order to prevail was the preponderance of the evidence, clear and convincing evidence, or proof beyond a reasonable doubt. But if the application of the standards makes no difference in the case that I hypothesize, one may fairly ask in what sort of case *does* the difference in standards **\*271** make a difference in outcome? Cases may be posed dealing with evidence that is essentially documentary, rather than testimonial; but the Court has held in a related context involving Federal Rule of Civil Procedure 52(a)

that inferences from documentary evidence are as much the prerogative **\*\*2522** of the finder of fact as inferences as to the credibility of witnesses. *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). The Court affords the lower courts no guidance whatsoever as to what, if any, difference the abstract standards that it propounds would make in a particular case.

There may be more merit than the Court is willing to admit to Judge Learned Hand's observation in *United States v. Feinberg,* 140 F.2d 592, 594 (CA2), cert. denied, 322 U.S. 726, 64 S.Ct. 943, 88 L.Ed.2d 1562 (1944), that "[w]hile at times it may be practicable" to "distinguish between the evidence which should satisfy reasonable men, and the evidence which should satisfy reasonable men beyond a reasonable doubt[,] ... in the long run the line between them is too thin for day to day use." The Court apparently approves the overruling of the *Feinberg* case in the Court of Appeals by Judge Friendly's opinion in *United States v. Taylor,* 464 F.2d 240 (1972). But even if the Court is entirely correct in its judgment on this point, Judge Hand's statement seems applicable to this case because the criminal case differs from the libel case in that the standard in the former is proof "beyond a reasonable doubt," which is presumably easier to distinguish from the normal "preponderance of the evidence" standard than is the intermediate standard of "clear and convincing evidence."

More important for purposes of analyzing the present case, there is no exact analog in the criminal process to the motion for summary judgment in a civil case. Perhaps the closest comparable device for screening out unmeritorious cases in the criminal area is the grand jury proceeding, though the comparison is obviously not on all fours. The standard for allowing a criminal case to proceed to trial is not whether the government has produced prima facie evidence of guilt beyond **\*272** a reasonable doubt for every element of the offense, but only whether it has established probable cause. See *United States v. Mechanik,* 475 U.S. 66, 70, 106 S.Ct. 938, 941–942, 89 L.Ed.2d 50 (1986). Thus, in a criminal case the standard used prior to trial is much more lenient than the "clear beyond a reasonable doubt" standard which must be employed by the finder of fact.

The three differentiated burdens of proof in civil and criminal cases, vague and impressionistic though they necessarily are, probably do make some difference when considered by the finder of fact, whether it be a jury or a judge in a bench trial. Yet it is not a logical or analytical message that the terms

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)

106 S.Ct. 2505, 91 L.Ed.2d 202, 54 USLW 4755, 4 Fed.R.Serv.3d 1041...

convey, but instead almost a state of mind; we have previously said:

"Candor suggests that, to a degree, efforts to analyze what lay jurors understand concerning the differences among these three tests ... may well be largely an academic exercise.... Indeed, the ultimate truth as to how the standards of proof affect decisionmaking may well be *unknowable,* given that factfinding is a process shared by countless thousands of individuals throughout the country. We probably can assume no more than that the difference between a preponderance of the evidence and proof beyond a reasonable doubt probably is better understood than either of them in relation to the intermediate standard of clear and convincing evidence." *Addington v. Texas,* 441 U.S. 418, 424–425, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979) (emphasis added).

The Court's decision to engraft the standard of proof applicable to a factfinder onto the law governing the

procedural motion for a summary judgment (a motion that has always been regarded as raising a question of law rather than a question of fact, see, *e.g., La Riviere v. EEOC,* 682 F.2d 1275, 1277–1278 (CA9 1982) (Wallace, J.)), will do great mischief with little corresponding benefit. The primary effect of the Court's opinion today will likely be to cause the decisions of trial judges on summary judgment motions in libel cases to be **\*273** more erratic and inconsistent than before. This is largely because the Court has **\*\*2523** created a standard that is different from the standard traditionally applied in summary judgment motions without even hinting as to how its new standard will be applied to particular cases.

**All Citations**

477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202, 54 USLW 4755, 4 Fed.R.Serv.3d 1041, 12 Media L. Rep. 2297

Footnotes

\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1 See, *e.g., Rebozo v. Washington Post Co.,* 637 F.2d 375, 381 (CA5), cert. denied, 454 U.S. 964, 102 S.Ct. 504, 70 L.Ed.2d 379 (1981); *Yiamouyiannis v. Consumers Union of United States, Inc.,* 619 F.2d 932, 940 (CA2), cert. denied, 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980); *Carson v. Allied News Co.,* 529 F.2d 206, 210 (CA7 1976).

2 The short, introductory article was written by petitioner **Anderson** and relied exclusively on the information obtained by Bermant.

3 In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974), this Court summarized who will be considered to be a public figure to whom the *New York Times* standards will apply:

"[The public figure] designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions."

The District Court found that respondents, as political lobbyists, are the second type of political figure described by the *Gertz* court—a limited-purpose public figure. See also *Waldbaum v. Fairchild Publications, Inc.,* 201 U.S.App.D.C. 301, 306, 627 F.2d 1287, 1292, cert. denied, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980).

4 Our analysis here does not address the question of the initial burden of production of evidence placed by Rule 56 on the party moving for summary judgment. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed. 265 (1986). Respondents have not raised this issue here, and for the purposes of our discussion we assume that the moving party has met initially the requisite evidentiary burden.

106 S.Ct. 2505, 91 L.Ed.2d 202, 54 USLW 4755, 4 Fed.R.Serv.3d 1041...

5    This requirement in turn is qualified by Rule 56(f)'s provision that summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition. In our analysis here, we assume that both parties have had ample opportunity for discovery.

6    In many cases, however, findings are extremely helpful to a reviewing court.

7    Our statement in *Hutchinson v. Proxmire,* 443 U.S. 111, 120, n. 9, 99 S.Ct. 2675, 2680, n. 9 (1979), that proof of actual malice "does not readily lend itself to summary disposition" was simply an acknowledgment of our general reluctance "to grant special procedural protections to defendants in libel and defamation actions in addition to the constitutional protections embodied in the substantive laws." *Calder v. Jones,* 465 U.S. 783, 790–791, 104 S.Ct. 1482, 1487–1488, 79 L.Ed.2d 804 (1984).

1    The Court's holding today is not, of course, confined in its application to First Amendment cases. Although this case arises in the context of litigation involving libel and the press, the Court's holding is that "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Ante,* at 2513–2514. Accordingly, I simply do not understand why Justice REHNQUIST, dissenting, feels it appropriate to cite *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), and to remind the Court that we have consistently refused to extend special procedural protections to defendants in libel and defamation suits. The Court today does nothing of the kind. It changes summary judgment procedure for *all* litigants, regardless of the substantive nature of the underlying litigation.

     Moreover, the Court's holding is not limited to those cases in which the evidentiary standard is "heightened," *i.e.,* those in which a plaintiff must prove his case by more than a mere preponderance of the evidence. Presumably, if a district court ruling on a motion for summary judgment in a libel case is to consider the "quantum and quality" of proof necessary to support liability under *New York Times, ante,* at 2513 and then ask whether the evidence presented is of "sufficient caliber or quantity" to support that quantum and quality, the court must ask the same questions in a garden-variety action where the plaintiff need prevail only by a mere preponderance of the evidence. In other words, today's decision by its terms applies to all summary judgment motions, irrespective of the burden of proof required and the subject matter of the suit.

2    Writing in dissent in *Matsushita,* Justice WHITE stated that he agreed with the summary judgment test employed by the Court, namely, that " '[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " 475 U.S., at 599, 106 S.Ct., at 1363. Whether the shift, announced today, from looking to a "reasonable" rather than a "rational" jury is intended to be of any significance, there are other aspects of the *Matsushita* dissent which I find difficult to square with the Court's holding in the present case. The *Matsushita* dissenters argued:

     "... [T]he Court summarizes *Monsanto Co. v. Spray-Rite Service Corp., supra,* as holding that 'courts should not permit factfinders to infer conspiracies when such inferences are implausible....' *Ante,* at ——. Such language suggests that a judge hearing a defendant's motion for summary judgment in an antitrust case should go beyond the traditional summary judgment inquiry and decide for himself whether the weight of the evidence favors the plaintiff. *Cities Service* and *Monsanto* do not stand for any such proposition. Each of those cases simply held that a particular piece of evidence standing alone was insufficiently probative to justify sending a case to the jury. These holdings in no way undermine the doctrine that all evidence must be construed in the light most favorable to the party opposing summary judgment.

     "If the Court intends to give every judge hearing a motion for summary judgment in an antitrust case the job of determining if the evidence makes the inference of conspiracy more probable than not, it is overturning settled law. If the Court does not intend such a pronouncement, it should refrain from using unnecessarily broad and confusing language." *Id.,* at 600–601, 106 S.Ct., at 1363 (footnote omitted).

     In my view, these words are as applicable and relevant to the Court's opinion today as they were to the opinion of the Court in *Matsushita.*

3    I am also baffled by the other cases cited by the majority to support its holding. For example, the Court asserts that "[i]f ... evidence is merely colorable, *Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (*per curiam*), ... summary judgment may be granted." *Ante,* at 2511. In *Dombrowski,* we reversed a judgment granting summary judgment

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)

106 S.Ct. 2505, 91 L.Ed.2d 202, 54 USLW 4755, 4 Fed.R.Serv.3d 1041...

to the counsel to the Internal Security Subcommittee of the Judiciary Committee of the United States Senate because there was "controverted evidence in the record ... which affords more than merely colorable substance" to the petitioners' allegations. 387 U.S., at 84, 87 S.Ct., at 1427. *Dombrowski* simply cannot be read to mean that summary judgment may be *granted* if evidence is merely colorable; what the case actually says is that summary judgment will be *denied* if evidence is "*controverted,*" because when evidence is controverted, assertions become colorable for purposes of motions for summary judgment law.

End of Document                                          © 2022 Thomson Reuters. No claim to original U.S.
                                                                              Government Works.

Barrentine v. Arkansas-Best Freight System, Inc., 750 F.2d 47 (1984)

26 Wage & Hour Cas. (BNA) 1663, 102 Lab.Cas. P 34,623

KeyCite Yellow Flag - Negative Treatment

Criticized in Aguilar v. U.S., Fed.Cl., October 7, 1996

750 F.2d 47

United States Court of Appeals,

Eighth Circuit.

Lloyd **BARRENTINE**, et al. Clyde G.

Edwards, Cleo Keeney; Maxie Blanton;

Johnny Robinson; J.N. Scates; Charley Deaton;

H.E. Mitchell and L.R. Young, Appellees,

v.

## ARKANSAS–BEST FREIGHT

## SYSTEM, INC., Appellant.

No. 83–1932.

|

Submitted April 11, 1984.

|

Decided Dec. 10, 1984.

#### Synopsis

Following reversal and remand, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641, of affirmance, 615 F.2d 1194, of finding that over-the-road truck drivers' submission of grievances barred them from asserting their statutory wage claim in subsequent court action, the United States District Court for the Eastern District of Arkansas, George Howard Jr., J., entered judgment awarding drivers unpaid wages in their action under the Fair Labor Standards Act and enjoining employer from continuing to violate the Act by refusing to pay drivers at least minimum wage for time spent in certain activity. Employer appealed. The Court of Appeals, McMillian, Circuit Judge, held that: (1) time spent by drivers performing a pretrip safety inspection and, if a defect was detected, in transporting defective vehicle to repair facility was compensable activity under the FLSA; (2) pretrip safety inspection activities were such an integral part of and so indispensible to drivers' principal activity as to be outside the Portal-to-Portal Act exemption from back wage liability under the FLSA; and (3) drivers were not entitled to seek injunctive relief against future violations of FLSA.

Affirmed in part and vacated in part.

West Headnotes (4)

[1] **Labor and Employment** ⟶ Preliminary or Postliminary Activities in General

Time spent by over-the-road truck drivers performing a pretrip safety inspection and, if a defect was detected, in transporting defective vehicle to repair facility was compensable activity under the Fair Labor Standards Act. Fair Labor Standards Act of 1938, § 6(a), as amended, 29 U.S.C.A. § 206(a).

14 Cases that cite this headnote

[2] **Labor and Employment** ⟶ Preliminary or Postliminary Activities in General

Pretrip safety inspection activities of over-the-road truck drivers were such an integral part of and so indispensible to drivers' principal activity as to be outside the Portal-to-Portal Act exemption from back wage liability of employer for such activities under the Fair Labor Standards Act. Fair Labor Standards Act of 1938, § 16(b), as amended, 29 U.S.C.A. § 216(b); Portal-to-Portal Act of 1947, § 4(a) 29 U.S.C.A. § 254(a).

43 Cases that cite this headnote

[3] **Labor and Employment** ⟶ Good Faith; Reasonable Grounds

Under the Portal-to-Portal Act amendments, even if employer shows both subjective good faith and objectively reasonable grounds for believing that its actions were not in violation of Act, remission of liquidated damages remains within sound discretion of trial court. Portal-to-Portal Act of 1947, § 11, 29 U.S.C.A. § 260.

13 Cases that cite this headnote

[4] **Labor and Employment** ⟶ Parties; Standing

Over-the-road truck drivers empowered to bring action against employer for back wages under the Fair Labor Standards Act were not entitled to seek injunctive relief against future violations

of Act; only the Secretary of Labor has such authority. Fair Labor Standards Act of 1938, §§ 11(a), 16(b, c), 17, as amended, 29 U.S.C.A. §§ 211(a), 216(b, c), 217.

29 Cases that cite this headnote

**Attorneys and Law Firms**

*48 Walton Maurras, Fort Smith, Ark., for appellant.

David C. Vladeck, Washington, D.C., for appellees.

Before McMILLIAN, Circuit Judge, FAIRCHILD,* Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

**Opinion**

McMILLIAN, Circuit Judge.

**Arkansas-Best Freight System**, Inc., appeals from a final judgment entered in the District Court[1] for the Eastern District of Arkansas awarding individual employees or former employees unpaid wages in their action under § 16(b) of the Fair Labor Standards Act of 1938 (FLSA), as amended, 29 U.S.C. § 216(b) (1982), and enjoining it from continuing to violate the FLSA by refusing to pay the named employees at least minimum wage for time spent in certain activity. For reversal appellant argues that (1) the activity involved is not compensable work under the FLSA, (2) the activity involved is exempt under § 4(a) of the Portal-to-Portal Act of 1947, 29 U.S.C. § 254(a) (1982), and (3) an injunction is not an available remedy in an FLSA suit for back wages brought by employees on their own behalf rather than by the Secretary of Labor. For the reasons discussed below, we affirm the judgment of the district *49 court as to back wages and vacate the injunction.

This case has an interesting history which includes a previous encounter with this court and a visit to the United States Supreme Court. Appellees are over-the-road truck drivers employed, or formerly employed, by appellant, an interstate common motor carrier, at appellant's Little Rock, Arkansas, terminal.[2] Upon reporting for duty at the terminal, a truck driver "punches in" on a time clock, receives dispatch papers and completes some preliminary paper work. The driver then "punches out," proceeds to an assigned vehicle and conducts a pre-trip safety inspection of the vehicle as required by federal

regulations. If the driver finds no defects, the driver proceeds on his or her trip.

If, however, a defect is detected, the driver must drive the vehicle to **Arkansas-Best's** repair facility located in the terminal, "punch in" again and wait for the vehicle to be repaired. The driver then "punches out" and commences the trip. In such a case, the driver is paid for the time spent between the second "punch in" and "punch out," but not for the time between the first "punch out" and the second "punch in." It is this policy which is the gravamen of the case.

Pursuant to the collective bargaining agreement between the parties, employee grievances were filed, claiming that under the collective bargaining agreement which required compensation "for all time in [the employer's] service," the truck drivers were entitled to compensation for the time in question. A joint grievance committee rejected the grievances without explanation.

Appellees[3] then filed a two-count complaint in federal district court alleging in Count I that the time in question was compensable under the FLSA and in Count II that the union breached its duty of fair representation in processing the grievances. The district court addressed only the fair representation claim and, finding it to be without merit, dismissed the complaint.[4]

On appeal this court affirmed the district court's holding as to the fair representation claim and also held that appellees' submission of their grievances to arbitration barred them from asserting their statutory wage claim in the subsequent court action. *Barrentine v. Arkansas-Best Freight System*, 615 F.2d 1194 (8th Cir.1980). The United States Supreme Court granted certiorari and reversed, holding that the FLSA wage claim was not barred by the prior unsuccessful submission of the dispute to the contractual dispute resolution procedure. *Barrentine v. Arkansas-Best Freight System*, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981). The case was accordingly remanded to the district court for resolution of appellees' statutory wage claim. On remand the district court held that the pre-trip safety inspection procedure involved in the suit was an integral and indispensable part of appellees' duties as employees of appellant and, therefore, not exempt from compensation by the Portal-to-Portal Pay Act. *Barrentine v. Arkansas-Best Freight System*, No. LR–C–77–85 (E.D.Ark. June 16, 1983). Judgment was entered in favor of appellees for back wages and an injunction issued enjoining appellant from continuing to violate the FLSA by

Barrentine v. Arkansas-Best Freight System, Inc., 750 F.2d 47 (1984)

26 Wage & Hour Cas. (BNA) 1663, 102 Lab.Cas. P 34,623

refusing to pay appellees at least minimum wage for the time spent on the activity in issue. This appeal followed.

## Back Wages

Appellant first argues that the time spent performing the safety inspection and transporting the defective vehicle to the repair facility is not compensable under the FLSA.

**\*50** The FLSA requires the payment of a minimum wage to "employees who in any workweek [are] engaged in commerce or in the production of goods." 29 U.S.C. § 206(a). The FLSA does not provide a statutory definition of work or employment; however, Supreme Court decisions have established guidelines for determining whether or not hours worked are covered by the FLSA. In *Tennessee Coal, Iron & R. Co. v. Muscoda Local 123*, 321 U.S. 590, 598, 64 S.Ct. 698, 703, 88 L.Ed. 949 (1944), the Court interpreted the FLSA to embrace "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *See also Armour & Co. v. Wantock*, 323 U.S. 126, 132–33, 65 S.Ct. 165, 168, 89 L.Ed. 118 (1944).

**[1]** Appellant argues that because appellees are required to make the pre-trip safety inspection by federal regulations, such activity is not "controlled or required by the employer." Appellant further argues that these inspections are "primarily for the benefit" of the driver and not "of the employer and his business." Both these arguments are without merit. The fact that a pre-trip safety inspection is required by federal regulations does not remove the employer's control over and responsibility for this inspection. And, although the individual driver of the vehicle will, of course, benefit from the safety inspection and repair of defects, appellant and the trucking industry as a whole, not to mention the motoring public, are certainly beneficiaries of the inspection procedure. We thus hold that the activity involved here meets the standard set forth by the Supreme Court for compensable activity under the FLSA. *Cf. Leone v. Mobil Oil Corp.*, 523 F.2d 1153, 1162 (D.C.Cir.1975) (time spent by employee representative in voluntarily accompanying federal inspectors in a workplace inspection is not compensable under the FLSA because employer does not select employee representative or regulate his conduct and because the employees are the beneficiaries of the inspection).

Appellant next argues that, in any event, liability is precluded by § 4(a) of the Portal-to-Portal Act, 29 U.S.C. § 254(a)(2),

which relieves employers of back wages liability under the FLSA for

activities [of an employee] which are preliminary to or postliminary to [the] principal activity or activities [which such employee is employed to perform], which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

Appellant argues that the principal activity for which appellees are employed is driving trucks and that the safety inspections are merely incidental and preliminary thereto. We disagree.

**[2]** The legislative history of the Portal-to-Portal Act and decisions construing it in conjunction with the FLSA make clear that the terms "principal activity or activities," which must be paid for, are to be read liberally. Any activity which is "an integral and indispensable part of" the principal activity is compensable. *Steiner v. Mitchell*, 350 U.S. 247, 256, 76 S.Ct. 330, 335, 100 L.Ed. 267 (1956). The only activities excluded from FLSA coverage are those undertaken "for [the employees'] own convenience, not being required by the employer and not being necessary for the performance of their duties for the employer." *Dunlop v. City Electric, Inc.*, 527 F.2d 394, 398 (5th Cir.1976). Examples of noncompensable activities specifically enumerated in the Senate report on the Portal-to-Portal Act as being "outside the employee's workday," include "[c]hecking in and out and waiting in line to do so, changing clothes, washing up or showering, [and] waiting in line to receive paychecks." S.Rep. No. 48, 80th Cong., 1st Sess. 47 (1947). The pre-trip safety inspection activities for which appellees here seek compensation are clearly of a different nature and we hold that they are such an integral part of and so indispensable to appellees' principal **\*51** activity as to be outside the Portal-to-Portal Act exemption. *See Mitchell v. Mitchell Truck Line, Inc.*, 286 F.2d 721, 724–25 (5th Cir.1961) (truck drivers' pre-trip activities including checking and servicing vehicle were outside the Portal-to-Portal exemption).

## Injunctive Relief

**[3]** Appellant argues that under the FLSA enforcement scheme appellees are not entitled to injunctive relief against appellant. We agree. Congress has framed various remedial measures for implementation and furtherance of its declared policies in the FLSA. Under 29 U.S.C. § 216(b), employees may maintain an action on their own behalf against

an employer for unpaid wages and liquidated damages.[5] Subsection (c) of § 216 authorizes the Secretary of Labor to bring suit on behalf of employees who request assistance to recover unpaid wages, provided the case does not involve an issue of law not finally settled by the courts. The right of employees to resort to legal action on their own behalf terminates "upon the filing of a complaint by the Secretary of Labor in an action under § 217 of this title." 29 U.S.C. § 216(b). Section 217, entitled "Injunction proceedings," grants the district courts jurisdiction to restrain violation of provisions of the FLSA, including the minimum wage provision. Title 29 U.S.C. § 211(a) provides that "[e]xcept as provided in section 212 of this title [relating to child labor], the Secretary of Labor shall bring all actions under section 217 of this title to restrain violations of this chapter."

[4] Courts are in agreement that under this scheme an employee's action can be maintained only to recover back wages and liquidated damages and not to obtain injunctive relief against future violations; only the Secretary is vested with the authority to seek an injunction. *See, e.g., Bowe v. Judson C. Burns, Inc.,* 137 F.2d 37, 39 (3d Cir.1943); *Marchak v. Observer Publications, Inc.,* 493 F.Supp. 278, 280–81 (D.R.I.1980); *EEOC v. American Telephone & Telegraph Co.,* 365 F.Supp. 1105, 1119–22 (E.D.Pa.1973). Although the injunction in the present case is limited, applying only to the individual employees involved in the suit, and is ancillary to an award of money damages, we do not believe it is authorized under the comprehensive statutory enforcement scheme.

Accordingly, we affirm the judgment of the district court as to back wages and vacate the injunction. Costs on appeal awarded to appellees.

## All Citations

750 F.2d 47, 26 Wage & Hour Cas. (BNA) 1663, 102 Lab.Cas. P 34,623

## Footnotes

*    The Honorable Thomas E. Fairchild, Senior Circuit Judge for the United States Court of Appeals for the Seventh Circuit, sitting by designation.

1    The Honorable George Howard, Jr., United States District Judge for the Eastern and Western Districts of Arkansas.

2    Since commencement of this action, appellant's terminal has been moved to North Little Rock, Arkansas.

3    There were originally nine appellees in the case; three were eventually dismissed with prejudice.

4    The district court announced its decision, which incorporated findings of fact and conclusions of law, from the bench.

5    Under the Portal-to-Portal Act amendments, 29 U.S.C. § 260, even if the employer shows both subjective good faith and objectively reasonable grounds for believing that its actions were not in violation of the statute, remission of liquidated damages remains within the sound discretion of the trial court, *E.g., Thompson v. Sawyer,* 219 U.S.App.D.C. 393, 678 F.2d 257, 282 (1982); *Employees of Dep't of Pub. Health & Welfare v. Department of Pub. Health & Welfare,* 452 F.2d 820, 826 (8th Cir.1971) (banc), *aff'd,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973).

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 21-2901, Document 62, 06/24/2022, 3337761, Page76 of 109

Liles v. Rock Farms of Arkansas, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 729166
Only the Westlaw citation is currently available.
United States District Court, E.D.
**Arkansas**, Western Division.

Clayton LILES, Perry Casey, and Gregory
Halley, Each Individually and on Behalf
of All Others Similarly Situated, Plaintiffs

v.

**ROCK FARMS OF ARKANSAS, LLC,**
and **Rocky** Harrell, Individually and d/b/
a **Rock Farms** of **Arkansas**, Defendants

No. 4:15-cv-
**469**
-DPM
|
Signed 02/24/**2017**

**Attorneys and Law Firms**

Joshua Sanford, Stephen Rauls, Sanford Law Firm, Little
**Rock**, AR, for Plaintiffs.

David M. Donovan, Staci Dumas Carson, Watts, Donovan &
Tilley, P.A., Little **Rock**, AR, for Defendants.

**ORDER**

D.P. Marshall Jr., United States District Judge

**\*1 1.** The Court appreciates the parties' helpful, concise, and
timely post-trial briefs and regrets its delay in deciding the
pending issue. Based on the applicable law and the evidence
presented at trial, the Court revises its bench ruling about the
commutes. One of those commutes was compensable time;
the other was not. Here's why.

**2.** One thorough daily inspection was required by law, so
it was a principal activity. 49 C.F.R. § 396.11 & § 396.13;
*Barrentine v. Arkansas-Best Freight System, Inc.*, 750 F.2d
47, 50 (8th Cir. 1984). And, in this case, the morning
inspection started the drivers' continuous workday. *IBP, Inc. v.
Alvarez*, 546 U.S. 21, 28-30 (2005); *Dooley v. Liberty Mutual
Insurance Co.*, 307 F. Supp. 2d 234, 242-49 (D. Mass. 2004).
The Portal-to-Portal Act's clear exclusion of commuting time,

therefore, doesn't apply to the first morning drive to the
quarry. Each driver is entitled to be paid for half an hour for
that work.

The Court concludes, though, that the whistle blew when each
driver delivered his last load, not when he got home (or to
Wal-Mart in Halley's situation). Remember: The agreement
to keep the trucks at the drivers' houses was for the drivers'
convenience, too. When **Rock Farms** and Harrell suggested
changing the drill to start and finish at the shop, Liles objected
strongly, and the employers backed off. If that change had
been made, the Portal-to-Portal Act's exclusion would cover
all time traveling to and from the shop. Fairness to both sides
therefore requires particular attention to the applicable federal
regulations and what actually happened here.

As the Court said from the bench, the drivers' two inspections
were really parts of one whole, which might be more or less
thorough in the morning or in the evening, depending on
circumstances. The Court's tentative conclusion is confirmed
by 49 C.F.R. § 396.11 & § 396.13, which together help
achieve an important safety goal: systematic inspection,
repair, and maintenance of commercial vehicles. 49 C.F.R.
§ 396.3(a). As applied to our facts, these regulations require
one thorough daily inspection. They contemplate this event
happening at the end of a day's work. 49 C.F.R. § 396.11(a)
(1). They also contemplate a written report, which didn't
happen here either. 49 C.F.R. § 396.11(a)(1) & (2). A day's-
end inspection would allow for repairs, based on any reported
problems, before the truck went back on the road. 49 C.F.R.
§ 396.11(a)(3). But if no problems were found, the driver
could begin the next workday without another comprehensive
inspection, as long as he was "satisfied that the motor vehicle
[was] in safe operating condition." 49 C.F.R. § 396.13(a).
Part of making this decision was reviewing the last inspection
report. And if that report noted defects or deficiencies, then
the driver had to sign it—to confirm review and that complete
repairs had been done. 49 C.F.R. § 396.13(b) & (c).

The regulations don't require two full-dress inspections.
Compare the specifics mandated by § 396.11(a)(1) (inspect
service brakes, parking brake, steering mechanism, lighting
devices and reflectors, tires, horn, windshield wipers, rear
vision mirrors, coupling devices, wheels and rims, and
emergency equipment) with § 396.13(a)'s general mandate
(driver must be satisfied that truck is in safe operating
condition). If a thorough inspection had been done the night
before, a quick confirming look in the morning would suffice.
As the title of § 396.13—"Driver Inspection"—indicates,

Case 21-2901, Document 62, 06/24/2022, 3337761, Page77 of 109

Liles v. Rock Farms of Arkansas, LLC, Not Reported in Fed. Supp. (2017)

this second look is an inspection. But it need not be a comprehensive one, depending on all the circumstances. Whatever the timing of the comprehensive inspection, the regulatory goal is met when drivers operate safe, inspected vehicles on the highway.[*]

**\*2** The facts sometimes don't track the words in the book. Here, for example, there were no inspection reports. Harrell testified that he required his drivers to inspect the trucks, and intended that they always follow the law. But their usual main inspection was in the morning before starting work, not after their workday ended. All the drivers confirmed this, with the hedge that they occasionally did the full-dress inspection in the evening instead. Each driver was always satisfied with the safety of his truck before getting on the highway to start the day's work. Any evening inspection stole a march on what **Rock Farms** and Harrell required, and what the drivers usually did, in the morning. A day's end look was prudent and efficient. This time was, combined with time during the morning inspection, compensable. But, lacking a clear mandate either in law or from the employer, doing a second full inspection every day was not a principal activity. The brevity of the drivers' second check, both as a matter of fact and of law, undermines the effort to stay on the clock during the drive home. Here, the evening check therefore didn't extend the drivers' workday beyond the last point of delivery. And the evening trip was a standard commute, uncompensable under the Portal-to-Portal Act's plain words. 29 U.S.C. § 254(a).

**3.** These drivers are entitled to half an hour per day more pay for their first morning trip. Calculations for the Judgment due by 10 March **2017**.

So Ordered.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 729166

Footnotes

[*]  **Rock Farms** and Harrell maintain their argument that these drivers operated only in *intrastate* commerce, which would make these regulations inapplicable. Noted, as a general matter. But Harrell testified that applicable federal regulations required a thorough pre-trip inspection. That acknowledgment puts these regulations in play.

End of Document                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Hernandez v. Publix Super Markets, Inc., S.D.Fla.,
April 9, 2014

2010 WL 2232677
Only the Westlaw citation is currently available.
United States District Court,
S.D. Florida.

Audley CHARLTON, Plaintiff,

v.

REPUBLIC SERVICES OF FLORIDA,
LIMITED PARTNERSHIP d/b/
a all Service Miami–Dade, a foreign
corporation, and Republic Services,
Inc., a foreign corporation, Defendants.

No. 09–22506–CIV.
|
June 2, 2010.

## Attorneys and Law Firms

Gary Andrew Costales, Gary A. Costales, Miami, FL, for
Plaintiff.

Jennifer L. Price, Jon Kevin Stage, Stearns Weaver Miller
Weissler Alhadeff & Sitterson, Fort Lauderdale, FL, for
Defendant.

## *ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

K. MICHAEL MOORE, District Judge.

**\*1** THIS CAUSE came before the Court upon Defendants'
Motion for Summary Judgment (dkt # 13).

UPON CONSIDERATION of the Motion, the Responses, the
pertinent portions of the record, and being otherwise fully
advised in the premises, the Court enters the following Order.

## I. BACKGROUND

This case involves an individual who claims he was
terminated from his employment in violation of various state
laws. Plaintiff Audley Charlton ("Charlton") was employed
as a helper, and later as a driver, by Defendant Republic
Services of Florida, Limited Partnership d/b/a All Service
Miami–Dade ("All Service") from September of 2000 to
May of 2008.[1] Def.s' Statement of Undisputed Material Facts
("Def.s' Facts") ¶¶ 1, 3 (dkt # 14).[2] All Service is a solid
waste retrieval company. *Id.* ¶ 1. Charlton is an African–
American male who was employed by All Service as the
driver of a front-end loader, a garbage truck with two forks
on the front used to pick up garbage dumpsters. Pl.'s Resp. to
Def.s' Statement of Undisputed Material Facts ("PL's Facts")
¶ 1 (dkt # 22). In 2004, Charlton injured his knee on the job
and subsequently received workers' compensation benefits.
Def.s' Facts ¶ 2. From April 3, 2007, to May 2, 2007, Charlton
reported mechanical problems with his assigned truck 14
times in separate written vehicle condition reports. PL's Facts
¶ 4. Some of these reports concerned problems with the brakes
and steering that impeded his ability to operate the vehicle.
*Id.* ¶ 4–7.

On May 3, 2007, Charlton returned to the truck yard with
a partial load of garbage because he was low on diesel
fuel. *Id.* ¶ 16. At this time, Charlton's supervisor was Frank
Pascual ("Pascual"). Carlos Arbelaez ("Arbelaez") was the
Operations Manager and Allyson Blease ("Blease") was the
General Manager. Charlton did not dump his truck prior to
returning to the yard because he had received permission to
leave a partial load of garbage in his truck on certain days.
Aff. of Charlton at ¶ 2 (dkt # 23–4); *see* Dep. of Pascual at 67–
68 (dkt # 23–1). All Service's company policy requires drivers
to empty their trucks before returning to the yard at the end of
their shifts. Decl. of Blease ¶ 6 (dkt # 16–2 at 5–7). All Service
alleges that when questioned about bringing a load of garbage
back to the yard, Charlton refused to dump the garbage and
said that he was looking for another job and would leave All
Service as soon as he found one. Dep. of Arbelaez at 8–9 (dkt
# 23–2); Dep of Blease at 29–30 (dkt # 23–3); Decl. of Blease
at ¶¶ 6–7 (dkt # 16–2, Ex. E).

After his shift on May 3, 2007, Charlton advised Arbelaez
that his knee hurt and that he would miss work the next day
to visit the doctor. Def.s' Facts ¶ 13; Pl.'s Facts ¶ 14. On May
4, 2007, Pascual told Charlton not to come in until May 7,
2007. When Charlton returned, he met with Blease on May 7,
2007, and Blease asked Charlton if he wanted to resign. When
Charlton asked why, Blease allegedly responded "because
you're black, no I am just kidding, kidding, kidding." Def.s'
Facts ¶ 14; Pl.'s Facts ¶ 18. Blease proceeded to terminate
Charlton from employment with All Service. Def.'s Facts ¶

15. Blease terminated Charlton because she believed that he posed a safety concern to himself and the general public based on his statement that he was looking for another job. Decl. of Blease ¶ 7–8.

**\*2** Charlton file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR") on July 1, 2007. Charge of Discrimination (dkt # 15, Ex. G at 2). Charlton filed an Amended Charge of Discrimination with the EEOC and the FCHR on February 18, 2008. Am. Charge of Discrimination (dkt # 15, Ex. G at 3). On May 6, 2009, Charlton filed a Complaint against Defendants in the Circuit Court for the Eleventh Judicial Circuit in and for Miami–Dade County, Florida, alleging a violation of the Florida Whistleblower Act (Count I), unlawful termination under the Florida Civil Rights Act (Count II) and worker's compensation retaliation (Count III). Compl. (dkt # 1 at 12–19). Defendants filed a Notice of Removal on August 26, 2009, based on diversity jurisdiction. Notice of Removal (dkt # 1).

## II. STANDARD OF REVIEW

The applicable standard for reviewing a summary judgment motion is unambiguously stated in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). Summary judgment may be entered only where there is no genuine issue of material fact. *Twiss v. Kury,* 25 F.3d 1551, 1554 (11th Cir.1994). The moving party has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.*

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Id.* However, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's

response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. ANALYSIS

### A. Charlton's Employer

Defendants argue that Charlton's cannot prevail on any of his claims against Defendant Republic Services, Inc. ("RSI") because it never employed Charlton and cannot be held liable for any of Charlton's claims. All Service concedes that it employed Charlton. Tracy Aubin ("Aubin"), RSI's Area Human Resources Manager, submits that Charlton was not employed by RSI. Aff. of Aubin, sworn to April 21, 2010 ¶ 5 (dkt # 16–2, Ex. F). Although RSI was the parent company of All Service, it did not own the facility or equipment used by All Service, did not provide compensation to Charlton, did not determine the terms and conditions of Charlton's employment, did not employ any other All Service employee, and had no control over All Service's day-to-day operations. *Id.* at ¶¶ 4–9. Charlton does not contest RSI's assertion that it never employed him and that it cannot be held liable for his claims. *See* Pl.'s Response to Def.s' Mot. for Summ. J. (dkt # 21); Pl.'s Facts (dkt # 22). In light of the evidence put forth by RSI that it did not employ Charlton, and Charlton's failure to put forth any competing evidence, RSI is entitled to summary judgment on each of Charlton's claims.

### B. Florida Whistleblower Act

**\*3** In Count I, Charlton alleges that All Service violated the Florida Whistleblower Act ("FWA"), which provides, in relevant part:

> An employer may not take any retaliatory personnel action against an employee because the employee has: ... (3) Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation.

§ 440.102, Fla. Stat. "The [FWA] is designed to protect private employees who report or refuse to assist employers who violate laws enacted to protect the public." *Shurick v. Boeing Co.,* No. 6:07–cv–1974–Orl–31GJK, 2010 WL 258788, at \*2 (M.D.Fla. Jan.20, 2010) (citing *Arrow Air, Inc.*

Charlton v. Republic Services of Florida, L.P., Not Reported in F.Supp.2d (2010)

*v. Walsh,* 645 So.2d 422, 424 (Fla.1994)). "The act is remedial in nature and should be construed liberally in favor of granting access to the remedy so as not to frustrate the legislative intent." *Id.* (citing *Irven v. Dep't of Health & Rehabilitative Servs.,* 790 So.2d 403, 406 (Fla.2001)).

To establish a violation of § 440.102(3), Charlton must satisfy the same requirements of a Title VII Civil Rights Act claim. *Id.* (citing *Rice–Lamar v. City of Fort Lauderdale,* 853 So.2d 1125, 1132–33 (Fla. 4th DCA 2003)).[3] To establish a prima facie case under Title VII, a plaintiff is required to show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; (3) and a causal link exists between engaging in the protected activity and the adverse employment action. *Rice–Lamar,* 853 So.2d at 1132–33. After establishing a prima facie case, the employer must produce a non-retaliatory reason for the employment action, which the plaintiff then bears the burden of proving was actually pretextual and a false cover for the impermissible retaliatory employment action. *Id.* at 1133.

In deciding whether an employee has engaged in statutorily protected expression, "the plain language of the statute, as well as legal precedent, demonstrate that the activity protected by the [FWA] must be an *actual* violation of the law, rule or regulation; a *suspected* violation, even a good faith belief that there is a violation, is not sufficient to trigger the Act's protection." *Odum v. Gov't Employees Ins. Co.,* No. 8:08–cv–1282–T–24–EAJ, 2009 WL 2134918, at *3 (M.D.Fla. July 13, 2009) (citing *White v. Purdue Pharma, Inc.,* 369 F.Supp.2d 1335, 1337–39 (M.D.Fla.2005)) (emphasis in original); *see Moren v. Progress Energy, Inc.,* No. 8:07–cv–1676–T–17, 2008 WL 3243860, at *9 (M.D.Fla. Aug.7, 2008) (stating that "unlike Title VII's unlawful retaliation provisions, the FWA requires the plaintiff to actually prove a violation of the law, rule, or regulation in order to succeed"); *Branche v. Airtran Airways, Inc.,* No. 8:01CV1747–T–30MSS, 2005 WL 1051097, at *2 (M.D.Fla. May 2, 2005) (same, declining to apply Title VII's good faith belief standard relied upon in *Padron v. Bell South Telecommunications, Inc.,* 196 F.Supp.2d 1250 (S.D.Fla.2002)).

**\*4** Charlton claims that he engaged in statutorily protected expression by reporting mechanical problems with his vehicle. Charlton states that his vehicle condition reports are mandated by federal law and federal regulations, specifically 49 C.F.R. § 396.11 and 49 U.S.C. § 31105. 49 C.F.R. § 396.11, provides, in relevant part:

(a) (1) Motor Carriers. Every motor carrier shall require its drivers to2 report, and every driver shall prepare a report in writing at the completion of each day's work on each vehicle operated ....

(b) Report content. The report shall identify the vehicle and list any defect or deficiency discovered by or reported to the driver which would affect the safety of operation of the vehicle or result in its mechanical breakdown ....

(c) Corrective action. Prior to requiring or permitting a driver to operate a vehicle, every motor carrier or its agent shall repair any defect or deficiency listed on the driver vehicle inspection report which would be likely to affect the safety of operation of the vehicle ....

49 C.F.R. § 396.11. A motor carrier means "a for-hire motor carrier or a private motor carrier." 49 C.F.R. § 390.5. Private motor carrier means "a person who provides transportation of property or passengers, by commercial motor vehicle, and is not a for-hire motor carrier." *Id.* Commercial motor vehicle means, in relevant part, "any self-propelled or towed motor vehicle used on a highway in interstate commerce to transport passengers or property when the vehicle—(1) Has a gross vehicle weight rating or gross combination rating, or gross vehicle weight or gross combination weight, or 4,536 kg (10,001 pounds) or more, whichever is greater...." *Id.*

These regulations raise the questions of whether garbage is property within the meaning of "private motor carrier," and whether Charlton was operating a "commercial motor vehicle." The issue of whether garbage is property has been addressed by courts and by the Interstate Commerce Commission in the context of the Motor Carrier Act and the Motor Carrier Safety Act. While these cases did not address the meaning of property within the meaning of "private motor carrier" under 49 C.F.R. § 390.5, the reasoning is nevertheless analogous.[4] In *Joray Trucking Corp. Common Carrier Application,* the ICC concluded that rock and debris transported from excavation and demolition sites were not property because they have a negative value, as opposed to sand and gravel, which are commodities with a positive value and thus lack the attributes normally associated with property. *Interstate Commerce Comm'n v. Browning–Ferris Indus., Inc.,* 529 F.Supp. 287, 289 (N.D.Ala.1981) (citing *Joray Trucking Corp. Common Carrier Application,* 99 M.C.C. 109 (1965)). Thus, trash and garbage, which have no value, are not property within the meaning of the Motor Carrier Act. *Browning–Ferris,* 529 F.Supp. at 291 (citing *Ex Parte No. MC–85, Transp. of "Waste" Products for Reuse &*

*Recycling (Gen. Motor Carrier Licensing),* 114 M.C.C. 92 (1971)); *see Wilson,* 444 F.Supp.2d at 307 (stating that under the Motor Carrier Safety Act, material transported for the purpose of disposal or to be used as landfill is not property within the meaning of "motor private carrier," 49 U.S.C. § 13102(15)); *see also Alice v. GCS, Inc.,* No. 05 C 50132, 2006 WL 2644958, at *3 (N.D.Ill. Sept.14, 2006) (holding that under the Motor Carrier Safety Act, non-hazardous, non-recyclable waste is not property within the meaning of "motor private carrier," 49 U.S.C. § 13102(15)). The ICC's basis for concluding that garbage is not property within the meaning of "motor private carrier," which has since been adopted by a number of federal courts, applies with equal force to the scope of property within the meaning of "private motor carrier" under 49 C.F.R. § 390.5. Thus, given that Charlton transports garbage, 49 C.F.R. § 396.11 does not apply to him and his vehicle condition reports do not constitute protected expression.[5]

**\*5** Charlton also claims that he engaged in statutorily protected expression pursuant to 49 U.S.C. § 31105, which provides, in relevant part:

(a) Prohibitions.—(1) A person may not discharge an employee, or discipline or discriminate against an employee regarding pay, terms, or privileges of employment, because—...

(B) the employee refuses to operate a vehicle because—

(i) the operation violates a regulation, standard, or order of the United States related to commercial vehicle safety, health, or security; or

(ii) the employee has a reasonable apprehension of serious injury to the employee or the public because of the vehicle's hazardous safety or security condition.

49 U.S.C. § 31105(a). This provision protects employees from adverse employment action arising from an employee's unwillingness to operate a vehicle because of a safety violation or an unsafe condition. Charlton's allegations may fall within the scope of § 31105, as it provides protection to employees that is similar to the protections provided by the FWA. However, Charlton is not seeking relief under § 31105. Rather, his purpose for referencing this statute is to demonstrate that he engaged in statutorily protected expression. To do so, he must have objected to, or refused to participate in, some activity that was in actual violation of a law or regulation. Section 31105 does not provide a basis for any statutorily protected expression by Charlton because

he did not object to, or refuse to engage in, any activity based on a violation of § 31105. He does not, and cannot, allege that All Service was in violation of § 31105 at the time he filed his vehicle condition reports because he was still employed at the time. Nor did his reports pertain to any violation of § 31105. Therefore, Charlton did not engage in any statutorily protected conduct. Accordingly, All Service is entitled to summary judgment on the FWA claim because Charlton has failed to establish a prima facie case.

### C. Unlawful Termination–Florida Civil Rights Act

Charlton claims that he was unlawfully terminated because of his race, in violation of the Florida Civil Rights Act ("FCRA"). The FCRA provides, in relevant part:

(1) It is an unlawful employment practice for an employer:

(a) To discharge or to fail or refuse to hire any individual, or otherwise to ! discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin, age, handicap, or marital status.

§ 760.10, Fla. Stat. "The plaintiff may establish a prima facie case of discrimination under Title VII ... on the basis of direct evidence of discrimination, which consists of 'evidence which, if believed, would prove the existence of discrimination without inference or presumption." *Holifield v. Reno,* 115 F.3d 1555, 1561 (11th Cir.1997) (quoting *Carter v. City of Miami,* 870 F.2d 578, 581–82 (11th Cir.1989)). "In the usual case, however, direct evidence is not present, and the plaintiff must rely on circumstantial evidence to prove discriminatory intent, using the framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Id.* The burden shifting analysis applicable to claims brought under Title VII of the Civil Rights Act of 1964, and the precedent from Title VII cases, are applicable to claims brought under the FCRA. *Gamboa v. Am. Airlines,* 170 Fed. Appx. 610, 612 (11th Cir.2006).

**\*6** Under the three-step burden shifting framework established in *McDonnell Douglas,* a Title VII complainant carries the initial "burden of establishing a prima facie case of racial discrimination ." 411 U.S. at 802. To establish a prima facie case, a plaintiff must show that he: (1) belongs to a protected class; (2) was qualified to do the job; (3) was subjected to adverse employment action; and (4) was replaced by a person outside the protected class or suffered from

disparate treatment because of membership in the protected class. *Bolton v. Potter,* 198 Fed. Appx. 914, 916 (11th Cir.2006). "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield,* 115 F.3d at 1562 (citations omitted).

Once the plaintiff has established a prima facie case, the burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *McDonnell Douglas,* 411 U.S. at 802. "This may be done by the employer articulating a legitimate, non-discriminatory reason for the employment decision, which is clear, reasonably specific, and worthy of credence. The employer has a burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced." *Hall v. Ala. Ass'n of Sch. Bds.,* 326 F.3d 1157, 1166 (11th Cir.2003) (citing *McDonnell Douglas,* 411 U.S. at 802; *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253–55, 258, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

If the defendant meets his burden, "then the plaintiff may attempt to show that the proffered reason was merely a pretext for the defendant's acts." *Jones v. Bessemer Carraway Med. Ctr.,* 137 F.3d 1306, 1310 (11th Cir.1998) (quoting *Burdine,* 450 U.S. at 253). "The employee may satisfy this burden either directly, by persuading the court that a discriminatory reason more than likely motivated the employer, or indirectly, by persuading the court that the proffered reason for the employment decision is not worthy of belief. By so persuading the court, the employee satisfies his ultimate burden of demonstrating by a preponderance of the evidence that he has been the victim of unlawful discrimination." *Hall,* 326 F.3d at 1166 (citing *Burdine,* 450 U.S. at 256). Despite this burden shifting test, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Jones,* 137 F.3d at 1310 (citing *Burdine,* 450 U.S. at 253).

In order to establish a prima facie case, "the plaintiff must show that his employer treated similarly situated employees outside his classification more favorably than [himself]." *Holifield,* 115 F.3d at 1562 (citations omitted). Further, "[t]o make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects." *Id.* (citations omitted). Therefore, "it is necessary to consider

whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Id.* (citations omitted). When a plaintiff has failed "to show the existence of a similarly situated employee, summary judgment is appropriate when no other evidence of discrimination is present." *Id.*

**\*7** In *Jones,* the Eleventh Circuit explained that "[t]he most important factors 'in the disciplinary context ... are the nature of the offenses committed and the nature of the punishments imposed.' " 137 F.3d at 1311 (citing *Jones v. Gerwins,* 874 F.2d 1534, 1539–40 (11th Cir.1989)). Further, the Eleventh Circuit "require[s] that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples and oranges." *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir.1999). "If Plaintiff fails to identify similarly situated, nonminority employees who were treated more favorably, [his] case must fail because the burden is on [him] to establish [his] prima facie case." *Jones,* 137 F.3d at 1311.

Here, Charlton asserts, and All Service does not dispute, that Charlton is a member of a protected class, that he was qualified to do his job, and that his termination constitutes adverse employment action.[6] Charlton further asserts that he was replaced by Ruden Delgado, a person outside his protected class whom he describes as a "White Cuban" or "White Hispanic."[7] Pl.'s Facts ¶ 19. All Service does not dispute that Charlton was replaced by Delgado or that Delgado is outside of Charlton's protected class. *See Terrell v. City of Harrisburg Police Dept.,* 549 F.Supp.2d 671, 682 (M.D.Pa.2008) (stating that Hispanic employee was outside of African–American plaintiff's protected class). These facts are sufficient for Charlton to establish a prima facie case because they meet all four prongs of the first step of the burden shifting analysis.

Moreover, Charlton alleges that he suffered disparate treatment because of his membership in a protected class given that he was the only driver terminated for bringing back a load of garbage.[8] Charlton had previously been permitted to bring back loads of garbage in the past when he ended the day without a full load or when his vehicle ran out of fuel. Pascual Dep. at 66–69 (dkt # 23–1). On at least Tuesdays and Thursdays, Charlton ordinarily left a partial load of garbage in the vehicle, which he would dispose of in the morning after filling up the truck. *Id.* at 67–68. Other drivers under Pascual's supervision brought back loads of garbage when

their vehicles ran out of gas, when there were mechanical problems, or when they had doctors appointments. *Id.* at 66. These drivers were not terminated, although some received verbal warnings. Arbelaez Dep. at 14 (dkt # 23–2). These drivers did not receive written warnings because verbal discipline was the first step in the disciplinary process. *Id.*

Pascual had fifteen drivers and two roll-off drivers under his supervision. Pascual Dep. at 18. It is unclear how many of these individuals were outside of Charlton's protected class during his employment, although only three or four were African–American when Charlton was terminated. Pascual Dep. at 42. It is not entirely clear whether the other drivers who brought back loads of garbage were outside of Charlton's protected class. However, given the number of African–American drivers working for Pascual at the time Charlton was terminated and Pascual's deposition testimony that it was a common practice for drivers to bring back loads of garbage for various reasons, it is reasonable to infer that some of the drivers who brought back partial loads were outside of Charlton's protected class. Moreover, the absence of similar adverse employment action to other similarly situated drivers engaged in identical conduct, combined with Charlton's allegation concerning Blease's joking statement that Charlton was being terminated because he is African–American, is sufficient to establish a prima facie case.

**\*8** Given that Charlton has established a prima facie case, the burden shifts to All Service to put forth a legitimate, nondiscriminatory reason for Charlton's termination. All Service alleges that when questioned about bringing a load of garbage back, Charlton refused to dump the garbage and said that he was looking for another job and would leave All Service as soon as he found one. Dep. of Arbelaez at 8–9 (dkt # 23–2); Dep. of Blease at 29–30 (dkt # 23–3); Decl. of Blease at ¶¶ 6–7 (dkt # 16–2, Ex. E); Investigative Report of Maria Tomich ("Tomich") at 3 (dkt # 23–7). Based on this statement, Blease concluded that Charlton was a safety risk to the general public and to himself and decided to terminate him. Decl. of Blease ¶ 7–8.

Charlton, however, states that he had permission to bring back a load of garbage on Tuesdays, Thursdays and Fridays because his diesel tank was not large enough to take the truck to the dump. Aff. of Charlton at ¶ 2 (dkt # 23–4); *see* Dep. of Pascual at 67–68. He also denies refusing to take the garbage to the dump or saying that he was looking for another job. *Id.* at 1–2. At the summary judgment stage, this Court must view the evidence and all factual inferences in the light most

favorable to Charlton.[9] Given that All Service's reason for Charlton's termination is entirely dependent on facts that are in dispute, there is a genuine issue of material fact as to whether All Service's reason for terminating Charlton was legitimate and nondiscriminatory. Even if this Court were to find that All Service has established that there is no genuine issue of material fact that it has produced a legitimate, non-discriminatory reason, there is nevertheless a genuine issue of material fact as to whether All Service's proffered reason was merely pretextual. Therefore, summary judgment in favor of All Service is not warranted on Charlton's FCRA claim.

### D. Workers' Compensation Retaliation

Charlton claims that he was terminated in retaliation for pursuing a workers' compensation claim. Section 440.205, Florida Statutes, provides: "No employer shall discharge, threaten to discharge, intimidate, or coerce any employee by reason of such employee's valid claim for compensation or attempt to claim compensation under the Workers' Compensation Law." § 440.205, Fla. Stat. "Retaliation claims brought under § 440.205 are subject to the burden shifting analysis applicable to Title VII claims." *Williams v. Record Town, Inc.*, No. 8:08–CV–502–T–24–MAP, 2009 WL 960096, at \*3 (M.D.Fla. Apr.6, 2009) (citing *Humphrey v. Sears, Roebuck, and Co.*, 192 F.Supp.2d 1371, 1374 (S.D.Fla.2002)). In order to establish a prima facie case of retaliatory discharge, Charlton must show that "(1) he sought workers' compensation benefits; (2) he suffered adverse employment action; and (3) there is a causal connection between his claim for workers' compensation benefits and the adverse employment action." *Id.* (citing *Russell v. KSL Hotel Corp.*, 887 So.2d 372, 379 (Fla. 3d DCA 2004)). "Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for the adverse employment action." *Id.* "After the employer makes this proffer, the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the legitimate reason was merely a pretext for the prohibited retaliatory conduct." *Id.*

**\*9** The Parties do not dispute that Charlton received workers' compensation benefits in 2004 and that his termination constitutes adverse employment action. All Service contends that there is no causal connection between the workers' compensation benefits and the adverse employment action because he was terminated before the individual who made the decision to terminate him became aware of his workers' compensation claim. Blease made

the decision to terminate Charlton on May 3, 2007, after consulting with Area President Bob Hely ("Hely").[10] Dep. of Blease at 32–33 (dkt # 23–3); Decl. of Blease ¶ 8 (dkt # 16–2 at 5–7). Blease did not become aware that Charlton had previously filed a workers' compensation claim until after the decision to terminate him had been made. Dep. of Blease at 24–25, 32; Decl. of Blease ¶ 9. Charlton has put forth no evidence that Blease knew of his workers' compensation claim before she decided to terminate him. Therefore, there is no genuine issue of material fact concerning the absence of a nexus between Charlton's workers' compensation claim and his termination. Accordingly, summary judgment in favor of All Service on Charlton's workers' compensation retaliation claim is warranted.

## IV. CONCLUSION

Based on the foregoing, it is

ORDERED AND ADJUDGED that Defendants' Motion for Summary Judgment (dkt # 13) is GRANTED IN PART AND DENIED IN PART. Summary judgment is granted in favor of RSI on all counts. Summary judgment is granted in favor of All Service on Charlton's FWA and workers compensation retaliation claims. Summary judgment is denied on Charlton's FCRA claim.

DONE AND ORDERED in Chambers at Miami, Florida, this *1st* day of June, 2010.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 2232677

### Footnotes

1  Plaintiff did not work for All Service from July of 2004 to October of 2005. Def.'s Facts ¶ 5.

2  Citation to the Parties' Statements of Fact incorporate by reference the underlying citations.

3  The Eleventh Circuit Court of Appeals has stated that for claims brought pursuant to the Florida Whistleblower Act, a Court should apply the analysis used in Title VII retaliation cases. *Sierminski v. Transouth Financial Corp.,* 216 F.3d 945, 950 (11th Cir.2000).

4  The Interstate Commerce Commission was essentially the predecessor of the Surface Transportation Board.

    Congress enacted the Motor Carrier Act [ ("MCA") ] in 1935. *See* William E. Kenworthy, Transportation Safety and Insurance Law § 4.01 (3rd ed.2005). The Act endowed the Interstate Commerce Commission [ ("ICC") ] "with the power to impose economic regulations such as licensing, certificate, and permit requirements on common and contract carriers, but not on private carriers." *Bilyou v. Dutchess Beer Distributors, Inc.,* 300 F.3d 217, 227 (2nd Cir.2002). "However, while private carriers were exempt from the economic and licensing regulations established by the MCA, the ICC retained the authority under the Act to prescribe safety of operation requirements relating to the maximum hours and qualifications of their employees." *Id.* "In 1996, Congress enacted the 'Department of Transportation Act,' which transferred the 'authority to regulate safety operations for motor vehicles under the MCA from the ICC to the Department of Transportation.' " *Id.* at 222 n. 2. "[T]he ICC retained responsibility for determining the fitness of common and contract carriers." Kenworthy, supra § 4.02. "Congress abolished the ICC on January 1, 1996 and transferred many of its functions to the newly created Surface Transportation Board, an agency within the Department of Transportation." *Id.*

    *Wilson v. IESI N.Y. Corp.,* 444 F.Supp.2d 298, 303 (M.D.Pa.2006).

5  The Parties have not submitted evidence that the front loader Charlton was operating weighs more than 10,001 pounds. While it is unlikely that a front loader garbage truck described as the truck Charlton operated would be under 10,000 pounds, it is unnecessary to resolve this issue given that garbage is not property within the meaning of "private motor carrier." It is also unclear whether Charlton's activities as a driver falls within the scope of interstate commerce.

6    Application of the burden shifting analysis appropriate here because there is no direct evidence of discrimination. Blease's alleged joking statement that Charlton should resign because of his race is not direct evidence of discrimination because, standing alone, it is insufficient prove the existence of discrimination without inference or presumption.

7    In his deposition, Pascual, Charlton's supervisor, stated that Charlton was replaced by Delgado, a "White Cuban." Dep. of Pascual at 47 (dkt # 23–1, Ex. B).

8    Viewing the facts in the light most favorable to Charlton, as we must at this stage, this Court credits Charlton's account of his termination, which does not include insubordination or statements that he was looking for another job and would leave as soon as he found one.

9    "Conclusory, self serving, or uncorroborated allegations in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well supported summary judgment" motion. *Smith v. HCA Inc.,* No. 303CV754J99TEM, 2005 WL 1866395, at *3 (M.D.Fla. July 26, 2005). This Court does not view Charlton's affidavit as self serving with respect to his version of the events surrounding his termination. The three people present when Charlton allegedly refused to dump the garbage and expressed an intention to find another job were Charlton, Arbelaez and Blease. Charlton tells one version of events while Arbelaez and Blease tell another. The fact that Charlton is outnumbered two to one is insufficient to establish that there is no genuine issue of material fact with respect to which version of the story is true. While Tomich's investigative report supports Arbeleaz and Blease's version, a reasonable jury could nevertheless find Charlton's version more credible.

10   No evidence has been presented as to when, or if, Hely learned of Charlton workers' compensation claim.

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Local 589, Amalgamated Transit Union v. MBTA, D.Mass., March 31, 2015

307 F.Supp.2d 234
United States District Court, D. Massachusetts.

Thomas DOOLEY, Individually
and on Behalf of all Other Persons
Similarly Situated, Plaintiffs

v.

LIBERTY MUTUAL INSURANCE
COMPANY, Defendant

No. CIV.A. 01–11029–REK.
|
Feb. 26, 2004.

## Synopsis

**Background:** Employees who worked as automobile damage appraisers brought collective action under the Fair Labor Standards Act (FLSA) against employer, an insurance company, seeking unpaid overtime compensation for travel and other time that they spent working and driving to and from appraisal sites from their homes. Parties filed discovery-related motions, and cross-moved for partial summary judgment requesting ruling of law as to whether appraisers' travel time was compensable under the FLSA.

**Holdings:** The District Court, Keeton, Senior District Judge, held that:

[1] tasks that employees performed at home at beginning and end of workday constituted principal activities under Portal-to-Portal Act for which they were entitled to overtime compensation under the FLSA, upon proof at trial that they began and ended workday by performing tasks at home;

[2] commuting time that employees spent driving from home to first appraisal site at beginning of day and from last appraisal site at end of day to home was compensable under the FLSA, as to employees who began workday by performing work at home;

[3] commuting time that employees spent driving from home to first appraisal site at beginning of day and from last

appraisal site at end of day to home was not compensable under FLSA, as to employees who did not begin workday by performing work at home;

[4] documents produced by employer's attorneys, including attorneys' work files, were discoverable to extent they contained information probative of hours that employees worked during period covered by documents, but were not relevant to employer's knowledge of FLSA requirements during same period; and

[5] employees' hourly rate of pay would be calculated, for purposes of award 'of overtime compensation to eligible employees under the FLSA, according to fluctuating workweek standard.

Motions granted in part and denied in part.

West Headnotes (15)

**[1]** **Federal Civil Procedure** ⟨⟩ Partial summary judgment

In deciding a motion for partial summary judgment that will not fully adjudicate case, a court may both (1) make legal rulings about materiality of factual assertions that are not properly controverted, and (2) make legal rulings about factual assertions that are properly shown to be controverted. Fed.Rules Civ.Proc.Rule 56(d), 28 U.S.C.A.

2 Cases that cite this headnote

**[2]** **Labor and Employment** ⟨⟩ Working time

Deciding whether a given activity constitutes a "principal activity" within the meaning of the Portal–to–Portal Act is something a court may do in the manner and by procedures appropriate to deciding matters of law. Portal-to-Portal Act of 1947, § 4(a), 29 U.S.C.A. § 254(a).

1 Cases that cite this headnote

**[3]** **Labor and Employment** ⟨⟩ Portal-to-portal time in general

Three-step inquiry applicable to determination of whether an employee's activities fall within terms of the Portal-to-Portal Act, rendering them non-compensable under the FLSA, involves determination of first whether the claimed activity is a principal activity, and second, if not, whether the activity occurs after the employee has started performance of his or her principal activities and before he or she has completed those activities; third, if the work is in fact outside the work day, the Portal-to-Portal Act does not make the work non-compensable unless the work consists of travel to or from primary activities or consists solely of work preliminary to or after completion of the employee's primary activities. Fair Labor Standards Act of 1938, §§ 6(a), 7(a), 29 U.S.C.A. §§ 206(a), 207(a); Portal-to-Portal Act of 1947, § 4(a), 29 U.S.C.A. § 254(a).

4 Cases that cite this headnote

[4] **Labor and Employment** ⬤ Rules and regulations in general

Administrative interpretations published by Department of Labor, though not binding on courts, are entitled to deference if they appear reasonable and persuasive.

1 Cases that cite this headnote

[5] **Labor and Employment** ⬤ Portal-to-portal time in general

In determining whether an employee's principal activities fall within the terms of the Portal-to-Portal Act so as to render them uncompensable under the FLSA, the term "principal activities" is to be construed broadly. Fair Labor Standards Act of 1938, §§ 6(a), 7(a), 29 U.S.C.A. §§ 206(a), 207(a); Portal-to-Portal Act of 1947, § 4(a), 29 U.S.C.A. § 254(a).

[6] **Labor and Employment** ⬤ Portal-to-portal time in general

Whether a particular function of an employee's job is a principal activity, so as to fall within the Portal-to-Portal Act and be uncompensable

for overtime compensation under the FLSA, may be determined by deciding whether the task is performed as part of the regular work of the employees in the ordinary course of business. Fair Labor Standards Act of 1938, §§ 6(a), 7(a), 29 U.S.C.A. §§ 206(a), 207(a); Portal-to-Portal Act of 1947, § 4(a), 29 U.S.C.A. § 254(a).

1 Cases that cite this headnote

[7] **Labor and Employment** ⬤ Preliminary or postliminary activities in general

Tasks that employees, automobile appraisers for employer, an insurance company, performed at home at beginning and end of workday constituted principal activities under Portal-to-Portal Act for which they were entitled to overtime compensation under the FLSA upon proof that they began and ended workday by performing tasks at home; employees alleged that they started laptops, checked e-mail and voice mail, responded to messages, reviewed the day's assignments and those for following day, electronically sent appraisals and photographs to employer, and made work-related phone calls, tasks were part of employees' regular work, and employees alleged that they began and ended workday by performing such tasks. Fair Labor Standards Act of 1938, §§ 6(a), 7(a), 29 U.S.C.A. §§ 206(a), 207(a); Portal-to-Portal Act of 1947, § 4(a), 29 U.S.C.A. § 254(a); 29 C.F.R. § 790.8(a. b).

3 Cases that cite this headnote

[8] **Labor and Employment** ⬤ Travel time

Commuting time that employees, automobile appraisers for employer, an insurance company, spent driving from home to first appraisal site at beginning of day and from last appraisal site at end of day to home was compensable under the FLSA, as to employees who began workday by performing work at home; such employees' workday began and ended when they performed tasks that were part of their regular work at home by starting laptops, checking e-mail and voice mail, responding to messages, reviewing assignments, electronically sending appraisals

and photographs to employer, and making work-related phone calls, employees traveled after workday began and workday did not end until after they returned home, and there was no reason to depart from general rule that employees' time had to be compensated until end of workday. Fair Labor Standards Act of 1938, §§ 6(a), 7(a), 29 U.S.C.A. §§ 206(a), 207(a); Portal-to-Portal Act of 1947, § 4(a), 29 U.S.C.A. § 254(a).

9 Cases that cite this headnote

[9]    **Labor and Employment** ⟜ Travel time

An employee's travel between an office and an off-site location after the workday has begun is compensable time under the FLSA. Fair Labor Standards Act of 1938, §§ 6(a), 7(a), 29 U.S.C.A. §§ 206(a), 207(a).

1 Cases that cite this headnote

[10]    **Labor and Employment** ⟜ Travel time

Commuting time that employees, automobile appraisers for employer, an insurance company, spent driving from home to first appraisal site at beginning of day and from last appraisal site at end of day to home was not compensable under FLSA, as to employees who did not begin workday by performing work at home, even though employees transported equipment to and from appraisal sites; commuting time occurred before workday began, was not integral to employees' work, and fell within Portal-to-Portal Act, normal commuting time was excluded under Portal-to-Portal Act, and employees' transportation of light equipment did not transform ordinary commute into principal work activity. Fair Labor Standards Act of 1938, §§ 6(a), 7(a), 29 U.S.C.A. §§ 206(a), 207(a); Portal-to-Portal Act of 1947, § 4(a)(1), 29 U.S.C.A. § 254(a)(1); 29 C.F.R. §§ 785.35, 790.7(d), 790.8(a).

10 Cases that cite this headnote

[11]    **Labor and Employment** ⟜ Travel time

The more the preliminary or postliminary activity is undertaken by an employee for the

employer's benefit, the more indispensable it is to the primary goal of the employee's work, and the less choice the employee has in the matter, the more likely such work will be found to be compensable under the FLSA. Portal-to-Portal Act of 1947, § 4(a)(2), 29 U.S.C.A. § 254(a)(2).

[12]    **Labor and Employment** ⟜ Preliminary or postliminary activities in general

**Labor and Employment** ⟜ Travel time

An employee's commuting and similar activities are generally not compensable under FLSA; the ability of the employer to maintain records of such time expended is a factor, and, where the compensable preliminary work is truly minimal, it is the policy of the law to disregard it. Portal-to-Portal Act of 1947, § 4(a)(1), 29 U.S.C.A. § 254(a)(1).

[13]    **Labor and Employment** ⟜ Travel time

A hallmark of an ordinary commute for which an employee is not entitled to overtime compensation under the FLSA is that it does not involve work beyond that necessary for transportation. Portal-to-Portal Act of 1947, § 4(a)(1), 29 U.S.C.A. § 254(a)(1).

4 Cases that cite this headnote

[14]    **Federal Civil Procedure** ⟜ Employment, records of

Documents produced by employer's attorneys, including attorneys' work files, were discoverable to extent they contained information probative of hours that employees worked as automobile damage appraisers during period covered by documents, for purposes of calculating overtime payments due under FLSA for hours they worked at home and while traveling to first appraisal from home at beginning of workday and returning home from last appraisal at end of day, but were not relevant to employer's knowledge of FLSA requirements during same period; employment agreement provided clear mutual understanding that employees would receive fixed weekly

salary rather than hourly salary, and employees did not assert that employer committed fraud regarding their salaries so as to render agreement void and to engage in discovery on issue. Federal Labor Standards Act of 1938, §§ 7(a)(1), 29 U.S.C.A. §§ 207(a)(1); Portal-to-Portal Act of 1947, § 4(a), 29 U.S.C.A. § 254(a); 29 C.F.R. § 778.114(a).

**[15] Labor and Employment ⚬⚬ Work week**

Hourly rate of pay of employees who worked as automobile damage appraisers would be calculated, for purposes of awarding them overtime under the FLSA, according to fluctuating workweek standard; employment agreement between employer and employees provided that employees would receive fixed weekly salary instead of an hourly salary, agreement provided parties' clear, mutual understanding that employees were to receive fixed salary regardless of how many hours worked per week, employees did not suggest that agreement was voidable due to employer's alleged misrepresentations as to employees' salary, and clear mutual understanding existed between parties even without reference to agreement. Federal Labor Standards Act of 1938, § 7(a)(1), 29 U.S.C.A. §§ 207(a)(1); Portal-to-Portal Act of 1947, § 4(a), 29 U.S.C.A. § 254(a); 29 C.F.R. § 778.114(a).

1 Cases that cite this headnote

### Attorneys and Law Firms

**\*237** Howard E. Gottlieb, Orangeburg, NY, for Howard E. Gottlieb, Plaintiff.

Douglas Hart, Shepard, Mullin, Richter & Hampton LLP, Los Angeles, CA, for Liberty Mutual Insurance Company, Defendants.

Todd S. Heyman, Shapiro, Haber & Urmy, LLP, Boston, for Thomas Dooley, Plaintiff.

Andrew C. Pickett, Jackson, Lewis, LLP, Boston, for Liberty Mutual Insurance Company, Defendant.

Frederick Puglisi, Shepard, Mullin, Richter & Hampton LLP, Los Angeles, CA, for Liberty Mutual Insurance Company, Defendant.

Thomas V. Urmy, Jr., Shapiro Haber & Urmy LLP, Boston, for Thomas Dooley, Plaintiff.

**\*238** Eric J. Winton, Jackson Lewis LLP, Boston.

### Memorandum and Order

KEETON, Senior District Judge.

### I. Pending Matters

Pending for decision are matters related to the following filings:

(1) Joint Stipulation for Entry of Partial Judgment (Docket No. 120, filed December 8, 2003);

(2) Plaintiffs' Motion for Partial Summary Judgment (Docket No. 121) and Memorandum in Support (Docket No. 122), Statement of Undisputed Material Facts (Docket No. 123), and Declarations of Todd S. Heyman (Docket No. 124), Tony Pisano (Docket No. 125), Holly King (Docket No. 126), and Thomas Dooley (Docket No. 127) (filed January 12, 2004), Declaration of Michael Talarico (Docket No. 130, filed January 13, 2004), and Second Declaration of Todd S. Heyman (Docket No. 147, filed February 2, 2004);

(3) Defendant's Opposition to Motion for Partial Summary Judgment (Docket No. 138), Affidavit of Douglas R. Hart in Support (Docket No. 141), and Affidavit of Brian O'Connor in Support (Docket No. 143) (filed January 26, 2004);

(4) Plaintiffs' Memorandum in Reply to Defendant's Opposition to Motion for Partial Summary Judgment (Docket No. 145, filed February 2, 2004);

(5) Defendant's Response to Plaintiffs' Statement of Undisputed Material Facts (Docket No. 139, filed January 26, 2004);

(6) Defendant's Objection to Evidence Presented in Support of Plaintiffs' Motion for Partial Summary Judgment (Docket No. 140, filed January 26, 2004);

(7) Plaintiffs' Response to Defendant's Objections to Evidence Presented in Support of Plaintiffs' Motion for Partial Summary Judgment (Docket No. 146, filed February 2, 2004);

(8) Defendant's Cross–Motion for Partial Summary Judgment (Docket No. 134), Memorandum in Support (Docket No. 135), Statement of Undisputed Material Facts (Docket No. 136), Affidavits of James L. Hunt in Support (Docket Nos. 137 and 142) (filed January 26, 2004);

(9) Plaintiffs' Response to Defendant's Statement of Undisputed Material Facts (Docket No. 148, filed February 2, 2004);

(10) Defendant's Reply to Plaintiffs' Response to Defendant's Statement of Undisputed Material Facts (Docket No. 150, filed February 2, 2004);

(11) Plaintiffs' Motion to Compel the Production of Documents Following In Camera Review (Docket No. 128) and Memorandum in Support (Docket No. 129) (filed January 12, 2004);

(12) Defendant's Opposition to Motion to Compel the Production of Documents (Docket No. 132) and Affidavit of Douglas Hart in Support (Docket No. 133) (filed January 26, 2004); and

(13) Plaintiffs' Reply Memorandum in Support of Motion to Compel (Docket No. 144, filed February 2, 2004).

## II. Procedural and Factual Background

This is a collective action filed under 29 U.S.C. § 216(b), which permits a plaintiff to bring an action under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), on behalf of himself and others similarly situated, if all putative plaintiffs file a Notice of Consent with the Court.

The plaintiffs here are auto damage appraisers employed by defendant Liberty Mutual Insurance Company ("Liberty"). They seek unpaid overtime compensation for certain work performed between June 15, 1998 and the present. A number of issues formerly in dispute between the parties have been resolved by the Stipulation (Docket No. 120). The pending motions **\*239** address unresolved issues bearing on whether the plaintiffs are to be compensated for their time spent

driving to their first duty location, and from their final duty location.

When one of Liberty's customers is involved in an accident, the customer has the option of taking his or her car to a drive-in facility, or having an appraiser come to the customer. The insured arranges a date, time, and location with Liberty's dispatcher. An appraiser is then required to travel to the location selected by the insured to perform the appraisal. Liberty's appraisers, therefore, spend substantial periods of time traveling between job locations, in addition to traveling between home and their first and last appraisals of the day.

The parties agree that appraisers will, at least sometimes, perform certain work at their homes, for which they are compensated if they properly report their work performed. For instance, before traveling to their first appraisal, employees sometimes start their laptop computers, open necessary software, check their voice mail, check their email, respond to messages, set a new voice mail greeting on their phones, review their day's assignments, map out a geographical route for the day, and load their computer, printer, docking station, digital camera, and other supplies into their vehicles. The parties disagree about how often appraisers perform this sort of work at home.

Similarly, the parties agree that, at least sometimes, appraisers perform certain work-related tasks at the end of the day in their homes, for which they are compensated if they report the work. These tasks include checking their email and voice mail; calling Liberty employees, body shops, parts suppliers, insureds, and claimants; completing estimates or appraisals that they were unable to complete in the field; faxing paperwork to Liberty; electronically sending the day's appraisals to Liberty; electronically sending photographs documenting the day's claims to Liberty; electronically completing a time log for the day; and downloading and reviewing assignments for the following day. Again, the parties dispute the extent to which appraisers perform this work at home.

The plaintiffs have filed a motion, designated by them as a motion for partial summary judgment, requesting a ruling of law to the effect that the time they spend driving from their homes to their first appraisal site, and from their final appraisal site back to their homes, are compensable under the FLSA. The defendants have filed a document, designated by them as a cross-motion for partial summary judgment, requesting the opposite ruling.

Also pending is the plaintiffs' Motion to Compel the production of certain documents the defendant generated between 1992 and 1993. These documents relate to advice the defendant received from its attorneys as to whether the appraisers were properly classified as exempt from the overtime compensation requirements of the FLSA.

**III. Disposition of the Pending Matters**

*A. Stipulation*

I have reviewed the parties' stipulation contained in Docket No. 120. In this stipulation, the parties have agreed to rulings of law, and purport to have stipulated to partial summary judgment. The use of any term including the word "judgment" in the present context is potentially misleading. The effect of approving the stipulation would not produce a judgment, partial or otherwise. I conclude that this characterization is inaccurate. Rather than approve the stipulation in its current form, I make the requested stipulated rulings of law in the Order below.

**\*240** *B. Evaluation, on the Current Record, of Plaintiffs' Arguments*

The plaintiffs present two arguments as to why their time spent driving to and from home should be considered compensable under the FLSA. First, they argue that the drives occur during the workday, and therefore are compensable. Second, they argue that the travel time is part of the plaintiffs' principal activities.

With respect to the plaintiffs' first argument, I rule, below, that the extent to which the plaintiffs' commute time is compensable under the FLSA turns on whether the plaintiffs' workday commences and ends at home. This, in turn, is a material question in genuine dispute between the parties. The record before me at this time does not warrant a ruling that either party has shown that no genuine dispute of material fact exists. For this reason, summary judgment is not appropriate at this time. I add, however, certain rulings of law. First, I rule that circumstances may exist in which commute time legally must be compensated under the FLSA. Thus, for example, if the plaintiffs prove at trial that their workday begins and ends

at home, then they are entitled to compensation for time spent driving to their first appraisal site and from their last site.

With respect to the plaintiffs' second argument, I rule, below, that the plaintiffs' travel to the first appraisal site, and from the last appraisal site, is not a principal activity within the meaning of the Portal–to–Portal Act, 29 U.S.C. § 254, and is therefore not compensable under the FLSA.

In making the rulings explained in this Memorandum, I have relied on plaintiffs' affidavits only to the extent that the affiant made a relevant statement based on his or her personal knowledge. Specifically, I relied only on those portions of the affidavits that outlined what equipment each affiant loads into his or her vehicle at the beginning of the day, and unloads at the end of the day. To the extent the defendant has objected, in Docket No. 140, to these statements, those objections are overruled. Each of the defendant's other objections in Docket No. 140 is moot.

*C. Cross–Motions*

*1. Terminology and Substance*

Because the parties are not seeking a final disposition of any part of this case, the terminology of "summary judgment" is not used in explaining the rulings I make in acting on the current cross-motions. Instead I explain in other ways the reasons for the rulings I make and other rulings I decline to make in the disposition of these cross-motions. *Cf.* Fed.R.Civ.P. 56(d) advisory committee's note (1946) ("[A] partial summary 'judgment' is not a final judgment, and, therefore, is not [generally] appealable. The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case.").

*2. Standard of Decision*

[1] Although the parties do not contemplate my making an order for what is truly a judgment of any kind, partial or final, it is appropriate for me to apply the standard set forth in Fed.R.Civ.P. 56(d) to the extent it is relevant. In other words, in these circumstances a court must "if practicable ascertain what material facts exist without substantial controversy and what material facts are in fact and in good faith controverted," and should make an order so specifying. Fed.R.Civ.P. 56(d). Thus, a court may both (i) make legal rulings about materiality of factual assertions that are not properly controverted, and

(ii) make legal rulings about factual assertions that are properly shown to be controverted.

**\*241** A trial court's authority to make legal rulings of these kinds is not limited, of course, to genuine summary judgment proceedings. It exists in many other circumstances, including those presented by the current cross-motions.

The rulings that the parties have requested in the current motions are interlocutory and are not appealable.

### 3. The Fair Labor Standards Act and the Portal–To–Portal Act

Under the Fair Labor Standards Act, employers must pay employees covered by the Act at least a minimum wage for all hours worked. 29 U.S.C. § 206(a); *see also Andrews v. DuBois*, 888 F.Supp. 213, 216 (D.Mass.1995). Employers must pay covered employees at one and a half times their regular pay for any hours worked beyond 40 hours per week. 29 U.S.C. § 207(a); *see also DuBois*, 888 F.Supp. at 216.

**[2]** The Portal–to–Portal Act, 29 U.S.C. § 254(a), modifies the FLSA by providing that, in general,

no employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended..., on account of the failure of such employer to ... pay an employee overtime compensation, for or on account of any of the following activities of such employee engaged in on or after May 14, 1947 -

(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

(2) activities which are preliminary to or postliminary to said principal activity or activities,

which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

*Id.* Deciding whether a given activity constitutes a "principal activity" within the meaning of the Portal–to–Portal Act is something a court may do in the manner and by procedures appropriate to deciding matters of law. *Ballou v. General Elec. Co.*, 433 F.2d 109, 111 (1st Cir.1970), *cert. denied*, 401 U.S. 1009, 91 S.Ct. 1253, 28 L.Ed.2d 545 (1971). In the present circumstances, for example, this is true as to asserted facts

concerning the activities of at least some of the plaintiffs that are not in genuine dispute.

**[3]** Three steps are required to decide whether the plaintiffs' activities fall within the terms of the Portal–to–Portal Act, rendering them non-compensable under the FLSA. First, I must determine whether the claimed activity is a "principal activity." If not, I must determine whether, under the final clause quoted above, the activity occurs after the worker has started performance of his or her principal activities, and before the worker has completed those activities. If the work is, in fact, outside the workday, the Portal–to–Portal Act does not make the work non-compensable, unless the work consists of travel to or from the primary activities, or consists solely of work preliminary to or after completion of the worker's primary activities.

The plaintiffs, in their arguments, focus on two discrete forms of work: (i) their work at home at the beginning and end of the day, and (ii) their work transporting their equipment to and from home.

### 4. Plaintiffs' Activities at Home

It is undisputed that at least some of the plaintiffs perform work-related activities at the beginning of the day at home before driving to their first appraisal site, and again at the end of the day after returning **\*242** from their final appraisal. Do the plaintiffs' alleged activities at home constitute principal activities? In deciding how to answer this question, I focus only on those plaintiffs who, beyond genuine dispute, work at home at the beginning and end of the day.

**[4]** The statute itself provides no guidance as to what activities fall into the "principal activity" category. The Department of Labor has published administrative interpretations that, though not binding on courts, are entitled to deference if they appear reasonable and persuasive. *See O'Brien v. Town of Agawam*, 350 F.3d 279, 298 (1st Cir.2003); *see also Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944) (the interpretations "have the power to persuade, if lacking power to control, as they constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance").

In 29 C.F.R. § 790.8, the Department of Labor makes it clear that

in order for an activity to be a "principal" activity, it need not be predominant in some way over all other activities

engaged in by the employee in performing his job; rather, an employee may, for purposes of the Portal–to–Portal Act be engaged in several "principal" activities during the workday. The "principal" activities referred to in the statute are activities which the employee is "employed to perform"; they do not include noncompensable "walking, riding, or traveling" of the type referred to in section 4 of the act [9 U.S.C. § 254(a)(1) ].... The legislative history further indicates that Congress intended the words "principal activities" to be construed liberally ... to include any work of consequence performed for an employer, no matter when the work is performed. A majority member of the committee which introduced this language into the bill explained to the Senate that it was considered "sufficiently broad to embrace within its terms such activities as are indispensable to the performance of productive work."

*Id.* § 790.8(a) (footnotes omitted). Acting under the authority of this guidance, I conclude that the "term 'principal activities' includes all activities which are an integral part of a principal activity." *See id.* § 790.8(b).

**[5]** **[6]** Furthermore, under the case law, the term "principal activities" is to be construed broadly. *See Barrentine v. Arkansas–Best Freight Sys., Inc.,* 750 F.2d 47, 50 (8th Cir.1984); *Dunlop v. City Elec., Inc.,* 527 F.2d 394, 398 (5th Cir.1976); *Bobo v. United States,* 37 Fed. Cl. 690, 694–95 (1997), *aff'd,* 136 F.3d 1465 (Fed.Cir.1998). Whether a particular function is a principal activity may be determined by deciding whether the task is "performed as part of the regular work of the employees in the ordinary course of business." *Dunlop,* 527 F.2d 394, 401 (5th Cir.1976).

**[7]** Under this rubric, I conclude that the activities the plaintiffs allege they perform at home constitute principal activities. Appraisers are required, as part of their job duties, to check their email and voice mail, to prepare their computers for use, and to return telephone calls. These tasks are "part of the regular work of the employees." *Dunlop.* 527 F.2d at 401. Applying, as applicable law requires, a broad definition of the term, I rule that these activities constitute "principal activities" within the meaning of the Portal–to–Portal Act.

**[8]** Next, I must determine whether my conclusion that the plaintiffs' activities at home commence the workday. If they do, then the plaintiffs' drive from home to the next work site occurs within the workday. **\*243** The Portal–to–Portal Act applies only to those activities that occur "either prior to the time on any particular workday at which such employee commences, or subsequent to the time on

any particular workday at which he ceases, such principal activity or activities." 29 U.S.C. § 254(a). I concluded, above, that the plaintiffs' alleged activities at home constitute principal activities. Because the plaintiffs' drive to the first appraisal site does not occur "prior to the time [the] employee commences [his or her] principal activity or activities," the drive is outside the ambit of the Portal–to–Portal Act. The default rule of the FLSA—that the plaintiffs must be paid—applies. *See* 29 C.F.R. § 790.6(a) ("Periods of time between the commencement of the employee's first principal activity and the completion of his last principal activity on any workday must be included in the computation of hours worked to the same extent as would be required if the Portal Act had not been enacted."). Because the Portal–to–Portal Act is inapplicable, I need not decide whether the plaintiffs' drive falls within § 254(a)(1) (excluding compensation for travel outside the workday).

Defendant's heavy reliance on *Andrews* is misplaced. The plaintiffs in *Andrews* were correctional officers at the Massachusetts Department of Correction. 888 F.Supp. at 215. As part of their responsibilities, the employees kept one or more dogs at their homes, and were responsible for cleaning, grooming, feeding, exercising, and training the dogs. *Id.* The officers were responsible for transporting the dogs, either in their personal vehicles or in state-supplied vehicles. *Id.* The plaintiffs claimed that they were owed compensation both for the time they spent taking care of the dogs at home and for the time they spent transporting the dogs. Judge Young held that the plaintiffs were entitled to compensation for taking care of the dogs, *id.* at 216–17, but not for transporting them, *id.* at 217–20.

But *Andrews* is distinguishable. No argument was presented in *Andrews* asserting that the transportation time should be included because the workday had begun. Nor would such an argument have made sense, since caring for police dogs is a 24–hour activity. Beyond genuine dispute, Congress clearly did not manifest an intent for a workday to span a 24–hour period. Thus, the suggested argument was simply inapplicable in *Andrews.* Instead, ruling that the transportation was not compensable, *Andrews* rejected not this but instead other arguments. *Andrews* held (i) that, in the circumstances of that case, it did not make sense to treat the home as an alternative work site, *id.* at 218; (ii) that the transportation of the dogs was not a service that directly benefitted the employer, *id.*; and (iii) that dogs were not analogous to heavy machinery, and therefore did not fall within 29 C.F.R. § 790.7(d) (excluding from 29 U.S.C. § 254(a)(1) employees who transport heavy

equipment). None of these rulings is relevant in determining whether the appraisers in this case begin their workday at home.

A recent First Circuit opinion also involves related facts; but it, too, is distinguishable. In *Tum v. Barber Foods, Inc.*, 331 F.3d 1 (2003), the plaintiffs were workers at a poultry processing plant. *Id.* at 3. Employees were paid starting at the time they punched in to a computerized time-keeping system. *Id.* Before they were permitted to punch in, however, employees were required to don an extensive array of outerwear, such as lab coats, hairnets, earplugs, safety glasses, steel-toed boots, bump hats, and back belts, and were required to carry certain equipment. *Id.* Clothing and equipment for the employees to pick up were located in various locations on the production floor, requiring employees **\*244** to walk between the locations to retrieve their required outerwear. *Id.* at 3–4.

The First Circuit conceded that the donning of clothes and equipment could constitute a primary activity. Nevertheless, it held that the time employees spent walking from one location to another, collecting outerwear, was not compensable. The court reasoned:

As described in 29 C.F.R. § 790.7(g) n. 49, walking time is not automatically excluded from the purview of the Portal–to–Portal Act by virtue of following compensable doffing. By stretching the traditional understanding of a primary activity to cover donning and doffing in very limited circumstances, Congress was not creating an avenue to circumvent the Portal–to–Portal Act's exemption of preliminary or postliminary activities. In the case before us, Employees concede that the walk to the first place where gear is gathered is exempted by the Portal–to–Portal Act. *See* 29 C.F.R. § 790.7. Following this logic, if Barber Foods were to dispense all of the gear from one point, then it could eliminate Employees['] claim for walk time between dispensing areas. It would be nonsensical for us to conclude that the compensability of walk time depended on whether they picked up their gear at one bin or two. Employers could prevent compensability for walk time by placing all of the items at one location instead of at a few locations in close proximity. Consequently, we find that the walking at issue is not exempted from the Portal–to–Portal Act due to it occurring after the doffing has commenced.

*Id.* at 6. Thus, because it was "nonsensical" to distinguish between the situation where clothing could be retrieved in a single location and the situation where clothing was retrieved in multiple locations, the First Circuit held that the walking time was not compensable.

No such circumstances exist here. In the circumstances of this case, neither the appraisers nor Liberty can realistically eliminate the necessity to travel. No reason exists to depart from the general rule set forth in the statute that, once the workday begins, workers' time must be compensated under the FLSA until the end of the workday. *See Alvarez v. IBP, Inc.*, 339 F.3d 894 (9th Cir.2003) (distinguishing *Tum* on its facts, and noting that "[t]here is nothing in the statute or regulations that would lead to the conclusion that a workday may be commenced, then stopped ..., then recommenced...").

The defendant argues that 29 C.F.R. § 785.35 provides that commute time is not compensable. But the text of § 785.35, properly read, does not assist the defendant. The administrative interpretation states:

An employee who travels from home *before his regular workday* and returns to his home *at the end of the workday* is engaged in ordinary home to work travel which is a normal incident of employment.... *Normal* travel from home to work is not worktime.

*Id.* (emphasis added). By contrast, the plaintiffs contend, and I have ruled, above, that the appraisers travel from home *after* the workday has begun, and that the workday does not end until well after they have returned home. The plaintiffs' situation is simply not encompassed by the administrative interpretation. *Cf.* 29 C.F.R. § 790.6 (periods within the workday unaffected by Portal–to–Portal Act).

At oral argument, the defendant maintained that the purpose of the Portal–to–Portal Act is to limit the amount of commute time for which employers are liable; the defendant asserts that it does not expand employers' liability. But the plaintiffs **\*245** do not argue that the Act expands employers' liability. Instead, they say merely that it does not apply in this situation, and that the base provisions of the FLSA are controlling. Moreover, they say that the FLSA, as a remedial statute, should be interpreted broadly, and exemptions from it are to be construed narrowly. *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960). Also, as explained earlier, the term "principal activity," as used in the Act, is to be construed broadly—thereby excluding a greater number of situations from the Act's ambit. I rule that to include the plaintiffs' driving time does not contravene the manifested intent of the Portal–to–Portal Act.

The defendant also contended at oral argument that I should "interpret the Portal–to–Portal Act to give effect to the purposes behind the legislation." *Aguilar v. United States*, 36

Fed. Cl. 560, 565 (1996). Contrary to my ruling above, the *Aguilar* court concluded that the term "principal activities" should be narrowly construed to effectuate congressional intent. *Id.* But the *Aguilar* decision has been repudiated in its own jurisdiction. *Bobo,* 37 Fed. Cl. at 695 (stating that "*Aguilar* interprets the FLSA too restrictively and the Portal Act too broadly"), *aff'd,* 136 F.3d at 1468 n. 1 ("We decline to adopt [the *Aguilar* ] interpretation" of the Portal–to–Portal Act.). The defendant has identified no case law controlling in any jurisdiction to support its contention that the term "principal activity" in the Portal–to–Portal Act should be read narrowly.

**[9]** The conclusion that the plaintiffs are entitled to compensation comports with common sense. Unlike the plaintiffs in *Andrews,* who could not be said to have started their workday at home, the plaintiffs here perform substantial administrative work at home. Their office is their home. The first and last trip of the day for these appraisers is not a commute in the ordinary sense of the word—it is a trip between their office, where their administrative work is performed, and an off-site location. Travel between an office and an off-site location is compensable time. *See Baker v. Barnard Const. Co.,* 146 F.3d 1214, 1216 (10th Cir.1998) (hereinafter *Baker* ). In these circumstances, it would make little sense to fail to compensate the employees for this travel time.

### 5. Plaintiffs' Driving Activity

**[10]** I ruled, above, that those plaintiffs who perform work at home at the beginning and end of the day must be compensated for their first and last drive of the day. The defendant asserts, however, that some of the plaintiffs do not perform work at home. Whether this is true is in dispute between the parties. But the plaintiffs assert that the dispute is not material, because, plaintiffs say, even if some plaintiffs do not work at home, the time spent driving is itself compensable under the FLSA. I rule, however, that if a plaintiff does not perform work at home then the first and last drive of the day fall within the ambit of the Portal–to–Portal Act and are not compensable.

As before, first, I analyze whether the driving is a principal activity. Generally, travel to and from home is not a principal activity. *See* 29 C.F.R. § 790.8(a) (principal activities "do not include noncompensable 'walking, riding, or traveling' of the type referred to in section 4 of the act [29 U.S.C. § 254(a)(1) ]"). The plaintiffs argue that transporting their equipment to appraisal sites is "integral and indispensable

to the performance of [the appraisers'] principal activities." Docket No. 122 at 22. They cite numerous cases holding that transportation of equipment is a principal activity and is compensable. *See, e.g., Preston v. Settle Down Enterprises,* **\*246** *Inc.,* 90 F.Supp.2d 1267, 1280 (N.D.Ga.2000).

At oral argument, the defendant, citing *Aguilar v. United States,* 36 Fed. Cl. 560 (1996), asserted that the "integral and indispensable" test does not apply to commutes (29 U.S.C. § 254(a)(1)), but rather only to "preliminary and postliminary activities" (29 U.S.C. § 254(a)(2)). *Aguilar* does support this proposition. *See id.* at 565 (" '[I]ntegral and indispensable' activities [are] compensable even if performed 'before or after the regular work shift' *unless* [sic, should be *only if* ] those activities 'are not specifically excluded by Section 4(a)(1) [29 U.S.C. § 254(a)(1) ].' ") (quoting *Steiner v. Mitchell,* 350 U.S. 247, 256, 76 S.Ct. 330, 335, 100 L.Ed. 267 (1956) (emphasis in original)). Although, as noted above, *Aguilar* has been repudiated, the Supreme Court case upon which it relies, *Steiner,* has not.

I conclude that the "integral and indispensable" exception applies to both subsections of § 254(a). Except in the one phrase quoted above, nowhere in the *Steiner* opinion does the Court discuss § 254(a)(1). An interpretation of *Steiner* to mean that *all* commutes are exempted from the "integral and indispensable" test would conflict with numerous Department of Labor interpretations. *See* 5 C.F.R. §§ 551.422(a)(2), 551.401, 550.112(g); *see also* 29 C.F.R. §§ 785.41, 790.7(d), 790.7(d) n.47; *Bobo,* 37 Fed. Cl. at 695 n. 7. Instead, I adopt *Bobo* 's reading that *Steiner* stands

for the proposition that section 254(a)(1) of the Portal Act precludes compensation for normal commuting time. The DOL regulations are consistent with *Steiner* because they interpret Portal Act section 254(a)(1) to remove normal commuting time from FLSA compensation requirements. These DOL regulations also provide that employee commutes entailing substantial work differ from normal commutes. In short, the regulations take a common-sense approach and teach that section 254(a)(1) of the Portal Act deems normal commuting time noncompensable and therefore is inapplicable to commutes during which employees perform work for their employers.

37 Fed.Cl. at 695 n. 7 (citations omitted); *cf.* 29 C.F.R. § 785.35 ("*[n]ormal* travel" between home and work falls within the Portal–to–Portal Act and is not compensable) (emphasis added). Because the two subsections of § 254(a) express a single concept— that "preliminary" and "postliminary" activities are not

compensable, including *ordinary* commutes—I rule that the "integral and indispensable" test applies to both subsections.

Remaining is this question: Is transporting the equipment "integral" to the appraisers' work? The case law holds that, as a general rule, commuting is not a principal activity, even if the employee is also transporting equipment for the employer's benefit. The line of canine handler cases, all but one of which hold that a police officer who transports a canine to and from work at the behest of the police department is not engaging in compensable activity, provide good examples. *See Aiken v. City of Memphis,* 190 F.3d 753, 757 (6th Cir.1999); *Bobo v. United States,* 136 F.3d 1465, 1468 (Fed.Cir.1998); *Reich v. New York City Transit Auth.,* 45 F.3d 646, 649 & 651–52 (2d Cir.1995); *Bolick v. Brevard,* 937 F.Supp. 1560, 1565 (M.D.Fla.1996); *DuBois,* 888 F.Supp. at 215, 218; *Levering v. District of Columbia,* 869 F.Supp. 24, 28–29 (D.D.C.1994); *Truslow v. Spotsylvania County Sheriff,* 783 F.Supp. 274, 278 n. 5 (E.D.Va.1992); *but see Graham v. Chicago,* 828 F.Supp. 576 (N.D.Ill.1993). Courts reach this result even while applying the "integral and indispensable" test. *See, e.g., Bobo,* 37 Fed. Cl. at 695. Some of these cases rest on **\*247** the conclusion that employees would have to commute, whether or not they were also transporting equipment, *see, e.g., DuBois,* 888 F.Supp. at 218, or on the premise that simply commuting in a vehicle carrying equipment does not constitute work, *see, e.g., Reich,* 45 F.3d at 651–52.

The plaintiffs' reliance on *Secretary of Labor v. Field,* 495 F.2d 749 (1st Cir.1974), is unavailing. The question the court faced in *Field* was whether a drive from one business location to another was compensable under the FLSA. The court held that it was. *Id.* at 751. But *Field* did not consider, as I must here, whether a commute between a home and a business location is compensable under the FLSA. *Cf. DuBois,* 888 F.Supp. at 218 (commutes are not compensable because employees should not be paid for travel required independent of employer policies).

**[11]** **[12]** The proposition that a drive may be compensable (because the employee is transporting equipment for the benefit of the employer) where the drive starts at a business location, but not compensable if the drive starts at an employee's home, is borne out by the factors courts look to when deciding if a given task constitutes a "principal activity."

> The more the preliminary (or postliminary) activity is undertaken for the employer's benefit, the more

indispensable it is to the primary goal of the employee's work, and the less choice the employee has in the matter, the more likely such work will be found to be compensable. Commuting and similar activities are generally not compensable. The ability of the employer to maintain records of such time expended is a factor. And, where the compensable preliminary work is truly minimal, it is the policy of the law to disregard it.

*Reich v. New York City Transit Auth.,* 45 F.3d 646, 650 (2d. Cir.1995). Transporting equipment evokes many of the factors articulated in *Reich,* in favor of a finding that the activity is principally work-related. Commuting, however, adds a significant factor on the opposite side of the equation, favoring a conclusion that the same activity is not work-related.

**[13]** I conclude that the transportation of light equipment from employees' homes to work, and back from work to home, does not constitute a principal activity. First, the manifested intent of Congress favors the defendant. By enacting the Portal–to–Portal Act, Congress manifested an intent to immunize employers from liability for ordinary commutes. *See Reich,* 45 F.3d at 651. A hallmark of an ordinary commute is that it does not involve work beyond that necessary for transportation. *See id.; cf. Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 598, 64 S.Ct. 698, 703, 88 L.Ed. 949 (1944) (defining work as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business"). Although transporting heavy equipment might constitute work, any effort involved in transporting light equipment is likely to be treated as de minimus. The equipment the appraisers must carry is light and fits into a large briefcase. It is not reasonable to infer that Congress manifested an intent that transporting light equipment transforms an ordinary commute into a principal work activity. Indeed, this approach would lead to surprising results. For example, under the reasoning the plaintiffs propose, a police officer who is required to carry a gun must be compensated for his or her commute, since the officer is also transporting necessary equipment. This is not consistent with the intent manifested by Congress. *See Levering,* 869 F.Supp. at 28.

**\*248** Second, the administrative interpretations support this result. In 29 C.F.R. § 790.7(d), the Department of Labor characterized an employee who travels with "a portable power saw or other heavy equipment" as performing active

duties, as contrasted with an employee who carries "ordinary hand tools." *Id.; see also Tum,* 331 F.3d at 7 ("[W]alking while carrying ordinary hand tools... falls outside of the narrow category of walking that is not segregable from the simultaneous performance of [their] assigned work" and is not compensable) (citations and quotation marks omitted). I find the distinction between carrying heavy equipment and transporting hand tools persuasive.

Third, the statute itself may foreclose the possibility that the commuting time be considered a principal activity for some, if not all, of the plaintiffs. The Employee Commuting Flexibility Act, Pub L. No. 104–188 § 2102, 110 Stat.1928 (codified at 29 U.S.C. § 254(a)), amended the Portal–to–Portal Act by providing:

> For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

*Id.* The record before this court at this time suggests that at least some of the plaintiffs may drive vehicles owned by Liberty, although no evidence has been placed before the court regarding the existence or nonexistence of an agreement regarding the use of a vehicle. Because the parties have not briefed the applicability of this provision, I do not rest my ruling on it.

The plaintiffs cite a host of other cases in which, they assert, courts have held that transporting equipment constitutes a primary activity. *See Baker,* 146 F.3d at 1219; *Herman v. Rich Kramer Constr., Inc.,* No. 97–4308WMS, 1998 WL 664622 (8th Cir. September 21, 1998); *Crenshaw v. Quarles Drilling Corp.,* 798 F.2d 1345, 1350 (10th Cir.1986); *Chao v. Virginia Dep't of Transp.,* 157 F.Supp.2d 681, 689 (E.D.Va.2001), *rev'd on other grounds,* 291 F.3d 276 (4th Cir.2002); *Preston v. Settle Down Enterprises, Inc.,* 90 F.Supp.2d 1267, 1280 (N.D.Ga.2000) (employee performs compensable work while traveling if he or she is also "transporting equipment without which the employee's job could not be done"); *Breen v. Concrete By Wagner, Inc.,* No. 98 C 3611, 1999 WL 1016267 (N.D.Ill. Nov. 4, 1999); *Graham v. City of Chicago,* 828 F.Supp. 576, 582 (N.D.Ill.1993); *Dole v. Enduro Plumbing,*

*Inc.,* No. 88–7041–RMT, 1990 WL 252270, at *6 (C.D.Cal. Oct.16, 1990).

But these cases are distinguishable on their facts. As *Reich* noted, a multitude of factors must be weighed when deciding whether a given activity is a principal activity. In the cases the plaintiffs cite, either travel was from an intermediate site (and, hence, no home-to-work commute was involved) (*Dole, Breen, Preston* ) or the act of driving equipment itself constituted substantial work, either because of additional responsibilities or the extensive nature of the equipment being transported (*Baker, Herman, Crenshaw* ), or are too unclear as to the facts to constitute useful precedents here (*Chao* ). *Graham* remains, but it is contradicted by extensive case law reaching the opposite conclusion. To the extent that some of these cases state broadly that travel time is compensable if employees are transporting equipment **\*249** without which their jobs could not be done, *e.g., Crenshaw,* 798 F.2d at 1350, I read these statements as implying that the transportation involves some degree of effort. Otherwise, as observed earlier, the commutes of police officers who carry guns, or indeed, employees who carry badges, would always be compensable.

Here, because the employees are driving from their homes, and because the equipment they transport is relatively light, *see* Plaintiffs' Statement of Undisputed Material Facts (Docket No. 123) at ¶ 46, I rule that their commutes do not constitute a primary activity.

In summary, I rule that those employees who cannot show they perform work at home before and after their daily appraisals are not entitled to be compensated for their commute times. Those employees who can show that they work at home at the beginning of the day but not the end of the day are entitled to compensation for their morning commutes, and those who can show work at home at the end of the day are entitled to compensation for their evening commutes.

### D. Motion to Compel

#### 1. Introduction

[14]   The plaintiffs also move for an order compelling the production of certain documents produced by Liberty's attorneys in the early 1990s, including the attorneys' work files (the "1992–93 documents"). The parties appear to agree that, in their settlement agreement, Liberty has waived any objection to the production of these documents on any

grounds other than relevance in their settlement agreement. The agreement provides, in part:

> Liberty Mutual agrees to produce the documents that were the subject of the Court's June 13, 2003 Order for an *in camera* inspection by the Court for the purpose of determining whether such documents are relevant to any issue that then remains to be determined by the Court. If the Court determines that any of such documents are relevant to any such remaining issue, Liberty Mutual will produce such documents to the Plaintiffs forthwith.

Agreement of Partial Settlement (Ex. C to Docket No. 129) at ¶ 19. I assume for the purposes of this Memorandum and Order, but do not decide, that assertions of privilege are unavailable to Liberty at this stage of these proceedings. The only question before me is whether the 1992–93 documents are relevant to any of the matters remaining in this case.

The plaintiffs present two arguments supporting their proposed conclusion that the documents are relevant. First, they argue that the documents relate to Liberty's state of mind when it hired plaintiffs. Liberty's state of mind, the plaintiffs contend, is relevant to determining the appropriate method of calculating the rate of overtime payments. Second, they argue that the documents may contain information about the number of hours worked in the early 1990s. This information, the plaintiffs contend, is probative of the number of hours appraisers worked between 1993 and 2002, during which time Liberty maintained no direct records of appraisers' hours. For the reasons explained below, I reject the plaintiffs' first argument. I conclude, however, that if no objection other than relevance applies, then the documents are discoverable if they contain information relating to the number of hours appraisers worked in the early 1990s.

### 2. Rate of Overtime Pay

**[15]** One of the issues remaining in this case is how to calculate the appraisers' hourly rate for the purposes of awarding them overtime. The plaintiffs assert that the appropriate calculation would be to divide the appraisers' weekly salary by a ***250** 40–hour workweek to obtain their hourly wage, then award them time and a half for any hours worked above 40 hours. For instance, if the appraisers earned $800 in a week, their hourly salary would be $20. If they worked a 60–hour workweek, they would be entitled to $30 per overtime hour for each of the 20 hours of overtime they worked in that week, for a total of $600 in overtime, in addition to their $800 base pay.

Liberty, however, says it will claim the benefit of a fluctuating workweek. Under this method of calculation, employees' hourly rates are considered to fluctuate every week depending on the number of hours in fact worked. In the above example, in a week in which employees with a base salary of $800/week work 60 hours, their hourly rate would be calculated by dividing $800 by 60 hours, arriving at an hourly rate of $13.33. They would be entitled to an overtime payment of $400, or $13.33 times 1.5 times 20 hours overtime, in addition to the $800 base pay. Under the fluctuating workweek calculation, the more hours employees work, the lower their hourly rate.

The statutory and regulatory provisions relating to the fluctuating workweek are as follows. The FLSA provides, in general, that

> no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods in commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). The phrase "the regular rate at which [the employee] is employed" is ambiguous in the situation where employees regularly work irregular hours for a fixed weekly wage. *Valerio v. Putnam Assocs.*, 173 F.3d 35, 39 (1st Cir.1999). In this situation, the Supreme Court has interpreted the statute to provide for a fluctuating hourly rate, as described above. *See Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 579–80, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942) ("Overnight Motor"). The Court's interpretation, as applicable here, is reflected in 29 C.F.R. § 778.114(a).

In order for the fluctuating workweek to apply, the administrative interpretation specifies that a "clear mutual understanding of the parties that the fixed salary is compensation ... for the hours worked each workweek, whatever their number" must exist. 29 C.F.R. § 778.114(a). This prerequisite has been uniformly adopted by the case law. *See, e.g., O'Brien v. Town of Agawam*, 350 F.3d 279, 290 (1st Cir.2003).

The plaintiffs set forth what they admit to be a novel legal theory regarding the proper interpretation of the "clear mutual understanding" requirement. They assert that, when they were hired, Liberty told them that the FLSA did not

entitle them to payment for overtime worked. The plaintiffs contend that the 1992–93 documents will demonstrate that this representation was made in bad faith because Liberty knew, based on the advice of its attorneys, that the appraisers *were* entitled to overtime. The plaintiffs argue that no "clear mutual understanding" that Liberty would pay the plaintiffs a weekly salary that would cover a fluctuating workweek is possible—even if the employee understood this to be the employment arrangement—because the employer's bad faith negates the mutuality of any understanding. In sum, they argue that even if the employee understood that he or she was to be paid a fixed salary, the *employer* **\*251** did not share that understanding, due to its alleged knowledge of the FLSA's requirements. *Cf.* Restatement (Second) of Contracts § 164(1) (1981) ("If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.").

The plaintiffs' argument proceeds by analogy to contract law. They cite cases that find the requisite mutual understanding by inferring an agreement from the conduct of the parties. The plaintiffs aver that, if an agreement is required, then fraud in the inducement should vitiate the agreement, voiding the "clear mutual understanding." The plaintiffs draw support for their argument from a line of FLSA cases that infer an "implied-in-fact" agreement regarding whether an employee was to be paid on an hourly basis from the conduct of the parties. *See Valerio,* 173 F.3d at 39–40; *Mayhew v. Wells,* 125 F.3d 216, 218 (4th Cir.1997); *Zoltek v. Safelite Glass Corp.,* 884 F.Supp. 283, 286–87 (N.D.Ill.1995). The plaintiffs assert that these cases demonstrate that courts turn to common-law principles of contract interpretation to decide whether a "clear mutual understanding" exists. At oral argument, the plaintiffs conceded that they did not contend that contract law applies of its own force, merely that courts should import applicable concepts.

The precedents, however, are distinguishable. In *Mayhew,* and *Zoltek,* contract law *did* apply of its own force. In those cases, the courts looked to the conduct of the employer and employee as evidence of the terms of the employment contract. Both courts concluded that the conduct of the parties indicated that the implied contract of employment provided that the employee was to receive a fixed salary no matter how many hours in a given week the employee in fact worked. *Mayhew,* 125 F.3d at 219–20; *Zoltek,* 884 F.Supp. at 286. The courts found that this implied employment agreement satisfied the "clear mutual understanding" requirement of

the case law and 29 C.F.R. § 778.114(a), *Id.* The court's citation in *Valerio* indicate that there, too, the court looked to the implied employment contract to find the requisite clear, mutual understanding. *Valerio,* 173 F.3d at 39–40.

For this case law to be applicable, the plaintiffs would be required to show that their entire employment agreement is voidable due to Liberty's alleged misrepresentations. Under the approach of *Mayhew, Zoltek,* and *Valerio,* the clear, mutual understanding that the appraisers are to receive a fixed salary no matter how many hours a week they work is derived from the employment agreement; it follows that the clear, mutual understanding is voidable only if the underlying employment agreement is. I do not understand the plaintiffs to be seeking this result. And some doubt exists as to whether they would be entitled to seek this result under their present pleadings. *See* Fed.R.Civ.P. 9(b).

Even if the contract were voidable, a court still could find a clear, mutual understanding. Although the cases permit reference to employment contracts to find this understanding, they do not require this approach. Indeed, an "understanding" is not the same thing as a "contract." An understanding is certainly required for a contract—but the reverse is not true. Parties may reach an understanding, for example, without the payment of consideration. Understandings that are not contracts are not enforceable on their own terms, despite the fact that they may, as here, have legal significance.

Plaintiffs ask, then, that I hold that a mere *understanding* is voidable when procured by fraud or misrepresentation. I conclude that such a course would be ill- **\*252** advised. I start with the fundamental purpose of the FLSA: to protect the general well-being of workers. *See* 29 U.S.C. § 202 (statement of Congressional purpose). The fluctuating workweek rule derives from the Supreme Court's interpretation of the FLSA's language regarding the "regular rate of pay" where employees receive a fixed weekly salary. *See Overnight Motor,* 316 U.S. at 579–80, 62 S.Ct. 1216. The "clear mutual understanding" requirement ensures that the parties, in fact, agreed to a weekly salary as opposed to an hourly rate of pay. *See* 29 C.F.R. § 778.114(a). None of these doctrines exists to remedy fraud or misrepresentation on the part of the employer. Other provisions of the FLSA, as well as common-law tort and contract remedies, are readily available to employees who are wronged by employer misrepresentations. The fluctuating workweek doctrine is not a benefit to be withheld as a punitive measure, but rather is an interpretive tool to give effect to the understanding of the parties.

In conclusion, I rule that the record now before me supports an inference that the employment agreement between Liberty and the appraisers provided that the appraisers would receive a fixed weekly salary, not an hourly salary. No suggestion is before me that the entire employment agreement is voidable. Even without reference to the employment agreement, I rule that a clear, mutual understanding existed between the parties that the appraisers would receive a fixed weekly salary. In these circumstances, I rule that the 1992–93 documents, to the extent they relate to Liberty's knowledge of the FLSA's requirements, are not relevant to any outstanding matter in this case.

Because I concluded, however, that the 1992–93 documents are discoverable to the extent they contain information probative of the hours appraisers worked during the time period covered by those documents, the Order below requires Liberty to produce those documents that contain such information, unless Liberty can show that objections in writing have been preserved. If further disputes arise, the parties may bring them to my attention by an appropriate motion.

## ORDER

For the foregoing reasons, it is ORDERED:

(1) As explained in Part III.A of the foregoing Memorandum, the Joint Stipulation for Entry of Partial Judgment (Docket No. 120) is ALLOWED to the following extent:

(a) Defendant is liable for and shall pay to each of the plaintiffs an amount equal to two times the amount of any single damages that may hereafter be stipulated by the parties or, absent any such stipulation, be found by the court to be owed to the plaintiffs as unpaid overtime compensation for their services as Liberty Mutual Auto Damage Appraisers during the periods described in paragraph 2, below. Plaintiffs waive any claim to prejudgment interest and agree not to seek such interest in this action.

(b) For purposes of the Statute of Limitations set forth in 29 U.S.C. 255(a), in determining the number of hours on account of which any such single damages may be owed to any plaintiff, the court will base its findings upon the number

of unpaid hours over 40—if any and for which overtime has not been paid—worked by such plaintiff in any week during the period beginning on the date three years before the date on which such plaintiff's Notice of Consent form was filed with the court. In the case of the named plaintiff, Thomas Dooley, the period relevant to computing damages begins on June 15, 1998.

**\*253** (c) Liberty Mutual reserves the right to argue application of the fluctuating workweek method of computing overtime compensation and make any other arguments regarding what constitutes compensable hours worked, including the argument that "commuting time" to the first appointment from home and from the last appointment home is non-compensable.

(d) In addition to any amounts paid to the plaintiffs as damages, defendant is liable for and shall pay to the plaintiffs' counsel pursuant to 29 U.S.C. 216(b) such amounts of attorneys' fees and expenses as may hereafter be agreed by stipulation of the parties approved by the court, or, absent such agreement, as may be awarded by the court.

(2) As explained in Part III.B of the foregoing Memorandum, Defendant's Objection to Evidence Presented in Support of Plaintiffs' Motion for Partial Summary Judgment (Docket No. 140) is OVERRULED in part and is MOOT in part;

(3) As explained in Part III.C of the foregoing Memorandum, Plaintiffs' Motion for Partial Summary Judgment (Docket No. 121) is ALLOWED in part and DENIED in part;

(4) As explained in Part III.C of the foregoing Memorandum, Defendant's Cross–Motion for Partial Summary Judgment (Docket No. 134) is ALLOWED in part and DENIED in part; and

(5) As explained in Part III.D of the foregoing Memorandum, Plaintiffs' Motion to Compel the Production of Documents Following In Camera Review (Docket No. 128) is ALLOWED in part and DENIED in part.

## All Citations

307 F.Supp.2d 234, 9 Wage & Hour Cas.2d (BNA) 972

Dooley v. Liberty Mut. Ins. Co., 307 F.Supp.2d 234 (2004)

9 Wage & Hour Cas.2d (BNA) 972

End of Document

© 2022 Thomson Reuters. No claim to original U.S.
Government Works.

2008 WL 3243860
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Tampa Division.

Jared R. MOREN, Plaintiff,

v.

PROGRESS ENERGY, INC., Defendant.

No. 8:07–cv–1676–T–17.
|
Aug. 7, 2008.

**Attorneys and Law Firms**

Ronald W. Fraley, The Fraley Firm, PA, Tampa, FL,
for Plaintiff.

Thomas M. Gonzalez, Thompson, Sizemore, Gonzalez
& Hearing, PA, Tampa, FL, for Defendant.

**ORDER**

ELIZABETH A. KOVACHEVICH, District Judge.

**\*1** This cause is before the Court on Defendant,
Progress Energy, Inc .'s, motion for summary judgment
(Doc. No. 11), and the Plaintiff, Jared Moren's,
response (Doc. No. 20) thereto.

**FACTS**

Unless otherwise noted, the facts are taken from
the Plaintiff's Response to Defendant's Motion for
Summary Judgment (Doc. No. 20) and supporting
affidavits and depositions (Doc. Nos.12–17) for the
purpose of resolving the pending motion.

Jared Moren ("Moren"), a white, heterosexual male,
was hired by Progress Energy, Inc. ("Progress")
as a lineman apprentice in April 2005. He was
assigned to the Line Department, located in St.
Petersburg, Florida. Jeff Grosseibl ("Grosseibl"), also
a white, heterosexual male, was hired as a lineman
in September 2005. Grosseibl and Moren worked
in the same lineman crew based out of the Line

Department. As a lineman, Grosseibl was Moren's
superior within the crew. According to Progress's
motion, a lineman is also referred to as the apprentice's
yard supervisor. However, Moren's direct management
supervisor, from whom Moren took work orders, was
Operations Manager Kent Allen ("Allen").

Grosseibl began harassing Moren in December 2005.
Specifically, Moren alleges that Grosseibl called him
names such as "homosexual," "faggot," "dickeater,"
"dickcheese," "dildo," "asshole," "dumbass," and
"shithead." Grosseibl also frequently asked Moren
if he had a "boyfriend named Bruce," and whether
he "played with Barbie dolls." Grosseibl also posted
signs that read, "Moren is gay," and drew pictures
on adhesive notes depicting Moren having sex with
another man and with a dog. Grosseibl then posted
these sexually explicit depictions on a company truck
that lineman used to travel to work-sites. Moren further
alleges that on one occasion Grosseibl punched him in
his side, and that Grosseibl threatened to nail Moren
to a cross and light him on fire. Moren confronted
Grosseibl several times and told him to stop. When
Grosseibl continued, Moren complained to Allen about
the harassment.

In the meantime, Moren's performance evaluations
contained constructive criticism suggesting that Moren
needed to listen more, talk less, and improve his
pole-climbing abilities. On March 3, 2006, Moren
met with Allen, Grosseibl, and two other linemen,
in Allen's office. During this meeting, Grosseibl
and the linemen expressed concern with Moren's
work performance, including the issues mentioned in
Moren's performance evaluations. Once Grosseibl and
the other linemen left Allen's office, Moren, again,
complained to Allen about Grosseibl's harassment.
Allen assured Moren that he would resolve the
problem.

The name-calling continued, however. On March
6, Moren called Progress's Corporate Security
department and filed a formal complaint. On March
7, Moren met with and was interviewed by two
investigators from the Corporate Security Department.
An investigation ensued. Moren was notified the
next day that Corporate Security had determined that
Grosseibl's conduct was inappropriate. Moren then
took vacation leave from March 9 through March

Case 21-2901, Document 62, 06/24/2022, 3337761, Page103 of 109

Moren v. Progress Energy, Inc., Not Reported in F.Supp.2d (2008)

13. The day before returning to work, Moren called Allen to find out the status of the investigation. Allen informed Moren that Grosseibl was fired and that Moren should return to his regular routine.

**\*2** Moren alleges that soon after he complained to Allen during the March 3 meeting about Grosseibl's boorish conduct, Moren was subjected to retaliation. Specifically, Moren alleges that, on March 7, a District Operations Manager Dereck Roberts and Allen told Moren that he should not have gone "above their heads" to corporate, but that he should have left it to Roberts and Allen to resolve the problem. Moren also alleges that Tom Hanrahan ("Hanrahan"), another lineman that worked in the same crew as Moren and Grosseibl, berated Moren by calling him "the rat" and intimidating him by saying that Moren would get fired because he got a long-time member of the "brotherhood,"[1] fired.

On March 21, an altercation ensued between Moren and Hanrahan at a work-site. Hanrahan, a lineman and Moren's superior in the crew, ordered Moren to climb a pole. Moren refused claiming he felt ill. Hanrahan accused Moren of lying about being ill. Moren then climbed down from the pole, at which point Hanrahan and Moren approached each other in a "brisk manner" and came "within inches" of each other before stepping away. But before stepping away, Moren and Hanrahan exchanged words. Moren alleges that Hanrahan again threatened him about interfering with the union, while Moren allegedly said that he did not care that Hanrahan was a lineman and that he would not grovel at Hanrahan's feet.

When the crew returned to the Line Department, Moren complained to Allen that Hanrahan had harassed him at the work-site. Allen and Roberts conducted an investigation, and subsequently, on March 30, held a meeting with Moren and union representative Todd Fountain ("Fountain"). At this meeting, Moren alleges that Roberts and Fountain pressured him to resign. Specifically, Moren alleges that Fountain told him that if he did not resign, Progress would fire him, and that having a termination on his record would be detrimental to his career. On April 10, upon concluding that Moren had acted inappropriately toward Hanrahan during the altercation, Allen issued Moren a written reprimand, suspended him for three

days without pay, and issued him a mandatory referral to Progress's Employee Assistance Program. Moren resigned on April 17, upon return from his suspension.

On or about April 26, Moren filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC"). The EEOC issued Moren a notice of right-to-sue on June 28, 2007. On September 19, 2007, Moren filed a complaint (Doc. No. 1) against Progress bringing three counts: 1) sexual harassment and hostile work environment under Title VII of the Civil Rights Act of 1964 ("Title VII"), section 2000e, United States Code, *et seq.,* and the Florida Civil Rights Act ("FCRA"), section 760.01, Florida Statutes, *et seq.;* 2) retaliation under Title VII, the FCRA, and the Florida Whistleblower Act, section 448.101, Florida Statutes; and 3) constructive discharge under Title VII and the FCRA. Progress answered (Doc. No 4) thereto on October 17, 2007, and on June 30, 2008, filed a motion for summary judgment (Doc. No. 11). On July 18, 2008, Moren filed a response (Doc. No. 20) to Progress's motion for summary judgment.

## STANDARD OF REVIEW

**\*3** Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). That burden can be discharged if the moving party can show the Court that there is "an absence of evidence to support the nonmoving party's case." *Id.* at 323, 325. When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324.

Issues of fact are "genuine' only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Material facts are those that will affect

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

103

the outcome of the trial under governing law. *Id.* at 248. In determining whether a material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir.1983).

## DISCUSSION

### *Sexual Harassment*

In Count I, Moren brings a claim of hostile work environment based on sexual harassment against Progress under Title VII and the FCRA. Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...." 42 U.S.C. § 2000e–2(a)(1).

To establish a *prima facie* case of sexual harassment which creates a hostile work environment under Title VII, a plaintiff must show that 1) the plaintiff belongs to a protected group; 2) the plaintiff was subject to unwelcome sexual harassment; 3) the harassment was based on the plaintiff's sex; 4) the harassment was so severe and pervasive that it affected a term, condition or privilege of employment; and 5) there is a basis for employer liability. *Scott v. Pizza Hut of America, Inc.*, 92 F.Supp.2d 1320, 1323 (M.D.Fla.2000). For the reasons stated below, we find that a reasonable jury, considering the evidence, could not find that Moren establishes the third element of his hostile work environment claim.

The United States Supreme Court has ruled that a same-sex sexual harassment claim is not excluded under Title VII. *Oncale v. Sundowner Servs., Inc.*, 523 U.S. 75, 79–80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Moren and Grosseibl are both males. Moren alleges that Grosseibl's sexual harassment created a hostile work environment. Therefore, we find that Moren is a member of a protected class for the purpose of his Title VII claim.

**\*4** The *gravamen* of any sexual harassment claim is that the alleged sexual harassment was unwelcome "in the sense that the employee did not solicit it or incite it, and in the sense that the employee regarded the conduct

as undesirable or offensive." *Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir.1982) (citations omitted). Courts may also consider the manner in which the employee registered his complaint. *See Weinsheimer v. Rockwell International Corp.*, 754 F.Supp. 1559, 1564 (M.D.Fla.1990), *aff'd*, 949 F.2d 1162 (11th Cir.1991) (conduct was not "unwelcome" where plaintiff did not report offensive behavior until months after it happened, and, even then, only in the course of casual conversation with supervisor).

Progress argues that the harassment was not unwelcome because Moren failed to register a complaint until about five months after the harassment began. However, Moren alleges that the harassment began sometime in December 2005, and it is undisputed that Moren complained to Allen during the March 3, 2006 meeting. At most, Moren waited a little over three months to make his first complaint.[2] Moreover, we reject the notion that simply because a victim of offensive behavior waits awhile to register a complaint, it necessarily means that the victim welcomed the behavior. In fact, a prudent individual would try to work it out with the offender before taking it to management, just as Moren seems to have done here.

Progress argues further that the harassment was not unwelcome because Moren participated in the boorish behavior. Just because Moren challenged the behavior does not necessarily mean he welcomed it. Moren's alleged "participation" was reasonable, since no self-respecting person would allow such behavior to go unchallenged. Therefore, we find that the harassment was unwelcome. Next, we address whether the harassment was because of Moren's gender.

The Supreme Court held in *Oncale* that the critical issue in determining whether the alleged abuse amounts to harassment because of the plaintiff's gender is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U .S. at 80 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). It is insufficient to show merely that the "words used have sexual content or connotations." *Id.*

The fact that Grosseibl and Moren are both heterosexual males attenuates the argument that the harassment was because of Moren's gender. Plus, there is no evidence to show that male employees at Progress were treated differently than female employees, or were exposed to disadvantageous conditions to which female employees were not exposed. No such evidence was presented probably because there were no female employees in the linemen crew to serve as points of comparison.

Moreover, in his deposition, Moren testified, "I don't think Mr. Grosseibl thought much of me as a person .... He had it out personally against me .... He attacked me personally, not against my work." (Moren Deposition at 95, 97–98). Moren also testified that Grosseibl "kind of, like, singled me out. I mean, he went out of his way to take this out on me." (Moren Deposition at 135). Moren also testified that he was called other names that do not have sexual connotations, such as "asshole" and "dumbass." (Moren Deposition at 99). On the other hand, Grosseibl testified, "As a journey lineman, it's my duty to harass the apprentices. That's how line work is. It's a fraternity. You haze them." (Grosseibl Deposition at 6). Grosseibl also testified that his harassment was not because of his gender. (Grosseibl Deposition at 35). These testimonies suggest anything but that Grosseibl's harassment was because of Moren's gender. Therefore, we find that there is no issue of material fact as to this required element.

*5 Alternatively, Moren also argues, somewhat cryptically, that Grosseibl's harassment was "because of Grosseibl's perception of Moren as a particular kind of man." (Doc. No. 20). We cannot decipher what Moren means here exactly. But, if we were to conjecture, it seems Moren is arguing that the harassment he allegedly suffered qualifies as Title VII sexual harassment because the harassment resulted from stereotypes associated with homosexuality. The Supreme Court has determined that discrimination based on stereotyping could, in certain situations, qualify as discrimination based on sex under Title VII. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 250, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (overruled on other grounds). In *Hopkins,* the partners at Price Waterhouse described Hopkins as:

"macho," suggested that she "overcompensated for being a woman," advised her to take "a course

at charm school," objected to her use of profanity "because it's a lady using foul language," explained that she "ha[d] matured from a tough-talking somewhat masculine hard-nosed [manager] to an authoritative, formidable, but much more appealing lady [partner] candidate," and was told that in order to improve her chances for partnership, she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry."

*Id.* at 235.

*Hopkins* is distinguishable from Moren. First, the discrimination in *Hopkins* was based on gender stereotyping, that is, stereotyping based on feminine characteristics that are traditionally associated with women. Hopkins was not perceived as feminine; rather, she was perceived as masculine. The Court stated that "[t]here were clear signs ... that some of the partners reacted negatively to Hopkins' [masculine] personality because she was a woman." *Id.* at 235. In light of this analytical framework, a claim under Title VII could be stated if Moren was able to show that the harassment he allegedly suffered was based on his perceived failure to conform to a masculine gender role. Moren, however, cannot.

Moren infers that because Grosseibl called him names and made statements that have homosexual connotations, that he was a victim of sexual harassment based on stereotyping. Although there is no shortage of adjectives to describe Grosseibl's inappropriate behavior toward Moren, the facts before us are insufficient to make such an inference. In order to properly make this inference, Moren would have to show at least that the harassment he allegedly suffered was based on his perceived failure to conform to a masculine gender role. Or, to put it another way, the facts must establish that Moren's behavior at work could indeed be reasonably perceived as feminine, and, therefore, as that of a homosexual. But as stated above, there is nothing to establish such failure on Morens part. In fact, Grosseibl testified that he knew Moren was not a homosexual and that he knew Moren liked women, which suggests that Moren did not act feminine at work. (Grosseibl Deposition at 135).

*6 Because Moren cannot establish the third required element of his Title VII hostile work environment

claim, we do not find it necessary to address the merits of the fourth and fifth elements. Therefore, we grant Progress summary judgment as to Count I.

### *Constructive Discharge*

In Count III, the last count, Moren brings a constructive discharge claim against Progress under Title VII and the FCRA. In order for the plaintiff to prove constructive discharge, he must demonstrate that "[ ]he involuntarily resigned from h[is] employer to escape intolerable and illegal employment requirements to which he or she was subjected to because of race, color, religion, sex, or national origin." *See Morgan v. Ford,* 6 F.3d 750, 755 (11th Cir.1993) (quoting *Henson,* 682 F.2d at 907). Moreover, "[t]he standard for proving constructive discharge is higher than the standard for proving a hostile work environment." *Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d 1208, 1231 (11th Cir.2001).

We held above that Moren's hostile work environment claim does not survive summary judgment because there was no genuine issue of material fact. A viable Title VII hostile work environment claim is the necessary predicate for Moren's Title VII constructive discharge claim. Therefore, Moren's constructive discharge claim necessarily cannot survive summary judgment.

### *Retaliation*

In Count II, Moren brings a retaliation claim against Progress under Title VII, the FCRA, and the Florida Whistleblower's Act ("FWA"). To establish a *prima facie* case of retaliation under Title VII, the plaintiff must prove that: 1) he participated in an activity that Title VII protects; 2) he suffered an adverse employment action; and 3) there is a causal connection between the participation in the protected activity and the adverse employment decision. *See Hurlbert v. St. Mary's Health Care Sys., Inc.,* 439 F.3d 1286, 1297 (11th Cir.2006). If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate reason for the adverse employment action. *Id.* "If the defendant does so, the

plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." *Id.*

### I. Protected Activity

Statutorily-protected activity includes complaining to superiors about alleged sexual harassment and filing complaints with the United States Equal Employment Opportunity Commission. *Johnson v. Booker T. Washington Broad. Serv.,* 234 F.3d 501, 507 (11th Cir.2000); *see also Meeks v. Computer Assocs. Intl.,* 15 F.3d 1013, 1021 (11th Cir.1994) (quoting *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1494 (11th Cir.1989)) ("To recover for retaliation, the plaintiff 'need not prove the underlying claim of discrimination which led to her protest,' so long as she had a reasonable good faith belief that the discrimination existed."). Moren engaged in statutorily-protected activity by filing a formal complaint with the Corporate Security Department at Progress, which, in turn, resulted in the termination of Grosseibl. Thus, Moren can meet the first element of his *prima facie* case for retaliation under Title VII.

### II. Adverse Employment Action

*7 The Supreme Court recently addressed the adverse employment action element of a Title VII retaliation claim in *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). In that case, the Court held that "the scope of [Title VII's] anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm," and, therefore, "is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 63–65. Therefore, "an employee need not show an adverse employment action, but rather, must show that 'a reasonable employee would have found the challenged action materially adverse.' " *Crosby v. Mobile County Personnel Bd.,* 2007 WL 245126, at *4 (11th Cir. January 30, 2007) (quoting *Burlington,* 548 U.S. at 68). In other words, the plaintiff must show that he suffered a materially adverse action that would dissuade a reasonable employee in the same position from filing his complaint.

Moren alleges that soon after he filed the complaint with the Corporate Security Department, he was subject to retaliation. First, upon return from his paid

vacation, District Operations Manager Dereck Roberts and Allen told Moren that he should not have gone "above their heads" to corporate, but that he should have left it to Roberts and Allen to resolve the problem. Second, Hanrahan, a lineman who was ranked above Moren, allegedly berated Moren by calling him "the rat" and threatened him that he was going to get fired for interfering with the "brotherhood." Moren and Hanrahan engaged in an altercation at a work-site during which Hanrahan again threatened Moren that he was going to be fired.

Following the altercation with Hanrahan at the work-site, Moren had a meeting with Allen and Todd Fountain, the union representative. At this meeting, Moren alleges that Fountain told him that if Moren did not resign, Progress would fire him, and that having a termination on his record would be detrimental to his career. Progress, perhaps rightly, argues that each of these actions taken against Moren do not amount to materially adverse actions. However, we find that the episodes, strung together and viewed as a whole within the broad boundaries set by the Supreme Court in *Burlington*, amount to materially adverse actions. Lastly, Allen issued a written reprimand against Moren and suspended him for three days without pay. Progress does not dispute that the suspension constitutes a materially adverse employment action.

Construing the facts in the light most favorable to Moren, and considering the totality of the circumstances, we find that Moren could show that the materially adverse actions discussed above would dissuade a reasonable employee in the same position from filing a complaint of harassment. Therefore, Moren can meet the second element of his *prima facie* case for retaliation under Title VII.

## III. Causal Connection

To establish a causal connection between Plaintiff's participation in a protected activity and Defendant's adverse employment action, Plaintiff must show that the "decision-maker[s] [were] aware of the protected conduct," and "that the protected activity and the adverse action were not wholly unrelated. *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir.1999) (citations omitted). For the purposes of establishing a *prima facie* case, "close temporal proximity" may be sufficient to show that the protected

activity and the adverse action were not "wholly unrelated." *Id.*

*8 It is undisputed that Progress was aware he filed a complaint with Allen and with the Corporate Security Department. Moreover, Moren's complaint to the Corporate Security Department and the materially adverse actions that followed are temporally proximate and not wholly unrelated. Therefore, we find that Moren has established a *prima facie* retaliation claim under Title VII.

## IV. Non–Retaliatory Reasons and Pretext

Once the plaintiff can establish a *prima facie* case, the defendant must then show a non-retaliatory reason for terminating plaintiff's employment. If this is satisfied by the defendant, the plaintiff must then show the non-retaliatory reason proffered by defendant is pretextual. *Chambers v. Walt Disney World Co.*, 132 F.Supp.2d 1356, 1368 (M.D.Fla.2001). In other words, if Progress articulates a legitimate non-retaliatory reason for its materially adverse actions, Moren must show that the stated reason is an attempt to cover Progress's true retaliatory intentions.

Progress argues that the three-day suspension without pay was a disciplinary action taken in response to the altercation Moren had with Hanrahan, in which Moren was at fault. Therefore, Progress argues, the three-day suspension was non-retaliatory. Progress asserts that Moren disobeyed Hanrahan's order to climb the pole, aggressively approached Hanrahan, and verbally disrespected Hanrahan's authority. Moren alleges that he told Hanrahan that he could not continue climbing up the pole because he felt ill. Given that Hanrahan was close friends with Grosseibl, and the fact that Hanrahan berated and threatened Moren after Grosseibl was fired, we find it reasonable for a trier-of-fact to find that Hanrahan ordered, and yelled at, Moren to climb the pole out of retaliatory intent. Moreover, according to both Moren's and Grosseibl's depositions, it is clear that safety was of a paramount concern at Progress. The factual issue remains, therefore, that if Moren was not responsible for getting Grosseibl fired, would Hanrahan have ordered Moren to continue climbing the pole even after Moren told him he was feeling ill?

Furthermore, in regard to the altercation that ensued between Moren and Hanrahan, although Progress

argues in its argument section of its motion that Moren approached Hanrahan in an aggressive manner, Progress states in the facts section that Moren and Hanrahan *"approached each other* in a 'brisk manner' and came 'within inches' of each other before stepping back." (emphasis added). If the altercation ensued as a result of mutual incitement, it appears perhaps that Moren was not the only one to blame. Only Moren, however, was disciplined. Therefore, a fact-finder must clarify the ambiguity, resolve the factual disputes surrounding the altercation, and determine whether the suspension was non-retaliatory.

Lastly, there is also an issue as to whether Progress would indeed have fired Moren if he did not resign. Moren alleges that Todd Fountain, the union representative, told him that, if he did not resign, Progress would fire him. Fountain also intimated that given Moren's young age, having such a negative employment record would be detrimental for Moren's career. The question, then, arises, how did Fountain know that Progress would fire Moren if Moren did not voluntarily resign? Did Progress ask Fountain to pressure Moren to resign to protect itself from employment liability? If so, was Progress's decision to fire Moren influenced in any way by Moren's complaint to Corporate Security? Or, another question that arises is, did Fountain, on behalf of the union, want Moren fired for getting a member of the "brotherhood" fired?

**\*9** Given the totality of the circumstances between March 7, 2006, when Moren registered the complaint with the Corporate Security Department, and April 10, 2006, when Moren was suspended without pay, we find that Progress has not met its burden of showing that the adverse employment actions were legitimate and non-retaliatory. But even if Progress's stated reasons are sufficiently non-retaliatory, the uncertainty surrounding that time period, including the altercation and the meeting with Fountain, sufficiently raises the specter of pretext. Thus, we find that there are genuine issues of material fact to be weighed by the trier-of-fact. Therefore, summary judgment is not proper for Moren's claim of retaliatory discharge under Title VII.

With respect to Moren's retaliation claim under the Florida Whistleblower's Act ("FWA"), section 448.101, Florida Statutes, a plaintiff alleging a violation of the FWA must establish the same three elements that are required to establish a *prima facie* case of unlawful retaliation under Title VII. *Sierminski v. Transouth Financial Corp.,* 216 F.3d 945, 950 (11th Cir.2000). However, unlike Title VII's unlawful retaliation provisions, the FWA requires the plaintiff to actually prove a violation of a law, rule, or regulation in order to succeed. *White v. Purdue Pharma, Inc.,* 369 F.Supp.2d 1335, 1337–39 (M.D.Fla.2005) (construing the FWA to require an actual violation of a law, rule, or regulation). Because Moren's Title VII hostile work environment and constructive discharge claims cannot survive summary judgment, there is no underlying violation of a law, rule, or regulation that supports his claim under the FWA.

### *Florida Civil Rights Act*

Florida courts have held that decisions construing Title VII are applicable when considering the Florida Civil Rights Act ("FCRA"), section 760.01, Florida Statutes, because the Act was patterned after Title VII. *Harper v. Blockbuster Entertainment,* 139 F.3d 1385, 1387 (11th Cir.1998) (citing *Ranger Ins. Co. v. Bal Harbour Club, Inc.,* 549 So.2d 1005, 1009 (Fla.1989)). "No Florida court has interpreted the [Florida Civil Rights Act] to impose substantive liability where Title VII does not." *Id.* Therefore, for the same reasons that Moren's claims for hostile work environment and constructive discharge fail under Title VII, the claims also fail under the FCRA. However, since Moren's claim for retaliation under Title VII survives summary judgment, his retaliation claim under the FCRA also survives.

### CONCLUSION

Moren fails to establish his claim for hostile work environment based on sexual harassment under Title VII and the FCRA. The facts clearly establish that no reasonable jury would find that the harassment Moren endured was because of his gender. Nor could any reasonable jury find that the harassment was because of stereotyping. Consequently, we find that Moren necessarily fails to establish his Title VII and FCRA constructive discharge claim. Lastly, we find that because there exists genuine issues of material

facts with regard to Moren's retaliation claim under Title VII, the FCRA, and the FWA, a reasonable jury could find that Progress's materially adverse actions was in retaliation to Moren's filing his complaint with the Corporate Security Department. Accordingly, it is:

**\*10 ORDERED** that the Defendant, Progress Energy, Inc.'s, motion for summary judgment (Doc. No. **11**) is **GRANTED** as to Count I and III, and

**DENIED** as to Count II, of the Plaintiff, Jared Moren's, complaint (Doc. No. 1).

**DONE AND ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 3243860

Footnotes

1    The "brotherhood" refers to the International Brotherhood of Electrical Workers Union.

2    There is a factual dispute as to when Moren first complained to Allen, his direct supervisor, about Grosseibl's harassment. Moren alleges that he complained to Allen on numerous occasions before the March 3 meeting. Allen denies this allegation. This dispute, however, is not material since we find that the harassment was unwelcome.

End of Document                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.